IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Velocity Express Corporation, et al., | Case No. 09-13294 (MFW) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF VINCENT A. WASIK IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

**VINCENT A. WASIK**, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am the Chief Executive Officer of Velocity Express Corporation, one of the debtors herein (together with the other debtor entities, the "Debtors").

2.     In accordance with the relevant resolution and/or authorization filed simultaneously with the Debtors' Chapter 11 petitions, I have been authorized to submit this Declaration in support of the applications and motions (collectively, the "First Day Pleadings")[2] which have been or will be filed with the Court in connection with the commencement of these Chapter 11 cases and to assist the Court and other parties in interest in understanding the circumstances that precipitated the commencement of these Chapter 11 cases.

---

[1] The following subsidiaries and affiliates (including the last four digits of their respective taxpayer identification numbers) have filed petitions for relief under chapter 11 concurrently with Velocity Express Corporation (5929): CD&L, Inc. (0958); Clayton/National Courier Systems, Inc. (6454); Click Messenger Service, Inc. (6117); Olympic Courier Systems, Inc. (3847); Securities Courier Corporation (0185); Silver Star Express, Inc. (8303); U-Ship International, Ltd. (3181); Velocity Express Leasing, Inc. (6733); Velocity Express, Inc. (4426); Velocity Systems Franchising Corporation (9687); VXP Leasing Mid-West, Inc. (0846); and VXP Mid-West, Inc. (0845).  The Debtors' principal address is One Morningside Drive North, Building B, Westport, CT 06880.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable First Day Pleading.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the Debtors' operations, financial condition and the industry as a whole. If I were called upon to testify, I would testify competently to the facts set forth herein.

4. In my capacity as Chief Executive Officer, I am responsible for the oversight of all of the Debtors' affairs and, as a consequence, I have detailed knowledge of all aspects of the Debtors' operations.

5. On September 24, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

6. The Debtors intend to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

A. The Debtors' Business Operations

7. Velocity Express Corporation ("Velocity") is a corporation organized under the laws of the State of Delaware. Each of the other Debtors is a direct or indirect wholly-owned subsidiary of Velocity.

8.     The Debtors are engaged in the business of providing "time definite logistics services." We operate primarily in the United States with limited operations in Canada. We currently operate in a single business segment.

9.     The Debtors have one of the largest nationwide networks of time definite logistics solutions in the United States and are a leading provider of distribution, scheduled and expedited logistics services. Our customers are comprised of multi-location, blue chip customers with operations in the healthcare, office products, financial services, commercial, retail & consumer products, transportation & logistics, energy and technology sectors.

10.     Our service offerings are divided into the following categories:

a)     distribution logistics, consisting of the receipt of customer bulk shipments that are divided and sorted at major metropolitan locations for delivery to multiple locations and more broadly defined time schedules;

b)     scheduled logistics, consisting of the daily pickup and delivery of parcels with narrowly defined time schedules predetermined by the customer; and

c)     expedited logistics, consisting of unique and expedited point-to-point service for customers with extremely time sensitive delivery requirements.

B.     History of the Company

11.     Our business began as United Shipping & Technology, Inc., a Utah corporation. On August 28, 1999, United Shipping & Technology, Inc. acquired from CEX Holdings, Inc. all of the outstanding shares of common stock of Corporate Express Delivery Systems, Inc. ("CEDS"), a provider of same-day delivery solutions. Subsequently, CEDS changed its name to UST Delivery Systems, Inc. and then to

Velocity Express, Inc. Since a corporate reorganization on January 4, 2002, we have operated as Velocity Express Corporation.

12. On August 17, 2006, we acquired CD&L, Inc. ("CD&L"). The board of directors saw a number of advantages in the acquisition of CD&L, including the of economies of scale resulting from the combination of the Debtors' business and that of CD&L, the increased geographic areas which could be served by the business with the acquisition of CD&L, the profitability of CD&L, increased efficiencies in operations of CD&L after introducing the Debtors' information technology and management techniques and increased market share.

C. Regulation and Safety

13. The Debtors business and operations are subject to various federal, state, and local regulations and, in many instances, require permits and licenses from these authorities. The Debtors hold nationwide general commodities authority from the Federal Highway Administration of the U.S. Department of Transportation to transport certain property as a motor carrier on an inter-state basis within the contiguous 48 states and, where required, hold statewide general commodities authority. The Debtors are also subject to regulation by the Federal Aviation Administration/ Transportation Safety Administration for cargo shipments intended for transport on commercial airlines.

