# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Velocity Express Corporation, et al., | Case No. 09-13294 (MFW) |
| Debtors.[1] | (Joint Administration Requested) |

## DEBTORS' EMERGENCY MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AND BANKRUPTCY RULE 4001 (i) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING, (ii) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (iii) AUTHORIZING USE OF CERTAIN CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION, (iv) GRANTING OTHER RELATED RELIEF AND (v) SCHEDULING AN INTERIM AND FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Velocity Express Corporation ("VEXP") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, hereby move this Court for the entry of an order pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, and Federal Rules of Bankruptcy Procedure 4001 and 9014, (i) authorizing the Debtors to enter into a post-petition financing transaction, (ii) granting liens and superpriority claims, (iii) authorizing the Debtors' use of cash collateral pursuant to 11 U.S.C. § 363 and providing adequate protection, (iv) granting other related relief and (v) scheduling an interim and final hearing pursuant to Bankruptcy Rule 4001 (the "Motion"). In support of the Motion, the Debtors rely on the Declaration of Vincent A. Wasik, the Chief Executive Officer of VEXP, in Support of

---

[1] The following subsidiaries and affiliates (including the last four digits of their respective taxpayer identification numbers) have filed petitions for relief under chapter 11 concurrently with Velocity Express Corporation (5929): CD&L, Inc. (0958); Clayton/National Courier Systems, Inc. (6454); Click Messenger Service, Inc. (6117); Olympic Courier Systems, Inc. (3847); Securities Courier Corporation (0185); Silver Star Express, Inc. (8303); U-Ship International, Ltd. (3181); Velocity Express Leasing, Inc. (6733); Velocity Express, Inc. (4426); Velocity Systems Franchising Corporation (9687); VXP Leasing Mid-West, Inc. (0846); and VXP Mid-West, Inc. (0845). The Debtors' principal address is One Morningside Drive North, Building B, Westport, CT 06880.

Chapter 11 Petitions and First Day Pleadings, filed concurrently herewith. In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. The statutory and legal predicates for the relief sought herein are 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3. On September 24, 2009 (the "Petition Date"), each of the Debtors filed a duly authorized voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

4. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5. No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

6. The Debtors have one of the largest nationwide networks of time definite logistics solutions in the United States and are a leading provider of distribution, scheduled and expedited logistics services. They operate primarily in the United States with limited operations in Canada.

-2-

## Debtors' Debt Structure

A.    Revolving Credit Facility

7.    On March 13, 2009, certain of the Debtors entered into a senior secured revolving credit agreement (as amended, the "Existing Credit Agreement") with a syndicate of lenders (the "Prepetition Lenders") led by Burdale Capital Finance, Inc. ("Burdale"). Burdale is the administrative agent (the "Prepetition Agent")under the Existing Credit Agreement, proceeds from which were used to satisfy outstanding borrowings under a prior financing with Wells Fargo Foothill, Inc. (the "Wells Fargo Facility").

8.    Pursuant to the Existing Credit Agreement, Burdale was granted a first-priority lien and security interest (the "Prepetition First Liens") in substantially all real and personal property of the Debtors (the "Collateral"). VEXP, Velocity Express, Inc. and Velocity Express Leasing, Inc. (collectively, the "Borrowers") are borrowers under the Existing Credit Agreement. VXP Mid-West, Inc., VXP Leasing Mid-West, Inc., CD&L, Inc., Clayton/National Courier Systems, Inc., Click Messenger Service, Inc., Olympic Courier Systems, Inc., Securities Courier Corporation, Silver Star Express, Inc. and Velocity Systems Franchising Corporation (the "Guarantors") are guarantors under the Existing Credit Agreement of the Borrowers and Guarantors are joint and several.

9.    The Existing Credit Agreement matures on the earliest of (a) March 13, 2012, (b) March 31, 2010, so long as the maturity date of the Senior Notes has not been extended past June 30, 2010 in a manner acceptable to Burdale, and (c) 90 days prior to the maturity date of the Modified Senior Notes if the maturity date of the Modified Senior Notes has been extended to a date later than June 30, 2010 in a manner

RLF1-3438729-1

acceptable to Burdale. The Existing Credit Agreement provides for up to $12.0 million of aggregate financing, $7.5 million of which may be in the form of letters of credit. As of the Petition Date, borrowings under the Existing Credit Agreement totaled approximately $7,495,412 (the "Prepetition Obligations").