14. In connection with the operation of certain motor vehicles, the handling of hazardous materials in our delivery operations and other safety matters, including insurance requirements, we are subject to regulation by the U.S. Department of Transportation and U.S. states, the Occupational Safety and Health Administration, state

occupational health and safety legislation and federal and state employment laws with respect to such matters as hours of work, driver logbooks and workers' compensation.

15.     As of the Petition Date, the Debtors employ approximately 1,332 persons of whom approximately 170 were primarily employed in various management, sales, and other corporate positions, approximately 1,093 were employed as warehouse workers and operations personnel, and 69 were employed in connection with operations in Canada. We also have independent contracts with approximately 2,400 drivers in the United States and 24 drivers in Canada.

### Debtors' Debt Structure

A.     Revolving Credit Facility

16.     On March 13, 2009, certain of the Debtors entered into a senior secured revolving credit agreement (as amended, the "Existing Credit Agreement") with a syndicate of lenders (the "Prepetition Lenders") led by Burdale Capital Finance, Inc. ("Burdale"). Burdale is the administrative agent under the Existing Credit Agreement, proceeds from which were used to satisfy outstanding borrowings under a prior financing with Wells Fargo Foothill, Inc. (the "Wells Fargo Facility").

17.     Pursuant to the Existing Credit Agreement, Burdale was granted a first-priority lien and security interest (the "Prepetition First Liens") in substantially all real and personal property of the Debtors (the "Collateral"). VEXP, Velocity Express, Inc. and Velocity Express Leasing, Inc. (collectively, the "Borrowers") are borrowers under the Existing Credit Agreement. VXP Mid-West, Inc., VXP Leasing Mid-West, Inc., CD&L, Inc., Clayton/National Courier Systems, Inc., Click Messenger Service, Inc.,

Olympic Courier Systems, Inc., Securities Courier Corporation, Silver Star Express, Inc. and Velocity Systems Franchising Corporation (the "Guarantors") are guarantors under the Existing Credit Agreement.

18.     The Existing Credit Agreement matures on the earlier of (a) March 13, 2012, (b) March 31, 2010, so long as the maturity date of the Senior Notes has not been extended past June 30, 2010 in a manner acceptable to Burdale, and (c) 90 days prior to the maturity date of the Modified Senior Notes if the maturity date of the Modified Senior Notes has been extended to a date later than June 30, 2010 in a manner acceptable to Burdale. The Existing Credit Agreement provides for up to $12.0 million of aggregate financing, $7.5 million of which may be in the form of letters of credit. As of the Petition Date, borrowings under the Existing Credit Agreement totaled approximately $7,495,412 (the "Prepetition Obligations").

B.      Modified Senior Notes

19.     In connection with the acquisition of the CD&L portion of the Debtors' business, the Debtors issued certain senior secured notes (the "Senior Notes") and warrants. The Senior Notes were issued pursuant to an indenture (the "Indenture") dated as of July 3, 2006 between the Debtors and Wells Fargo Bank, N.A., as trustee (the "Indenture Trustee"). The Senior Notes were issued bearing interest at issuance an annual rate of 12%. The annual interest rate increased to 13% in July 2007 and to 18% in May 2008. The Senior Notes were issued at a discount of 5.66% of face value. The net proceeds from the sale of the Senior Notes, after deducting the discount and estimated offering expenses payable by the Debtors, were approximately $63.5 million. The Senior Notes were issued in units comprised of (a) $1,000 in aggregate principal amount at

maturity of Senior Notes and (b) a warrant to purchase 345 shares of the Debtors' common stock exercisable at $1.45 per share. Approximately 98% of the Senior Notes are owned by ComVest Velocity Acquisition I, LLC ("ComVest"), a Delaware limited liability company formed by the owners of the Senior Notes (the "Senior Noteholders").