B.     Modified Senior Notes

10.     In connection with the acquisition of the CD&L portion of the Debtors' business, the Debtors issued certain senior secured notes (the "Senior Notes") and warrants. The Senior Notes were issued pursuant to an indenture (the "Indenture") dated as of July 3, 2006 between the Debtors and Wells Fargo Bank, N.A., as trustee (the "Indenture Trustee"). The Senior Notes were issued bearing interest at issuance at an annual rate of 12%. As discussed below, the annual interest rate increased to 13% in July 2007 and to 18% in May 2008. The Senior Notes were issued at a discount of 5.66% of face value. The net proceeds from the sale of the Senior Notes, after deducting the discount and estimated offering expenses payable by the VEXP, were approximately $63.5 million. The Senior Notes were issued in units comprised of (a) $1,000 in aggregate principal amount at maturity of Senior Notes and (b) a warrant to purchase 345 shares of VEXP's common stock exercisable at $1.45 per share. Approximately 98% of the Senior Notes are owned by ComVest Velocity Acquisition I, LLC ("ComVest"), a Delaware limited liability company formed by the owners of the Senior Notes (the "Senior Noteholders").

11.     The Senior Notes are guaranteed by certain of VEXP's domestic subsidiaries and were originally secured by a first-priority lien (the "Notes Liens") on collateral consisting of substantially all of the tangible and intangible assets of VEXP and

-4-

its domestic subsidiaries. On December 22, 2006, the Indenture was amended to permit the Debtors to enter into the Wells Fargo Facility. In addition, the Indentured Trustee subordinated the Notes Liens securing the Senior Notes to the lien securing the Wells Fargo Facility, as required by the Indenture. The Debtors received consents from a majority of the holders of the Senior Notes pursuant to a consent solicitation. The Notes Liens remain subject to the Prepetition First Liens.

      12.    As of the Petition Date, the Debtors owed approximately $103 million under the Senior Notes. ComVest has entered into an Asset Purchase Agreement (the "APA") with the Debtors pursuant to which ComVest intends to purchase substantially all of the Debtors' assets through a combination of a cash bid and a credit bid of a portion of the Senior Notes.

## RELIEF REQUESTED

      13.    By this Motion, the Debtors request entry of an interim order (the "Interim Financing Order"), substantially in the form attached to this Motion as Exhibit B, and a final order (the "Final Financing Order"):[2]

> (a)    authorizing the Debtors to obtain postpetition financing (the "DIP Facility"), as set forth below and in the Amended Credit Agreement (the "Postpetition Credit Agreement"), substantially in the form attached hereto as Exhibit A, with Burdale as agent (the "DIP Agent") for the post-petition lenders (the "Postpetition Lenders"), with funds thereunder available for use in accordance with the budget (as amended, modified or updated in accordance with the Postpetition Credit Agreement, the "Budget")[3] and the other terms set forth in the Postpetition Credit Agreement;

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the Existing Credit Agreement and/or the proposed Interim Financing Order.

[3]  The Budget, a copy of which is annexed hereto as Exhibit C, is subject to further revision as may be agreed upon between the Postpetition Lenders and the Debtors.

(b) granting the DIP Agent and lender a superpriority administrative expense claim pursuant to § 364(c)(1) and security interests and liens pursuant to §§ 364(c)(2) and (3) and (d);

(c) authorizing the use of cash collateral of the Prepetition Lenders and the holders of the Senior Notes (the "Cash Collateral") and granting adequate protection;

(d) modifying the § 362 automatic stay to the extent set forth in the Interim Financing Order; and

(e) giving notice of and scheduling an interim and final hearing (the "Final Hearing") pursuant to Bankruptcy Rule 4001.