20.     The Senior Notes are guaranteed by the each of the domestic subsidiaries of the Debtors and were originally secured by a first-priority lien on collateral consisting of substantially all of the Debtors' tangible and intangible assets. The Senior Notes are secured by a validly perfected, first-priority lien on collateral consisting of substantially all of the Debtors tangible and intangible assets, junior only to the Prepetition First Liens of the Pre-Petition and Post-Petition Lenders. On December 22, 2006, the Indenture was amended to permit the Debtors to enter into the Wells Fargo Facility. In addition, the Indenture Trustee subordinated the liens securing the Senior Notes to the liens securing the Wells Fargo Facility, as required by the Indenture. The Debtors received consents from a majority of the Senior Noteholders pursuant to a consent solicitation.

21.     As of the Petition Date, the Debtors owed approximately $103 million under the Senior Notes. Prior to the commencement of these cases, purchased substantially all of the Senior Notes and has entered into an asset purchase agreement (the "APA") with the Debtors pursuant to which ComVest intends to purchase substantially all of the Debtors' assets through a combination of a cash bid, a credit bid and the assumption of certain liabilities.

### Events Leading to Debtors' Chapter 11 Filings

22.     The Debtors have been impacted by the significant downturn in the national economy over the past year just as so many other companies have been. Many of the Debtors' customers reduced their shipping expenses as their own sales decreased. As a result, over the past 12 months, the Debtors' revenues had dropped by approximately 35%.

23.     While the Debtors' revenues were dropping precipitously, the Debtors were unable to reduce their expenses to keep pace with the reduced revenues. The Debtors are parties to numerous long-term leases across the country that, absent these bankruptcy cases, they have been unable to shed. These lease obligations, together with the Debtors' obligations under their long-term debt, result in high fixed costs. Unable to reduce these expenses, the Debtors' operating performance has dramatically deteriorated as a result of the reduction in revenue.

24.     In addition to these financial woes, the Debtors are also party to at least ten (10) class actions and have received numerous assessments from state administrative agencies alleging that the Debtors improperly classified individuals as independent contractors rather than employees. While the Debtors dispute these allegations, the financial burden of fighting these claims and paying various settlements has exacerbated the Debtors' financial struggles.

25.     The Debtors filed these cases to effectuate the balance sheet restructuring embodied in the sale of their assets to ComVest or a competing bidder. The

Debtors believe that the reduced debt obligations resulting from this process will allow them to thrive going forward.

## First Day Pleadings

26.     As a result of my first-hand experience, and through my review of various materials and information, discussions with other members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (i) the necessity of obtaining the relief sought by the Debtors in their First Day Pleadings, (ii) the need for the Debtors to continue to operate effectively, (iii) the deleterious effects upon the Debtors of not obtaining such relief, and (iv) the immediate and irreparable harm to which the Debtors and their estates will be exposed immediately following the Petition Date unless the relief requested in the First Day Pleadings is granted without delay.

27.     The relief sought in the First Day Pleadings will minimize the adverse effects of the instant Chapter 11 cases on the Debtors and their estates. I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate effectively in Chapter 11 as debtors in possession.

28.     As described more fully below, the relief requested in the First Day Pleadings was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met and that the Debtors suffer no immediate and irreparable harm. I personally participated in the analysis that lead to the creation of each of the First Day Pleadings and assisted in the drafting and development of the relief requested therein. At all times, the Debtors' management and

professionals remained cognizant of the limitations imposed on debtors in possession, and in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' operability, pending a sale of their assets as a going concern.

B.    Motion for Joint Administration

29.    The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 cases will jointly affect each Debtor. Under these circumstances, the Debtors believe that the interests of the Debtors, their estates and creditors and other parties in interest would be best served by the joint administration, for procedural purposes only, of these Chapter 11 cases. The Debtors further believe that joint administration of these Chapter 11 cases will ease the administrative burden on the Court and all parties in interest and will protect creditors of the respective estates against potential conflicts of interest. For these reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors and therefore should be approved.

C.    Application to Retain Kurtzman Carson Consultants LLC

30.    By this application, the Debtors seek entry of an order authorizing the Debtors to retain Kurtzman Carson Consultants LLC ("Kurtzman") as their claims and noticing agent ("Agent"). Upon information and belief, Kurtzman is an experienced Agent and is frequently used by debtors in Chapter 11 cases of comparable size to these cases, and I believe Kurtzman is well qualified to serve as Agent in these cases. The employment of Kurtzman will also provide the Debtors with efficient management of the

claims and noticing processes in these cases, leaving the Debtors' management and professionals to focus on the Debtors' efforts to maximize the value of their estates.