## BASIS FOR RELIEF

A.  Debtor's Postpetition Financing Needs

14.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses without the funding provided for in the Postpetition Credit Agreement and the use of Cash Collateral contemplated in the proposed Interim Financing Order. In that regard, the Debtors have an immediate need to obtain financing and use of Cash Collateral in order to permit, among other things, the continued operation of their businesses, to maintain business relationships with vendors and suppliers and to satisfy other working capital needs. Without the proposed financing and use of Cash Collateral, the Debtors will not have the funds necessary to pay payroll, payroll taxes, inventory suppliers, overhead, rent, utilities and other expenses necessary for the continued postpetition operations of the Debtors' businesses and the management and preservation of the Debtors' assets and properties. The relief requested in this Motion is necessary to avoid immediate and irreparable harm and injury to the Debtors' estates.

-6-

A.    The Critical Need for Post-Petition Financing

15.    As described more fully in the Wasik Declaration, the Debtors have an immediate need for post-petition financing to continue to finance their post-petition operations and pay administrative expenses.  Such financing is critical to preserve the going concern value of the Debtors' assets, thereby maximizing the returns to all creditors and stakeholders that will be obtained from the contemplated sale of the Debtors' assets.

16.    Because virtually all of the Debtors' assets are encumbered by the pre-petition liens and security interests of the Pre-Petition Senior Lenders and the Senior Noteholders, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries and day-to-day operating expenses, including, but not limited to, rent and utility obligations, all of which are vital to sustain normal course business operations.  Due to the nature and magnitude of the Debtors' operations, which are dependent upon uninterrupted access to necessary working capital, the Debtors' immediate access to the DIP Facility is essential to prevent irreparable harm to the Debtors' estates.  The DIP Facility also is necessary to provide assurance to employees, landlord, utilities and other parties that they will be paid on a timely basis for post-petition services.  Without the DIP Facility, the Debtors' day-to-day operations would come to a halt, a result that would be devastating as the Debtors attempt to maximize the value of their assets through an expedited sale process.

17.    The Debtors also submit that, other than the DIP Facility, there are no viable financing alternatives available to it under the circumstances.  The Debtors have been exploring financial alternatives for several years and are intimately familiar

-7-

with the lack of financing available to them. For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs and the liens of the Prepetition Lenders and the Senior Noteholders on the Collateral, the Debtors are convinced that other than the DIP Facility they would be entirely unable to obtain financing to address their urgent liquidity needs.

18.     Moreover, as noted, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Prepetition Lenders and the Senior Noteholders. Thus, even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their Chapter 11 cases at the outset.

19.     Thus, the Debtors are unable to obtain alternative post-petition financing through credit allowable as an administrative expense, or credit secured by liens on the Debtors' assets junior to the liens of the Prepetition Lenders and the Senior Noteholders. In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the financing provided by the DIP Facility is the most favorable under the circumstances and provides the Debtors the liquidity necessary to maintain the going

concern value of their business pending the conclusion of the Debtors' proposed sale process.

20.     The DIP  Facility, which is the product of arm's length negotiations between the DIP Agent, the Postpetition Lenders, the Senior Noteholders and the Debtors, provides the Debtors with continued financing pursuant to (i) the terms of the Postpetition Financing Agreement annexed hereto as Exhibit "A,", (ii) the terms of the proposed Interim Financing Order in the form annexed hereto as Exhibit "B" (pending approval of the DIP Facility on a permanent basis at the Final Hearing) and (iii) the Budget annexed hereto as Exhibit "C."

21.     The Debtors have attempted but were unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1), or pursuant to Bankruptcy Code sections 364(a), (b), or (c).

22.     Under the circumstances, no other source of financing exists on terms more favorable than those offered by the Postpetition Lenders pursuant to the Postpetition Credit Agreement.

23.     The Postpetition Credit Agreement and the Debtors' use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, Burdale and ComVest.  The Debtors submit that the terms of the Postpetition Credit Agreement, the terms of the Debtors' use of Cash Collateral and the Debtors' grant of adequate protection are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

B.   Proposed Postpetition Financing

24.   The salient terms of the proposed Postpetition Credit Agreement and the Debtors' use of Cash Collateral are as follows: [4]

  (i) Borrowers and Guarantors. Same as Existing Credit Agreement.