D.  Motion to Approve Continued Use of Cash Management System

31.    By this motion, the Debtors seek entry of an order authorizing the continued use of their existing cash management system and bank accounts and business forms.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor in possession accounts and provide new business forms and stationary.  The Debtors also request the Court waive the requirements of Bankruptcy Code Section 345(b) on an interim basis and permit the Debtors to maintain their deposits in their accounts in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under Bankruptcy Code Section 345(b) on a final basis.

32.    As described in detail in the motion, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System").  To lessen the disruption caused by the bankruptcy filings and to maximize the value of their estates in these Chapter 11 proceedings, it is vital to the Debtors that they maintain their Cash Management System.

33.    The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this Cash Management System is vital to prevent undue disruption to the Debtors' business operations while protecting the

Debtors' cash for the benefit of the bankruptcy estates. Substantially disrupting their current cash management procedures would impair the Debtors' operations and their ability to optimize their business performance.

34. In light of the foregoing, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be granted.

E. Motion for Interim Order Deeming Utilities Adequately Assured

35. By this motion, the Debtors seek entry of interim and final orders prohibiting utility companies (the "Utility Companies") from terminating services on account of the non-payment of prepetition invoices, deeming the Utility Companies to be adequately assured of future payment and establishing procedures to determine additional adequate assurance.

36. The Debtors propose to deposit a sum equal to fifty percent (50%) of the Debtors' estimated monthly cost of utility service (the "Utility Deposit") into an interest-bearing, newly created segregated account, with such Utility Deposit to be held in escrow, pending further order of the Court.

37. In the operation of their businesses, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, trash service, electricity, gas, propane, and telephone service. Prior to the Petition Date, on an annual basis, the Debtors spend approximately $1,492,423 for various utility services, with an average monthly cost of approximately $124,368.

38.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' Chapter 11 efforts. Indeed, any disruption to the Debtors' locations by virtue of the cessation of utility services by the Utility Companies could bring the Debtors' operations to a grinding halt. Should one or more of the Utility Companies refuse or discontinue service even for a brief period, the Debtors' operations would be severely disrupted. Such an interruption would damage customer relationships, revenues, and profits and would ultimately adversely affect the Debtors' Chapter 11 efforts, to the detriment of their estates, creditors, and employees. It is therefore critical that utility services provided to the Debtors continue uninterrupted.

39.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be approved.

F.     Motion to Pay Employee Wages and Related Items

40.     Pursuant to this motion, the Debtors are seeking authority to honor and pay all prepetition wages, salaries and other accrued compensation, and to continue to honor certain other policies, programs and benefits the Debtors provide to their employees in the ordinary course of business. The Debtors estimate that as of the Petition Date, they currently owe approximately $4.33 million on account of prepetition wage and benefits obligations.

41.     The Debtors have a current workforce of approximately 1,263 employees and 13 temporary employees. The Debtors also use the services of 2,424 of independent contractors who are drivers and are critical to the Debtors' business

operations. The vast majority of these individuals rely exclusively on their full compensation to pay their daily living expenses, and these individuals will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid obligations owing to them. The Debtors believe that if they are unable to honor all such obligations immediately, morale and loyalty will be jeopardized at a time when such support is critical to the Debtors' Chapter 11 efforts.

42. The uninterrupted continuation of the Debtors' business operations is critically dependent upon a stable work force. The Debtors believe that any significant number of departures or deterioration in morale at this time will have an immediate and substantial adverse impact on the Debtors' businesses and result in immediate and irreparable harm to the Debtors' estates and their creditors. There is a real, immediate risk that if the Debtors are not authorized to continue to honor their prepetition employee obligations in the ordinary course, neither the employees nor the independent contractors would support and maintain the Debtors' business operations, thereby crippling such operations and instantly destroying the Debtors' prospects of successfully prosecuting these Chapter 11 cases. Consequently, the Debtors strongly believe that it is essential that they be permitted to pay their employees, temporary employees and drivers their prepetition wages and continue with their ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.