  (ii) Facility Amount. Revolving facility in an amount of up to $14,000,000 less the amount of the Prepetition Obligations (the "DIP Commitment").

  (iii) DIP Agent. Burdale.

  (iv) Maturity Date. The earliest of (a) the closing date of, or the termination of, the APA, (b) the date that is twenty-one (21) days after the date of the entry of the Interim Financing Order, if a Final Financing Order acceptable to DIP Agent is not entered on or prior to such date, (c) the entry of an Order confirming a plan of reorganization, (d) the date on which DIP Agent provides, via facsimile or overnight mail, written notice to counsel for Debtors and counsel for any Committee of the occurrence and continuance of an Event of Default, and (e) [December 7, 2009].

  (v) Interest/Letter of Credit Fee. The Postpetition Debt shall bear interest at a per annum rate equal to the "Base Rate" (as defined in the Loan Agreement) plus 6.00% per annum. The Base Rate shall be subject to a floor of 4.00% per annum. Letters of credit fee for letters of credit issued on or after the Filing Date shall be calculated as the average daily face amount of such outstanding letter of credit multiplied by 6.00% per annum

  (vi) Closing Fee/Other Fees. Debtors shall pay to Postpetition Agent, for the benefit of Postpetition Lenders, a closing fee (the "Closing Fee") in an amount equal to $175,000. The Closing Fee shall be fully earned and non-refundable upon the closing

---

[4]  To the extent that the terms set forth herein differ from the terms of the proposed Postpetition Credit Agreement or proposed Interim Financing Order, the Postpetition Credit Agreement and Interim Financing Order shall govern.

of the Postpetition Agreement. Debtors shall pay a success fee and prepayment fee which will be credited dollar for dollar against the obligation to pay such fees under the Prepetition Documents.

(vii) <u>Guarantors</u>. The Guaranty and all related security documents shall remain in full force and effect notwithstanding the entry of this Order and any subsequent orders amending this Order or otherwise providing for the use of Cash Collateral consented to by Agents and Lenders pursuant to section 363 or additional financing by Postpetition Agent and Postpetition Lenders pursuant to section 364 of the Bankruptcy Code. Each Guarantor is and shall remain liable for the guaranteed obligations under the Guaranty or the Canadian Guaranty, as applicable, including, without limitation, all Postpetition Debt, and any refinancing thereof. ComVest shall execute and deliver to Postpetition Agent the ComVest Guaranty and all security documents in connection therewith, pursuant to which ComVest shall guaranty the Aggregate Debt.

(viii) <u>Security Interests</u>. All loans made by the Postpetition Lenders to the Debtors are secured by: (a) pursuant to § 364(c)(1) of the Bankruptcy Code, a superpriority claim in these cases; (b) pursuant to §§ 364(c)(2) and (c)(3) of the Bankruptcy Code, a perfected first priority lien and security interest subject to the Prepetition First Liens and the permitted Liens and senior to the Notes Liens; and (c) a § 364(d) priming lien, in each case, subject to the Permitted Liens.

(ix) <u>Carve-Out</u>. Postpetition Lenders' liens shall be subject to a professional fee carve-out. With respect to each Carveout Professional: (1) shall equal an aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout Professional for the period commencing on the Filing Date and ending on the Termination Date and (ii) the aggregate amount of allowed fees and expenses that accrue during the period commencing on the Filing Date and ending on the Termination Date; (2) shall be reduced dollar-for-dollar by any payments of fees and

expenses to such Carveout Professional; and (3) shall be paid out of any prepetition retainer or property of the estate (other than property subject to an unavoidable lien in favor of the Prepetition Agent or the Postpetition Agent) before such payments are made from proceeds of the Postpetition Debt or the Aggregate Collateral. Further, Postpetition Agent shall have the right to subtract from the "Borrowing Base" and the "Maximum Advance Amount" (each as defined in the Loan Agreement) an amount equal to the sum of the aggregate amount of fees and expenses set forth in the Budget for the Carveout Professionals (minus amounts paid from time to time). Upon the Termination Date, and notwithstanding anything herein to the contrary, Postpetition Lenders shall provide Postpetition Debt to the Debtors in an amount equal to (a) the Carveout amount for each Carveout Professional determined in clause (1) above and (b) an amount equal to $25,000, which Postpetition Debt shall be used by the Debtors for the sole purpose of funding the Carveout Professionals after the Termination Date. Except as set forth in the preceding sentence, Postpetition Lenders shall have no obligation to fund any fees or expenses accrued on, prior to, or after the Termination Date.