G.    Motion to Pay Critical Vendors To The Debtors

43. Pursuant to this Motion, the Debtors seek entry of an interim and final order authorizing the Debtors, in their discretion, to pay the prepetition claims of certain vendors (the "Critical Vendors") for providing (i) essential goods to the Debtors

that were received by the Debtors before the Petition Date and/or (ii) essential services that were rendered to the Debtors before the Petition Date.

44.     The Debtors believe that payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because the Critical Vendors are the only source from which the Debtors can procure certain goods and services within a timeframe and at a price that will permit the Debtors to continue their businesses.  A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtors post-petition, and may force the Debtors to obtain such goods and services elsewhere at a higher price or not of the quantity or quality required by the Debtors.

45.     The Debtors consulted with appropriate members of their management team to identify those vendors that are most likely essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether certain customizations prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) if a vendor is not a sole provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured, and (d) whether a vendor meeting the standards of (a) or (b) is likely to refuse to continue providing goods or services to the Debtors post-petition if its prepetition balances are not paid.

46.     The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to the Debtors on terms that are as or more favorable to the Debtors as the

most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the six (6) months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor.

47. After carefully assessing the universe of vendors against the foregoing criteria, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtor in the interim is approximately $200,000 the duration of these chapter 11 cases.

H.    Motion to Reject Certain Leases

48. By this Motion, the Debtors respectfully request the entry of an order authorizing the Debtors' rejection of the Leases with respect to the Closed Locations (the "Rejected Leases"), effective as of the date the Debtors surrender the keys to the landlords (the "Landlords") for the Closed Locations and unequivocally indicate their intention to abandon the Closed Locations (the "Rejection Date") as of the Petition Date. The Debtors also seek authority to abandon any furniture, fixtures and equipment ("FF&E") or other materials (collectively, the "Abandoned Property") in the Closed Locations upon rejection.

49. The Debtors have surrendered the keys and the premises to the Landlords and unequivocally notified the Landlords of their intent to reject the Rejected Leases and will serve this Motion upon the Landlords. Furthermore, the Debtors waive any right to withdraw the Motion prior to the hearing on the Motion.

50. For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be approved.

I. DIP Financing Motion

51. By this motion, the Debtors request entry of interim and final orders authorizing, among other things, the Debtors to obtain postpetition financing pursuant to the terms set forth in the Debtor-In-Possession Credit Agreement (the "Postpetition Credit Agreement"), in the principal amount not to exceed $14,000,000 less the amount of any Prepetition Obligations from Burdale Capital Finance, Inc..

52. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses without the funding provided for in the Postpetition Credit Agreement. In that regard, the Debtors have an immediate need to obtain financing in order to permit, among other things, the continued operation of their businesses, to maintain business relationships with its employees, suppliers and customers and to satisfy other working capital needs. Without the proposed financing, the Debtors will not have the funds necessary to pay payroll, payroll taxes, inventory suppliers, overhead, rent, utilities and other expenses necessary for the continued postpetition operations of the Debtors' businesses and the management and preservation of the Debtors' assets and properties. The relief requested in this motion is necessary to avoid immediate and irreparable harm and injury to the Debtors' estates.

53. Prior to agreeing to the terms of the Postpetition Credit Agreement, the Debtors explored various options for obtaining postpetition financing and made a

concerted, good-faith effort to obtain credit on the most favorable terms available. Under the circumstances, the Debtors were unable to obtain financing on terms more favorable than those offered pursuant to the Postpetition Credit Agreement.

54.     In addition to the Postpetition Credit Agreement, ComVest has provided a Guaranty dated September 24, 2009 of certain obligations of the Debtors to the Post-Petition Lenders under the Postpetition Credit Agreement. Such Guaranty is junior only to the Prepetition and Postpetition Liens of the Lenders pursuant to the Postpetition Credit Agreement. Without the Guaranty, the Lenders would not have provided the DIP financing.

55.     The Postpetition Credit Agreement has been negotiated in good faith and at arm's length. The Debtors submit that the terms of the Postpetition Credit Agreement, the terms of the Debtors' use of cash collateral and the Debtors' grant of adequate protection are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by fair consideration.

56.     The Guaranty has been negotiated in good faith and at arm's length. The Debtors submit that the terms of the Guaranty, the terms of the Debtors' use of cash collateral and the Debtors' grant of adequate protection are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by fair consideration.