(x) <u>Covenants</u>. The Postpetition Credit Agreement contains affirmative, negative and financial reporting covenants customary for facilities of this nature.

(xi) <u>Sale Covenants</u>. To effectuate the sale process for substantially all of the Debtors' assets, Debtors have agreed to: (i) obtain, on or before the 15th day after the Petition Date, a Court order approving the procedures for the sale of all or substantially all of Debtors' assets, (ii) conduct, on or before the 40th day after the Petition Date, an auction for the sale of all or substantially all of the Debtors' assets, (iii) obtain, on or before the 45th day after the Petition Date, a Court order approving the sale of all or substantially all of the Debtors' assets, and (iv) consummate, on or before the 50th day after the

Petition Date, a sale of all or substantially all of the Debtors' assets.

(xii)   <u>Events of Default</u>. At Postpetition Agent's election, (a) the occurrence and continuance of any Event of Default first arising after the Filing Date under the Loan Agreement; and (b) Debtors failure to comply with the covenants or perform any of their obligations in strict accordance with the terms of this Order.

(xiii)   <u>Modification of the Automatic Stay</u>. To the extent necessary to effectuate the provisions of the Interim Financing Order.

(xiv)   <u>Use of Cash Collateral</u>. Debtors are authorized to use Cash Collateral to the extent required to pay the expenses enumerated in the Budget as and when such expenses become due and payable. The Prepetition Lenders shall be provided with replacement liens (the "Prepetition Lenders' Replacement Liens") which shall be first priority liens subject only to the Postpetition Liens and the Permitted Liens. The holders of the Senior Notes shall be provided with replacement liens subject to the Prepetition First Liens and the Prepetition Lenders' Replacement Liens.

(xv)   <u>Section 506(c) Wavier</u>. Upon entry of the Final Order, waiver of potential claims against the Agents and Lenders under §506(c) of the Bankruptcy Code.

C.   <u>Provisions that Potentially Implicate Local Rule 4001-2</u>

25.   Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") requires that certain provisions contained in the proposed financing documents be highlighted.

(a)   The proposed Interim Financing Order contains a finding of fact that, upon entry of the Final Order, would bind the estates or other parties in interest with respect to the validity, perfection or amount of the Prepetition Liens or

-13-

the waiver of claims against the Prepetition Agent or the Prepetition Lenders. Notwithstanding the foregoing, an official committee appointed in these Chapter 11 cases (or other parties with standing) would have the period of time from the Petition Date to the date that is the earlier of (1) forty-five (45) days after the Petition Date and (2) the third business day preceding the date scheduled for the auction (as set forth in Paragraph 7(b) of the Interim Financing Order), to investigate such matters. (Interim Financing Order, ¶ 9(a)).

(b)     The proposed Interim Financing Order contemplates that upon the entry of the Final Order, the Prepetition Lenders will be granted liens on the Debtors' claims arising under Bankruptcy Code sections 544, 547, 548, 549, 550 and 553. (Interim Financing Order, ¶ 3(d)).

(c)     The proposed Interim Financing Order contemplates that upon entry of the Final Order, rights under Bankruptcy Code section 506(c) are waived. (Interim Financing Order, ¶ 6(g)).

(d)     The proposed Budget contemplates a $50,000 carveout for Committee Professionals.