J.    Motion to Approve Bid Procedures[3]

57.    By their motion, the Debtors seek entry of an order (i) approving the Bid Procedures, (ii) approving the form and manner of notice of the Auction and Bid Procedures, (iii) scheduling the Sale Hearing and objection deadline with respect to the Asset Sale, (iv) approving the procedures for the assumption and assignment of executory contracts and unexpired real property leases; and (v) granting the such other and further relief as is just and proper (the "Bid Procedures Motion").

58.    The Debtors and ComVest, the proposed purchaser (the "Purchaser"), are parties to the Asset Purchase Agreement. As of the Petition Date, the Debtors owe the Senior Noteholders approximately $103 million, secured by liens on substantially all of the Debtors' Purchased Assets (the "Notes Liens"), which Notes Liens are subject to the Prepetition First Lien pursuant to the Credit Agreement and, as proposed in the DIP Financing Motion to the Postpetition Liens of the Lenders. Pursuant to the Asset Purchase Agreement, the Debtors propose to sell, assign and transfer the Purchased Assets to the Purchaser for the Purchase Price (as defined in the Asset Purchase Agreement), subject to higher and better offers, and free and clear of liens, claims, encumbrances, and interests other than the Assumed Liabilities (as defined in the Asset Purchase Agreement), with such encumbrances to attach to the proceeds of the Asset Sale.

59.    Following its engagement, Scura conducted due diligence on the Debtors. On March 26, 2009 Scura met in person with the Debtors' management to

---

[3] All capitalized terms not defined in this section K shall have the meaning ascribed to them in the Asset Purchase Agreement.

continue such due diligence. Scura subsequently prepared a "teaser" describing the Debtors based upon public information for use in contacting potential buyers. At that time, Scura also prepared an initial list of financial and strategic parties who might potentially have an interest in investing in the Debtors or purchasing their assets.

60.     On March 31, 2009, the Special Committee, Scura and counsel to the Special Committee commenced a series of weekly conference calls in which Scura updated the Special Committee on efforts undertaken and developments over the course of the prior week and received instructions from the Special Committee.

61.     On April 2, 2009 Scura began contacting potential buyers by email and telephone. Through April and May, Scura worked at continuing to contact these potential buyers. Approximately 120 potential buyers were contacted. During April and May, Scura worked with the Debtors to gather due diligence materials and prepare an electronic data room for use by bidders who expressed interest and entered into a confidentiality agreement. The data room was ready on June 1. Three parties executed confidentiality agreements and were provided access to the data room at that time.

62.     In accordance with the Sale Covenant set forth in the Existing Credit Agreement, the Debtors initiated a process to attempt to sell the Debtors, all or substantially all of their assets or the Senior Notes (a "Transaction"). To that end, Velocity appointed a special committee (the "Special Committee") of independent members of the board of directors (the "Board"), consisting of Richard A. Kassar and John J. Perkins, to oversee the sale process. The Special Committee, on or about March 18, 2009, engaged the firm of Scura, Rise & Partners Securities, LLC ("Scura") to act as

exclusive financial advisor to the Committee to assist it in attempting to effectuate a Transaction. The Special Committee also engaged independent legal counsel to assist it in its work. The company made an independent decision when other efforts to restructure failed that a sale transaction was the only way to preserve the going concern value and was in the best interest of the creditors and the company.

63.     In response to the opportunity created by the Debtors' obligation to conduct the sale process, a group led by MGC Global, LLC and existing management of the Company, including Vincent A. Wasik, Chief Executive Officer; Edward W. Stone, Chief Financial Officer; Jeffery Hendrickson, President and Chief Operating Officer; Andrew Kronick, Executive Vice President; Kay Durbin, Executive Vice President Workforce Management; Alexander Paluch, Chief Technology Officer and Mark Carlesimo, General Counsel, (collectively, the "Management Group") made a proposal on March 19, 2009 to purchase substantially all of the assets of the Company, subject to certain liabilities including its senior secured revolving credit facility with Burdale.

64.     The Sale Covenant required that a letter of intent for a Transaction be executed by June 21, 2009, which letter of intent, under the terms of the Sale Covenant, would be subject to requisite approvals and consents including governmental consents and the approval of Burdale, the Noteholders, and the Debtors' stockholders. On June 23, 2009, Velocity announced that it had entered into a letter of intent for a Transaction with the Management Group, subject to a number of conditions, including among other things financing, definitive documentation, and the approval of the Noteholders and the Company's preferred and common stockholders. There was no obligation on the part of the Debtors to negotiate exclusively with the Management

Group. The Management Group was entitled to reimbursement of its expenses, up to a maximum of $150,000, if another transaction were accepted.