26.     The provisions above are all justified under the circumstances of these cases in order to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing. The Postpetition Lender would not agree to provide the credit facility without the inclusion of such terms. In addition, the Debtors determined in the exercise of their sound business judgment that agreeing to such provisions was appropriate under the circumstances of these cases for several reasons, including, without limitation, the fact that (i) other adequate financing alternatives were unavailable, (ii) the value of the collateral is substantially less than the amount of the secured debt, (iii) the administrative expenses will be funded under the Postpetition Credit Agreement, and (iv) substantially all of the trade payables will be assumed pursuant to the APA. Further, because these cases will enable the sale of the Debtors' businesses as a going concern and

ComVest intends to credit bid under Section 363(k) of the Bankruptcy Code, the Debtors believe that (1) it is necessary for the investigation period to expire prior to the scheduled auction to satisfy the requirements of their lenders as Postpetition Lenders and the proposed Purchaser and (2) seeking an allowed claim for purposes of the proposed sale is appropriate under the circumstances.

**APPLICABLE AUTHORITY**

27.    It is vital to the success of the Debtors' Chapter 11 restructuring efforts that they immediately obtain access to sufficient postpetition financing and access to cash collateral. The preservation of the Debtors' business and jobs depends heavily on the expeditious approval of this Motion. Absent the Court's approval of the interim relief sought herein, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

A.    **The Debtors Satisfy the Requirements for Obtaining Credit Under Section 364(c) of the Bankruptcy Code**

28.    The Debtors propose to obtain financing under the Postpetition Credit Agreement by providing security interests and liens pursuant to sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtors in possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." *See In re Garland Corp.*, 6 B.R. 456, 461 n. 11 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa.),

*modified on other grounds*, 75 B.R. 553 (1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

29.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Code:

> (1) the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);
>
> (2) the credit transaction is necessary to preserve the assets of the estate; and
>
> (3) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores*, 115 RR. at 37-39; *see also In re St. Mary Hospital*, 86 RR. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. at 549.

30.    The Debtors attempted to identify other sources of postpetition financing to determine whether they could obtain debtor-in-possession financing on better terms than the terms contemplated in the Postpetition Credit Agreement. Based on current capital market conditions and discussions with potential lenders, the Debtors determined that post-petition financing on an unsecured basis or on a junior priority basis to prepetition secured parties would simply be unobtainable. Moreover, without post-petition financing, the Debtors would be unable to operate their business as a going concern, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts and liabilities. Finally, given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital markets, the Debtors believe the terms of the Postpetition Credit Agreement are fair, reasonable and adequate.

**B.    The Debtors Satisfy the Requirements for Obtaining**
**<u>Credit Under Section 364(d) of the Bankruptcy Code</u>**

31.    If a debtor is unable to obtain credit solely under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (*i.e.*, a "priming lien"). *See* 11 U.S.C. § 364(d). Section 364(d)(l) of the Bankruptcy Code authorizes a debtor-in-possession to incur superpriority senior secured debt or "priming" liens if: (i) the debtor is unable to obtain financing from another source, and (ii) the interests of the secured creditors whose liens are being primed by the post-petition financing are adequately protected. *See* 11 U.S.C. § 364(d)(1)(A) and (B). As noted above, the financing under the Postpetition Credit Agreement constituted the only viable financing option, and the priming liens are an essential part of the protections provided to the Postpetition Lenders thereunder. Moreover, as discussed below, the interests of the Senior Noteholders, whose liens are being primed, are adequately protected under the terms of the proposed Interim Financing Order.

### *Standards For Adequate Protection*

32.    The Bankruptcy Code does not explicitly define "adequate protection." However, Bankruptcy Code section 361 suggests that adequate protection may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the property, (ii) providing additional or replacement liens; or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property. *See* 11 U.S.C. § 361. The third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-by case basis, to determine what level of protection is appropriate to provide a secured party. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

-17-

33.     The goal of adequate protection is to protect a secured lender against a diminution in the value of its collateral during the reorganization process. *See, e.g.*, *In re Swedeland*, 16 F.3d at 564; *In re 848 Brickell Ltd.*, 243 B.R. 142, 148 (S.D. Fla. 1998). This is true whether the prepetition creditor is oversecured or undersecured; the protection to which the secured creditor is entitled is protection against any subsequent decrease in such creditor's interest in collateral that may be occasioned by the debtor's use thereof. *See* 11 U.S.C. § 361.