65.     As of July 31, 2009, the Special Committee authorized the Debtors to enter into a Recapitalization Agreement with the Management Group setting forth the terms of a transaction. The Recapitalization Agreement presumed that an entity formed by the Management Group, MCG Acquisition LLC ("Newco"), would be successful in (a) securing financing, and (b) entering into agreements with holders of the Senior Notes to purchase the Senior Notes and the related warrants held by the Senior Noteholders, for an aggregate purchase price, assuming all Notes were purchased, of $10 million in cash plus, if the Recapitalization Transactions were consummated, shares of Common Stock of the Company equal to 10% of the Common Stock of the Company outstanding after giving effect to the Recapitalization Transactions.

66.     On August 14, 2009, Newco terminated the Recapitalization Agreement. However, ComVest had become actively engaged in the process of finding an investor and continued to explore investment opportunities with respect to the Debtors. ComVest proceeded to acquire approximately 98% of the Senior Notes and ultimately decided to pursue an acquisition of substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code. To preserve the institutional knowledge possessed by the Management Group so as to maximize the likelihood of the Debtors continuing as a going concern ComVest reached an agreement with the Management Group with respect to an equity sharing arrangement for members of management by which the Management Group will hold 20% of the Purchaser.

Shortly before the Petition Date, the independent Board approved the entry by the Debtors into the APA.

67.    The Debtors desire to receive the greatest value for their Assets. The Debtors believe the terms of the APA are fair and reasonable and reflect the highest and best value for the Purchased Assets. Nevertheless, the Debtors intend to place the APA to the test of the broader public marketplace to determine whether higher and better offers are generated for the Purchased Assets. Accordingly, the Bid Procedures (as summarized in the Bid Procedures Motion) were developed consistent with the Debtors' need to expedite the sale process, given the continuing deterioration of the business but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Purchased Assets while affording appropriate protection to the Purchaser. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Purchased Assets by financially-capable, motivated bidders who are likely to close a transaction, while simultaneously discouraging non-serious offers and offers from persons the Debtors do not believe are sufficiently capable or likely to actually consummate a transaction.

68.    Along with the Debtors' professionals, I participated in the extensive negotiations between the Debtors and ComVest. The Debtors and ComVest are not related parties and have not engaged in any collusion in relation to the proposed sale. In connection with the sale process, the Debtors have consulted with their advisers, evaluated their strategic alternatives and acted with the intent of obtaining the best result possible for their estates, both in maximizing value for benefit of all constituent and in

reaching a result that best fits the Debtors' financial and business needs. The Pre-Petition and the Post-Petition Lender, by and through their counsel and on behalf of their constituents, have been actively involved in the negotiations of APA with ComVest and their input has been incorporated in the APA and the Bid Procedures for which the Debtors seek authority from the Court.

69.     In recognition of the benefit to the estates of having ComVest, as Purchaser, enter into the APA and serve as a floor against which other interested parties may submit higher and better bids , the Debtors have agreed to pay the Break-Up Fee and Expense Reimbursement to the Purchaser as described as set forth in the APA. I, along with the Debtors believe it is appropriate and reasonable to compensate the Purchaser for undertaking the efforts and expenditures to negotiate the APA, establish a "floor" bid for the Purchased Assets, as defined in the APA and establish the terms for the sale and assignment of the Debtors' Purchased Assets in the event a sale is made to another purchaser. I further believe that extending the bid protections, including the Break-Up Fee and the Expense Reimbursement to the Purchaser as set forth the in the APA is in the best interest of the estates and their creditors and is an exercise of sound business judgment. The bid protections provide a substantial benefit to the estates and credit