34.     Additionally, a debtor's proposed use of cash collateral and the use of funds from additional financing can enhance collateral value and provide adequate protection. *See In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) (noting the flexible nature of section 361(3) and observing case law support for the concept that an increase in the value of the collateral generated by the improvements resulting from the superpriority financing could constitute adequate protection). Indeed, courts have noted that "[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection." *In re Ralar Distrib., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994) (creditor had adequate protection where debtor's use of collateral allowed realization of more than liquidation value).

### Interests of the Prepetition Lenders are Adequately Protected

35.     The measures of protection provided to the Prepetition Lenders in the proposed Interim Financing Order, pursuant to and in accordance with sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, constitute adequate protection for any diminution in the value of their collateral resulting from, among other things, (i) the use of the Cash Collateral, (ii) the incurrence by the Debtors of the Postpetition Credit

Agreement and priming liens upon the collateral to the extent provided for in the Interim

Financing Order, (iii) the use, sale, lease, other disposition or depreciation of the

collateral, and (iv) the imposition of the automatic stay. Specifically, the proposed

Interim Financing Order provides that the Prepetition Lenders will receive:

| Prepetition Senior Lenders | First Priority Replacement Liens, subject to the Postpetition Liens and Permitted Liens, pursuant to Bankruptcy Code sections 361, 363(e) and 364(d). |
| Senior Noteholders | Second Priority Replacement Liens, subject to the Permitted Liens, the Prepetition First Liens, the First Lien Replacement Liens and the Postpetition Liens pursuant to Bankruptcy Code Sections 361, 363(e) and 364(d). |

36. Equally important, the Debtors' ability to obtain postpetition

financing via the Postpetition Credit Agreement ensures that the Debtors will be able to

operate their businesses during the course of the Chapter 11 process. By doing so, the

Debtors are preserving the value of the Prepetition Lenders' collateral by maintaining the

enterprise value of the Debtors' business operations. Absent such senior secured

financing, the Debtors would have no choice but to liquidate — which in no way would

be beneficial to the Prepetition Lenders. *See In re Ralar Distrib., Inc.*, 166 B.R. at 6

(finding that creditor had adequate protection where debtor's use of collateral allowed

realization of more than liquidation value).

37. Accordingly, the Debtors submit that the maintenance of the

Debtors' enterprise value in addition to the proposed replacement liens adequately protect

the Prepetition Lenders for any potential diminution in the value of their collateral

subsequent to the Petition Date.

RLF1-3438729-1

## C. No Comparable Alternative to the Postpetition Credit Agreement is Currently Available

38. The Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. The proposed terms of the Postpetition Credit Agreement are reasonable and adequate given the severe credit crisis that exists in today's market. Likewise, the various fees and charges required by the Postpetition Lenders under the Postpetition Credit Agreement were necessary to secure their agreement to provide the financing notwithstanding the volatility that exists in today's capital markets.

39. The terms and conditions of the Postpetition Credit Agreement were negotiated by the parties in good faith and at arm's length, and are fair and reasonable under the circumstances. Accordingly, the Postpetition Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code with respect to such agreement.

40. Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *cf. Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court."). In fact,

-20-

"[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the Postpetition Credit Agreement.

### D. Approval of the Postpetition Financing is in the Best Interests of the Debtors' Estates

41.     A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates, and will also have a detrimental effect on the collateral. Absent access to the funds contemplated in the Postpetition Credit Agreement and the use of the Prepetition Lenders' and Senior Noteholders' Cash Collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors. If the Debtors are unable to pay their ongoing obligations, they simply cannot operate.

42.     In contrast, the Debtors' access to the Postpetition Credit Agreement and continued use of Cash Collateral will ensure that the "going concern" value of their assets are preserved — a value substantially greater than the value that would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

43.     Accordingly, the Debtors submit that ample justification exists for the relief requested herein.

### E. The Court Should Modify the Automatic Stay

44. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Interim Financing Order contemplates the modification of the automatic stay as follows:

(i) Upon written notice of an Event of Default, without further notice or order of the Court, at Postpetition Lender's election: (a) the Postpetition Debt shall be immediately due and payable; (b) Postpetition Lender shall be entitled to apply or set off any cash in its possession or control to the Postpetition Debt until such Postpetition Debt is indefeasibly and finally paid in full (provided, however, that Postpetition Lender shall not apply or set off any cash in its possession or control until the fifth (5th) business day following the Termination Date); and (c) Debtors shall be prohibited from using any Cash Collateral for any purpose other than application to the Postpetition Debt until such Postpetition Debt is indefeasibly and finally paid in full.