70.     By these chapter 11 cases, the Debtors hope to gain Court approval of the APA in the context of an auction sale pursuant to Section 363 of the Bankruptcy Code. ComVest has agreed to act as the stalking horse pursuant to the terms of the APA. The APA contemplates a sale of substantially all of the Debtors' assets (the "Purchased Assets") and assumption of certain liabilities and contains certain bid protections that were a necessary inducement to ComVest's willingness to act as a stalking horse in these

cases. The Debtors will be seeking approval of those bid protections in the context of sale process. The proposed sale of the Purchased Assets is in the best interest of the Debtors' estates. The Debtors, in consultation with their professionals have determined that the proceeds from the proposed sale, or from any subsequent higher or better offer, of the Purchased Assets will exceed the proceeds realized through a liquidation. A liquidation process would undoubtedly take longer to accomplish and the Debtors' estates would likely incur unpredictable costs in consummating a liquidation. Moreover, in my business judgment, the real value in the Purchased Assets is the continuation of the business as a going concern by preserving the critical relationships between the Debtors, their customers, employees and independent contractors. I have been advised informed and do believe that a piecemeal liquidation would never capture that essential value of the Debtors and that the best way to maximize value for the benefit of the Debtors' estates and its creditors is in maintaining the Debtors' business as going concern pending a sale.

71.     Furthermore, he Debtors submit that implementation of the Bid Procedures will not chill the bidding for the Purchased Assets. Quite to the contrary, I believe that the approval of the Bid Procedures is in the best interests of the Debtors, their estates and their creditors in that it provides a structure and format for other potentially interested parties to formulate a bid for the Purchased Assets. Failure to approve the Bid Procedures may jeopardize the sale to the Purchaser to the detriment of the Debtors' creditors, employees, customers and vendors.

72.     In light of the foregoing, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be granted.

K.    Motion to Sell Substantially All of the Debtors' Assets

73.    By this motion, the Debtors are seeking authority to, among other things, sell substantially all of their assets free and clear of liens, claims, encumbrances, and interests and approve the APA with respect thereto.

74.    Pursuant to the APA, the Debtors propose to sell, assign and transfer the Assets to the Purchaser, free and clear of liens, claims, encumbrances, and interests, with such encumbrances to attach to the proceeds of the Sale, if any, subject to higher and better offers. Each of the Debtors are duly authorized to sell the Assets during these bankruptcy cases. Under the APA, the Purchaser (as the designee of the Senior Noteholders) is proposing to "credit bid" for the Assets as allowed pursuant to Section 363(k) of the Bankruptcy Code, assume certain liabilities, provide cash and pay an amount equal to the Obligations, as defined in the DIP Credit Agreement and the Obligations outstanding under the Burdale Credit Agreement, as more fully set forth in the APA that is attached as Exhibit "A" to the Bid Procedures Motion..

75.    The Debtors have determined that it is in the best interest of their estates to proceed with the Purchaser (hereinafter defined) as the stalking horse bidder pursuant to the APA since, among other reasons, in the Debtors' judgment, the Purchaser's bid pursuant to the APA constitutes the highest and best offer for the Debtors' Assets. Further, the Purchaser has indicated that it intends to continue the Debtors' enterprise as a going concern and has agreed to assume various liabilities, including satisfaction of outstanding trade payables as described in the APA.

76.     As set forth in the Bid Procedures Motion, the Debtors propose to subject the transaction embodied in the APA to higher and better offers.  If no such offer is received, however, the Debtors respectfully submit that approval of the sale to the Purchaser is reasonable and appropriate, and that it will maximize the value realized for the benefit of all of the stakeholders in the Debtors' estates.

77.     The Debtors have proposed the sale of the Assets after thorough consideration of viable alternatives, and have concluded that the sale is supported by a number of sound business reasons.  The Debtors cannot sustain a stand-alone operational reorganization based on, among other things, the level and structure of the Debtors' secured debt, and the potential liabilities arising out of the numerous class actions and assessments from governmental agencies alleging that the Debtors improperly characterized certain service providers as independent contractors rather than employees. Hence, the Debtors have determined, with the full support of their prepetition and post-petition secured lenders, that a sale of the Debtors' Assets provides the best and most efficient means for the Debtors to maximize the value of their estates.

78.     In light of the foregoing, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be granted.

## Conclusion

79.     For the reasons stated herein and in each of the First Day Pleadings filed concurrently or in connection with the commencement of these cases, I respectfully

request that each of the First Day Pleadings be granted in their entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed this 24th day of September 2009 at Westport, Connecticut.

Vincent A. Wasik
Chief Executive Officer