(ii) On the fifth business day following written notice of an Event of Default: (a) at Postpetition Agent's election, without further order of the Court, Agents shall have automatic and immediate relief from the automatic stay with respect to the Aggregate Collateral and shall be entitled to exercise all rights and remedies available to them under the Prepetition Documents, the Postpetition Documents and applicable nonbankruptcy law with respect to the Aggregate Collateral; and (b) at Postpetition Agent's election, Debtors shall surrender the Aggregate Collateral and otherwise cooperate to assist Agents in the exercise of the rights and remedies available to Agents under the Prepetition Documents, the Postpetition Documents and applicable nonbankruptcy law with respect to the Aggregate Collateral (provided, however, that during the five (5) business day period following written notice of an Event of Default and the Termination Date and prior to the entry of the Final Financing Order, the Debtors and any other party in interest shall have the right to oppose such relief from the automatic stay; provided further, however, that during such five (5) business day period,

> Postpetition Agent and Postpetition Lenders shall
> have no obligation to advance Postpetition Debt to
> Debtors).

45.     Stay-modification provisions are standard features and often requirements of postpetition financing facilities.  Here, the above provisions are a requirement to the Debtors' ability to obtain postpetition financing.  Because the Debtors were unable to obtain postpetition financing from a party other than the Postpetition Lenders and the Debtors simply cannot operate their businesses without such financing, the Debtors submit that proposed automatic stay modification is reasonable under the present circumstances and should be approved.

## REQUEST FOR INTERIM RELIEF

46.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to sections 363 and 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  The Debtors submit that, for the reasons set forth herein, authority to obtain post-petition financing and use cash collateral on an interim basis as requested is necessary to avert immediate and irreparable harm to the Debtors' business.

## REQUEST FOR FINAL HEARING

47.     The Debtors further respectfully request that the Court schedule the Final Hearing and authorize them to serve a copy of the signed Interim Financing Order, which fixes the time and date for the filing of objections, by first-class mail upon:

-23-

(i) the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' list of thirty (30) creditors holding the largest unsecured claims on a consolidated basis; (iii) counsel to the Prepetition Agent; (iv) counsel to the Postpetition Agent; (v) counsel to the Official Committee of Unsecured Creditors, if and when formed; (vi) any party who filed a request for notices in these Chapter 11 cases pursuant to Bankruptcy Rule 2002 prior to the date set forth in the Interim Financing Order for service of notice of the Final Hearing; and (vii) any known lien holders of the Debtors. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[5]

## NOTICE

48.     Notice of this Motion has been given to (i) the United States Trustee for this District, (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis, and (iii) counsel to the agent for the Debtors' prepetition secured lenders and proposed post-petition secured lender.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

49.     The Debtors have not previously sought the relief requested herein from this or any other Court.

**WHEREFORE**, the Debtors respectfully request that this Court: (i) enter the Interim Financing Order granting the relief requested herein; (ii) schedule a Final

---

[5]  Local Rule 2002-1 (b) provides that "[i]n chapter 11 cases, all motions ... shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i) and all parties whose rights are affected by the motion. If an official unsecured creditors' committee has not been appointed, service shall be made on the thirty (30) largest unsecured creditors in the case in lieu of the committee."

RLF1-3438729-1

Hearing; (iii) following a Final Hearing, enter the Final Financing Order; and (iv) grant the

Debtors such other relief as is just and proper.

Dated: Wilmington, Delaware
September 24, 2009

Respectfully submitted,

By: _____

**RICHARDS, LAYTON & FINGER, P.A.**
Russell C. Silberglied, Esq. (No. 3462)
Chun I. Jang, Esq. (No. 4790)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:  (302) 651-7700
Fax: (302) 651-7701

-and-

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Thomas A. Pitta, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel:  (973) 597-2500
Fax: (973) 597-2400

*Proposed Counsel to Debtors
and Debtors In Possession*