IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Velocity Express Corporation, *et al.*, | Case No. 09-13294 (MFW) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION FOR ORDER (I)(A) AUTHORIZING AND SCHEDULING AN
AUCTION AT WHICH THE DEBTORS WILL SOLICIT HIGHER AND
BETTER OFFERS IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING
THE BIDDING PROCEDURES FOR SUCH SALE OF ASSETS, (C)
APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT AND
(D) APPROVING THE FORM AND SCOPE OF NOTICE OF THE BID
PROCEDURES RELATING TO THE AUCTION AND ASSET SALE; AND
(II) APPROVING PROCEDURES FOR ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Velocity Express Corporation ("VEXP") and its affiliated debtors and debtors-in-

possession (collectively, the "Debtors"), by and through their proposed undersigned counsel,

hereby move this Court (the "Motion") for entry of an order (I)(A) authorizing and scheduling an

auction (the "Auction") at which the Debtors will solicit higher and better offers in connection

with the sale of substantially all of the Debtors' assets (the "Asset Sale"), (B) approving the

bidding procedures (the "Bid Procedures") for the Asset Sale, (C) approving the Break-Up Fee

and Expense Reimbursement and (D) approving the form and scope of notice of the Bid

---

[1] The following subsidiaries and affiliates (including the last four digits of their respective taxpayer identification numbers) have filed petitions for relief under chapter 11 concurrently with Velocity Express Corporation (5929): CD&L, Inc. (0958); Clayton/National Courier Systems, Inc. (6454); Click Messenger Service, Inc. (6117); Olympic Courier Systems, Inc. (3847); Securities Courier Corporation (0185); Silver Star Express, Inc. (8303); U-Ship International, Ltd. (3181); Velocity Express Leasing, Inc. (6733); Velocity Express, Inc. (4426); Velocity Systems Franchising Corporation (9687); VXP Leasing Mid-West, Inc. (0846); and VXP Mid-West, Inc. (0845). The Debtors' principal address is One Morningside Drive North, Building B, Westport, CT 06880.

Procedures relating to the Auction and Asset Sale; and (II) approving procedures for assumption and assignment of certain executory contracts and unexpired leases; and (III) granting related relief. In support of the Motion, the Debtors rely on the Declaration of Vincent A. Wasik, the Chief Executive Officer of Velocity Express Corporation, in Support of Chapter 11 Petitions and First Day Pleadings (the "Wasik Declaration"), filed concurrently herewith. In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     The statutory and legal predicates for the relief sought herein are 11 U.S.C. §§ 105(a), 363 and 365.

## BACKGROUND

3.     On September 24, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

4.     The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5.     No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

6.     The Debtors have one of the largest nationwide networks of time-definite logistics solutions in the United States and are a leading provider of distribution, scheduled and expedited logistics services. They operate primarily in the United States with limited operations in Canada.

RLF1-3438863-1

7.    The Debtors have been impacted by the significant downturn in the national economy over the past year. Many of the Debtors' customers reduced their shipping expenses as their own sales decreased. As a result, over the past 12 months, the Debtors' revenues had dropped by approximately 35%. In addition, the Debtors are also party to approximately ten (10) class actions and have received several assessments from state administrative agencies alleging that the Debtors improperly classified individuals as independent contractors rather than employees.

8.    Additional information about the Debtors' businesses and the events leading up to the Petition Date may be found in the Wasik Declaration, which is incorporated herein by reference.

## RELIEF REQUESTED

9.    The Debtors commenced these chapter 11 cases in order to permit them to conduct a sale of their business as a going concern under Bankruptcy Code section 363(b).

10.    The Debtors have determined that it is in the best interest of their estates to proceed with the Purchaser (hereinafter defined) as the stalking horse bidder pursuant to the APA (hereinafter defined) since, among other reasons, in the Debtors' judgment, the Purchaser's bid pursuant to the APA constitutes the highest and best offer for the Debtors' Assets. Further, the Purchaser has indicated that it intends to continue the Debtors' enterprise as a going concern and has agreed to assume various liabilities, including satisfaction of outstanding trade, as described in the APA.

11.    In connection with the Debtors' sale efforts, the Debtors have established procedures (subject to approval by this Court) for the submission and consideration of bids, so that these procedures may promptly be communicated to interested parties.

12.    By this Motion, the Debtors respectfully request entry of an order (I)(A) authorizing and scheduling the Auction at which the Debtors will solicit higher and better offers in connection with the Asset Sale, (B) approving the Bid Procedures for the Asset Sale, (C)

approving the Break-Up Fee and Expense Reimbursement and (D) approving the form and scope of notice of the Bid Procedures relating to the Auction and Asset Sale; and (II) approving procedures for assumption and assignment of certain executory contracts and unexpired leases; and (III) granting the such other and further relief as is just and proper.

## Debtors' Debt Structure

A.    Revolving Credit Facility

13.    On March 13, 2009, the Debtors entered into a senior revolving credit agreement (as amended, the "Credit Agreement") with a syndicate of lenders (the "Prepetition Lenders") led by Burdale Capital Finance, Inc. ("Burdale"). Burdale is the administrative agent under the Credit Agreement, proceeds from which were used to satisfy outstanding borrowings under a prior financing with Wells Fargo Foothill, Inc. (the "Wells Fargo Facility").

14.    Pursuant to the Credit Agreement, Agent was granted a first-priority lien and security interest (the "Prepetition First Liens") in substantially all real and personal property of the Debtors (the "Collateral" or "Assets"). Each of the Debtors is a borrower under or a guarantor of the obligations under the Credit Agreement. The Debtors' obligations are joint and several.

15.    The Credit Agreement matures on the earliest of (a) March 13, 2012, (b) March 31, 2010, so long as the maturity date of the Senior Notes (defined below) has not been extended past June 30, 2010 in a manner acceptable to Agent, and (c) 90 days prior to the maturity date of the Senior Notes if the maturity date of the Senior Notes has been extended to a date later than June 30, 2010 in a manner acceptable to Agent. The Credit Agreement provides for up to $12.0 million of aggregate financing, $7.5 million of which may be in the form of letters of credit. As of the Petition Date, borrowings under the Credit Agreement totaled not less than $7,495,412 (the "Prepetition Obligations").

B.    Senior Notes

16.     In connection with the acquisition of CD&L Inc. and its affiliates in July 2006, certain of the Debtors issued certain senior secured notes (the "Senior Notes") and warrants prior to their entry into the Credit Agreement with the Prepetition Lenders. The Senior Notes were issued pursuant to an indenture (the "Indenture") dated as of July 3, 2006 between the Debtors and Wells Fargo Bank, N.A., as trustee (the "Indenture Trustee"). The Senior Notes were issued bearing interest at issuance at an annual rate of 12%. The annual interest rate increased to 13% in July 2007 and to 18% in May 2008. The Senior Notes were issued at a discount of 5.66% of face value. The net proceeds from the sale of the Senior Notes, after deducting the discount and estimated offering expenses payable by the Debtors, were approximately $63.5 million. The Senior Notes were issued in units comprised of (a) $1,000 in aggregate principal amount at maturity of Senior Notes and (b) a warrant to purchase 345 shares of the [Debtors'] common stock exercisable at $1.45 per share. Approximately 98% of the Senior Notes are owned by ComVest Velocity Acquisition I, LLC ("ComVest"), a Delaware limited liability company. Prior to the Petition Date, ComVest purchased approximately 98% of the Senior Notes (hereinafter, collectively with the owners of the remaining 2% of the Senior Notes, the "Senior Noteholders") for the purpose of acquiring the Assets.

17.     The Senior Notes are guaranteed by VEXP's domestic subsidiaries and were originally secured by a first-priority lien on collateral consisting of substantially all of the Debtors' tangible and intangible assets. On December 22, 2006, the Indenture was amended to permit the Debtors to enter into the Wells Fargo Facility. In addition, the Indenture Trustee subordinated the lien securing the Senior Notes to the lien securing the Wells Fargo Facility, as required by the Indenture. The Debtors received consents from a majority of the Senior Noteholders pursuant to a consent solicitation.

18.     As of the Petition Date, the Debtors owed approximately $103 million under the Senior Notes.

**The Proposed Sale**

C.     The Proposed Sale of the Assets

19.     The Debtors and ComVest, the proposed purchaser (the "Purchaser"), are parties to an Asset Purchase Agreement (the "APA") dated as of September 24, 2009, a copy of which is annexed hereto as Exhibit A.  As of the Petition Date, the Debtors owe the Senior Noteholders approximately $103 million, secured by substantially all of the Debtors' assets, subject to the Prepetition First Liens pursuant to the Credit Agreement.  Pursuant to the APA, the Debtors propose to sell, assign and transfer the Assets to the Purchaser for the Purchase Price (as defined in the APA), subject to higher and better offers, and free and clear of liens, claims, encumbrances, and interests other than the Assumed Liabilities (as defined in the APA), with such encumbrances to attach to the proceeds of the Asset Sale, if any.  Under the APA, the Purchaser (as the designee of the Senior Noteholders) will submit a credit bid, pursuant to Bankruptcy Code section 363(k), for the Assets and satisfy the obligations owing to the Prepetition Lenders under the Credit Agreement as well as the Debtors' obligations under their debtor-in-possession financing.

20.     The Senior Noteholders required (the "Sale Covenant"), as a condition to their consent to the Debtors' March 13, 2009 entry into the Existing Credit Agreement, that the Debtors initiate a process to attempt to sell the Debtors or all or substantially all of their assets or the Senior Notes (a "Transaction"). To begin to satisfy its obligations under that covenant, Velocity appointed a special committee (the "Special Committee") of independent members of the board of directors (the "Board"), consisting of Richard A. Kassar and John J. Perkins, to oversee the sale process. The Special Committee, on or about March 18, 2009, engaged the firm of Scura, Rise & Partners Securities, LLC ("Scura") to act as exclusive financial advisor to the Committee to assist it in attempting to effectuate a Transaction. The Special Committee also engaged independent legal counsel to assist it in its work.

21.     Following its engagement, Scura conducted due diligence on the Debtors. On March 26, 2009 Scura met in person with the Debtors' management to continue such due

-6-

diligence. Scura subsequently prepared a "teaser" describing the Debtors based upon public information for use in contacting potential buyers. At that time, Scura also prepared an initial list of financial and strategic parties who might potentially have an interest in investing in the Debtors or purchasing their assets.

22.     On March 31, 2009, the Special Committee, Scura and counsel to the Special Committee commenced a series of weekly conference calls in which Scura updated the Special Committee on efforts undertaken and developments over the course of the prior week and received instructions from the Special Committee.

23.     On April 2, 2009 Scura began contacting potential buyers by email and telephone. Through April and May, Scura worked at continuing to contact these potential buyers. Approximately 120 potential buyers were contacted. During April and May, Scura worked with the Debtors to gather due diligence materials and prepare an electronic data room for use by bidders who expressed interest and entered into a confidentiality agreement. The data room was ready on June 1. Three parties executed confidentiality agreements and were provided access to the data room at that time.

24.     In response to the opportunity created by the Debtors' obligation to conduct the sale process, a group led by MGC Global, LLC and existing management of the Company (the "Management Group"), including Vincent A. Wasik, Chief Executive Officer; Edward W. Stone, Chief Financial Officer; Jeffery Hendrickson, President and Chief Operating Officer; Andrew Kronick, Executive Vice President; Kay Durbin, Executive Vice President Workforce Management; Alexander Paluch, Chief Technology Officer and Mark Carlesimo, General Counsel, made a proposal on March 19, 2009 to purchase substantially all of the assets of the Company, subject to certain liabilities including its senior secured revolving credit facility with Burdale.

25.     The Debtors were required under the Sale Covenant to enter into a letter of intent for a Transaction by June 21, 2009, which letter of intent, under the terms of the Sale Covenant, could be subject to requisite approvals and consents including governmental consents

and the approval of Burdale, the Noteholders, and the Debtors' stockholders. On June 23, 2009, Velocity announced that it had entered into a letter of intent for a Transaction with the Management Group, subject to a number of conditions, including among other things financing, definitive documentation, and the approval of the Noteholders and the Company's preferred and common stockholders. There was no obligation on the part of the Debtors to negotiate exclusively with the Management Group, but the Management Group was entitled to reimbursement of its expenses, up to a maximum of $150,000, if another transaction were accepted.

26.     As of July 31, 2009, the Special Committee authorized the Debtors to enter into a Recapitalization Agreement with the Management Group setting forth the terms of a transaction. The Recapitalization Agreement presumed that an entity formed by the Management Group, MCG Acquisition LLC ("Newco"), would be successful in (a) securing financing, and (b) entering into agreements with holders of the Senior Notes to purchase the Senior Notes and the related warrants held by the Senior Noteholders, for an aggregate purchase price, assuming all Notes were purchased, of $10 million in cash plus, if the Recapitalization Transactions were consummated, shares of Common Stock of the Company equal to 10% of the Common stock of the Company outstanding after giving effect to the Recapitalization Transactions.

27.     On August 14, 2009, Newco terminated the Recapitalization Agreement. ComVest had become actively engaged as a potential investor and continued to explore investment opportunities with respect to the Debtors. ComVest proceeded to acquire approximately 98% of the Senior Notes. ComVest also reached an agreement with the Management Group with respect to an equity sharing arrangement for members of management in order to preserve the institutional knowledge possessed by the Management Group. Upon the closing of the Asset Purchase Agreement, members of the Debtors' senior management will receive approximately 20% of the stock in Newco.

-8-

28.     ComVest ultimately decided to pursue an acquisition of substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code.   Shortly before the Petition Date, the Board approved the entry by the Debtors into the Asset Purchase Agreement.

D.     Proposed Bid Procedures

29.     The Debtors desire to receive the greatest value for their Assets.   Although the Debtors believe the terms of the APA are fair and reasonable and reflect the highest and best value for the Assets, they nevertheless desire to allow for any parties that may have an interest in purchasing the Assets a further opportunity to make a bid for the Assets, in the hope that higher and better offers are generated for the Assets.   Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the sale process but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Assets while affording appropriate protection to the Purchaser. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially capable, motivated bidders who are likely to close a transaction, while simultaneously discouraging non-serious offers and offers from persons the Debtors do not believe are sufficiently capable or likely to actually consummate a transaction.

30.     The following paragraphs in this section summarize key provisions of the Sale Procedures, but are qualified in their entirety by reference to the actual Sale Procedures attached hereto as Exhibit B:

> **Determination of "Qualifying Bidder" Status.**   Any potential bidder who wishes to participate in the Auction and bid on the Purchased Assets must demonstrate to the satisfaction of the Sellers that such potential bidder is a "Qualifying Bidder".   A Qualifying Bidder is a potential bidder other than the Purchaser who delivers to the Sellers a written and binding offer on or before the Bid Deadline (as defined below) that:

(a)     is a bid for the Purchased Assets in their entirety for a cash price greater than the Purchase Price and the "Minimum Initial Overbid Amount," which shall be $2,250,000, provided, that any increase in the Credit Bid by the Purchaser, as a secured lender, need not be in cash;

(b)     states that the bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Purchased Assets on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the APA (as determined by the Sellers in their reasonable business judgment), including, without limitation, the purchase of the Purchased Assets and the assumption of the Assumed Liabilities and is accompanied by a clean and duly executed asset purchase agreement (the "Modified APA") and a marked Modified APA reflecting the variations from the APA;

(c)     states that the bidder's offer is irrevocable until the closing of the purchase of the Purchased Assets if such bidder is the Successful Bidder;

(d)     does not request or entitle the bidder to any transaction or break-up fee, expense reimbursement or similar type of payment;

(e)     fully identifies the Potential Bidder and the applicable Potential Bidder's Sponsor (as defined below) (if any) and their representatives who are authorized to act on their behalf regarding the contemplated transaction; if the Potential Bidder is a newly formed acquisition vehicle, the Bid must include evidence (in the form of binding commitment letters, current financial statements, guarantees or otherwise) that the Potential Bidder and/or the Potential Bidder's Sponsor (as defined below), is able to fulfill all other obligations in connection with the contemplated transactions including, but not limited to, paying liquidated damages, if any;

(f)     except for an increase, if any, in the Credit Bid submitted by Purchaser, each Bid from a Potential Bidder is accompanied by a deposit in the amount

of 10% of the value of its Bid (each such deposit, a "Good Faith Deposit");

(g) states that the bidder is financially capable of consummating the transactions contemplated by the Modified APA;

(h) demonstrates to the reasonable satisfaction of the Debtors, in consultation with any Creditors' Committee, the DIP Agent and the Prepetition Lenders, and in consideration of their respective views, that such bidder has the financial ability to fund and consummate the acquisition of the Purchased Assets and Assumed Liabilities by the Closing, and the Bid shall include such financial and other information that will allow the Debtors, in consultation with any Creditors' Committee, the DIP Agent and the Prepetition Lenders and in consideration of their respective views, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA;

(i) shall not be conditioned on or subject to obtaining financing, shareholder approval or the outcome of due diligence, including environmental due diligence, by the Potential Bidder; and

(j) includes evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified APA.

A competing bid meeting the above requirements shall constitute a "Qualifying Bid". The Sellers shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be qualified by no later than _____, 2009, at 4:00 p.m. (ET). The Purchaser shall be deemed a Qualifying Bidder and the APA constitutes a Qualifying Bid for all purposes.

**Bid Deadline. All Qualifying Bids must be submitted by no later than _____, 2009, at Noon (ET) (the "Bid Deadline").** Prior to the Bid Deadline, Qualifying Bidders shall deliver written copies of their bids to: (a) the Sellers, 1

Morningside Drive North, Building B, Suite 300, Westport, CT 06880, Attn.: Mr. Vince Wasik; (b) counsel to the Seller, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Kenneth A. Rosen, Esq.; Richards Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Russell Silberglied, Esq.; (c) counsel to the Official Committee of Unsecured Creditors (the "Committee"), [_____]; (d) counsel to the Agent, Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603-5792, Attn.: Randall L. Klein, Esq., and Edwards Angell Palmer & Dodge LLP, 919 N. Market Street, 15th Floor, Wilmington, DE 19801, Attn: Stuart Brown, Esq.; and (e) counsel to the Purchaser, Akerman Senterfitt LLP, 335 Madison Avenue, Suite 2600, New York, New York 10017, Attn: Susan Balaschak, Esq.

**No Qualifying Bids.** If no timely conforming Qualifying Bids are submitted by the Bid Deadline other than the APA, the Debtors shall not hold an Auction and, instead, the Purchaser shall be the Successful Bidder and the Seller shall request at the Sale Hearing that the Bankruptcy Court approve the APA with the Purchaser

**Auction.** In the event that the Sellers receive by the Bid Deadline one or more bids that they deem in their discretion to constitute Qualifying Bids other than the APA, the Sellers shall conduct an auction with respect to the Purchased Assets (the "Auction"). **The Auction shall take place on _____, 2009, at 10:00 a.m. (ET)** at the offices of Lowenstein Sandler PC, 1251 Avenue of the Americas, New York, NY 10020, or such other place and time as the Sellers shall notify all Qualifying Bidders, the Committee, Agent, and other invitees via e-mail or facsimile. If, however, no such other Qualifying Bid is received by the Bid Deadline, then the Auction will not be held. The Auction shall be conducted in person, by telephonic conference call, internet, or such other method as designated by the Sellers. The Auction shall be governed by the following procedures:

(a) Only parties eligible to participate in the Auction shall be Qualified Bidders who have submitted a Qualified Bid to the Debtors prior to the Bid Deadline that was not rejected by the Debtors prior to the Auction;

(b) Only the Purchaser and Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(c) Each Qualified Bidder shall be required to acknowledge and agree in writing that it has not engaged (and agrees not to engage) in any collusion with respect to any Bids, the Auction or the Sale;

(d) Bidding shall commence at the amount of the highest and best Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

(e) The Purchaser and the Qualifying Bidders shall participate in person at the Auction, or through a duly authorized representative;

(f) The Auction may include individual negotiations with the Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders;

(g) The bidding at the Auction shall start at the purchase price stated in the Pre-Auction Successful Bid and continue, in one or more rounds of bidding, so long as during each round at least one Overbid (as defined below) is submitted. Each round shall last thirty (30) minutes. All Overbids shall be made and received on an open basis, such that all material terms of each Overbid will be fully disclosed to all other Qualified Bidders.;

(h) An "Overbid" is any bid made at the Auction after the Debtors' announcement of the Pre-Auction Successful Bid, that is an increment of at least $100,000 greater than the immediately preceding bid, and that otherwise complies with the terms and conditions for a Qualified Bid as set forth herein;

(i) The Auction shall continue until there is only one offer that the Sellers determine, subject to Bankruptcy Court approval, is the highest and best offer submitted at the Auction from among the Qualifying Bidders and the Purchaser (the "Successful Bid"). The bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of the Purchaser, as set forth in the applicable Modified APA. Within three days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents

-13-

evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of Auction shall not be considered by the Bankruptcy Court.

The Sellers reserve the right, as they may determine to be in the best interests of their estates, and in consultation with Agent and the Committee, to: (a) determine which bidders are Qualifying Bidders, except that the Prepetition Lenders (and any designee of the Prepetition Lenders) and the Purchaser are deemed Qualifying Bidders for all purposes; (b) determine which bids are Qualifying Bids, except that the APA is deemed a Qualifying Bid for all purposes; (c) determine which Qualifying Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Sale Procedures Order or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Sellers and their estates; (e) extend the deadlines set forth herein; (f) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (g) modify the Sale Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice (provided that the Sellers shall not waive or modify the Sale Procedures in any manner that is adverse to Purchaser). Without limiting the generality of the foregoing, the Sellers may determine to distribute or not distribute copies of other Qualifying Bids to other Qualifying Bidders prior to or during the Auction.

**Sale Hearing**. The Successful Bid (or the APA, if no Qualifying Bid other than that of the Purchaser is received and accepted) will be subject to approval by the Bankruptcy Court. Please be advised that the hearing to approve the sale of the Purchased Assets to the Successful Bidder (the "Sale Hearing") will take place on _____, 2009, at 10:00 a.m. (ET), or at such time thereafter as counsel may be heard, in the United States Bankruptcy Court for the District of Delaware. The Sale Hearing may be adjourned with the consent of the Successful Bidder from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

**Acceptance of the Successful Bid**. If an Auction is conducted, Purchaser or the Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment in consultation with any Creditors' Committee, the DIP Agent and Prepetition Lenders and

in consideration of their respective views, at the Auction shall be required to serve as a Back-Up Bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until twenty-four (24) hours after the closing of the Sale with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court.

31.     The Debtors submit that implementation of the Sale Procedures will not chill the bidding for the Assets. Quite to the contrary, approval of the Sale Procedures is in the best interests of the Debtors, their estates, and their creditors in that it provides a structure and format for other potentially interested parties to formulate a bid for the Assets. Failure to approve the Sale Procedures may jeopardize the sale to the Purchaser to the detriment of the Debtors' creditors, employees, customers, and vendors.

32.     As described above, prior to the Petition Date, the Debtors executed the Asset Purchase Agreement with the Purchaser, subject to higher and better bids at the Auction. Under the Asset Purchase Agreement, the Debtor has agreed to pay the Purchaser a "break-up fee" in the amount of $750,000 (the "Break-Up Fee") plus reimbursement of actual, reasonable and necessary expenses of the Purchaser in the amount of $250,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"), subject to this Court's approval, which amount the Debtors consider to be fair compensation and reimbursement of the expenses incurred by the Purchaser in conducting due diligence and negotiating the Asset Purchase Agreement. Absent such provision, the Purchaser was unwilling to act as a "stalking horse" and thereby establish a baseline by which the value of the Assets would be measured. The Debtors believe that in this instance it is necessary and appropriate for the Debtors to make payment of the Bid Protections to the Purchaser. The Debtors therefore request authority to pay the Bid Protections to the Purchaser, subject to the terms of the Asset Purchase Agreement. The Bid Protections shall be paid only if the Debtors fail to consummate

the transaction proposed in the Asset Purchase Agreement, but only if such failure to consummate the transaction is because the Debtors accept a competing offer from a competing bidder and actually closes the sale and receives the purchase price from such competing bidder.

F.   Notice of Sale Hearing, Auction, Sale Procedures, and Objection Dates

33.   The Debtors seek to have the Sale Hearing set for on or about [_____], 2009, with a proposed objection deadline for such Sale Hearing set for [_____], 2009 at 4:00 p.m. (prevailing Eastern Time).

34.   Not later than two (2) days after the entry of an Order approving this Motion, the Debtors will cause the Sale Notice and Sale Procedures attached to the accompanying order to this Motion as Exhibit A and Exhibit C, respectively, to be sent by first-class mail, postage prepaid, to all of its creditors and interest holders, all entities known to have expressed a *bona fide* interest in acquiring the Assets, all taxing authorities or recording offices which have a reasonably known interest in relief requested, the Office of the United States Trustee, counsel for any committee formed in this case, all federal, state, and local regulatory authorities with jurisdiction over the Debtors, the office of the United States Attorney, all insurers, all non-debtor parties to contracts or leases (executory or other), and other known parties-in-interest in these bankruptcy cases.[2]

35.   In addition, to facilitate a potential sale that would involve the assumption and assignment of certain of the Debtors' unexpired leases, license agreements, and executory contracts (collectively referred to as the "Contracts"), the Debtors propose to serve the Notice of Possible Assumption, Sale and Assignment of Certain Unexpired Leases and Executory Contracts and Sale Hearing (the "Notice"), in the form attached as Exhibit C hereto, not later than two (2) days after the entry of an order approving this Motion and request that the Court approve the following procedures for fixing any cure amounts owed on all unexpired leases, license agreements and executory contracts:

---

[2] The Debtors will coordinate with their proposed claims agent, Kurtzman Carson Consultants, to serve notice of the filing of this Motion and the Sale Motion, on all parties referenced in this Motion.

36.     The Debtors will attach to the Notice their calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all prepetition defaults under all unexpired leases, license agreements, and executory contracts (the "Prepetition Cure Amounts"). If no amount is listed on the Notice, the Debtors believe that there is no Prepetition Cure Amount. The Debtors request that unless the non-debtor party to an unexpired lease, license agreement or executory contract files and serves an objection (the "Cure Amount Objection") to its scheduled Prepetition Cure Amount on or before 4:00 p.m. (prevailing Eastern time) one (1) business day prior to the Auction, so as to be received no later than 4:00 p.m. on the same day, upon (i) VEXP, 1 Morningside Drive North, Building B, Suite 300, Westport, CT 06880 (Attn.: Mr. Vince Wasik, Chief Executive Officer), (ii) Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068 (Attn.: Kenneth A. Rosen, Esq.), counsel to the Debtors, (iii) Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801 (Attn: Russell Silberglied, Esq.), Delaware counsel to the Debtors, (iv) Akerman Senterfitt LLP, 335 Madison Avenue, Suite 300, New York, New York 10017 (Attn: Susan F. Balaschak, Esq.), counsel to the prepetition and postpetition secured lenders, (v) Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603-5792 (Attn.: Randall L. Klein, Esq.), and Edwards Angell Palmer & Dodge LLP, 919 N. Market Street, 15th Floor, Wilmington, DE 19801 (Attn: Stuart Brown, Esq.), counsel to the Agent for the Prepetition Lenders, and (vi) counsel to any official committee of unsecured creditors appointed in this case (if any, the "Committee"), such non-debtor party should (a) be forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts with respect to such unexpired lease, license agreement, or executory contract, and the Debtors shall be entitled to rely solely upon the Prepetition Cure Amount, and (b) be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or any other assignee of the relevant unexpired lease, license agreement, or executory contract that any additional amounts are due or defaults exist, or conditions to assumption and

assignment must be satisfied under such unexpired lease, license agreement, or executory contract.

37.     In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (i) the basis for the objection and (ii) the amount the party asserts as the Prepetition Cure Amount. After receipt of the Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Prepetition Cure Amount believed by the non-debtor party to exist.   In the event, however, the Debtors and the non-debtor party cannot consensually resolve the Cure Amount Objection and such dispute must be resolved, the Debtors will segregate any disputed cure amounts pending the resolution of any such disputes by this Court or mutual agreement of the parties.

38.     The Debtors further request, pursuant to Federal Rule of Bankruptcy Procedure 9014, that objections, if any, to the relief requested in the Sale Motion must (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, on or before [_____], 2009 at 4:00 p.m. (prevailing Eastern Time) and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon the notice parties identified above in Paragraph [29].

**BASIS FOR RELIEF**

A.     The Bid Procedures are an Exercise of the Debtors' Sound Business Judgment

39.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  As described above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for all or portions of the Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstances.

RLF1-3438863-1

40.     Pursuant to the "business judgment" rule, once the Debtors articulate a valid business justification "there is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Company*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (same); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").

41.     Indeed, when applying the business judgment rule, courts show great deference to debtors' decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 316 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification for the proposed Bid Procedures. *See In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware Hudson Railway Co.*, 124 B.R. 169, 179 (D. Del. 1991).

42.     The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' stakeholders. The proposed procedures contain terms and conditions that are appropriate given the circumstances of these cases and the Debtors' business, and the adoption of the Bid Procedures represents a sound exercise of the Debtors' business judgment.

43.     The Debtors have sound business justifications for seeking approval of the Bid Procedures at this juncture. The Debtors believe it is in the best interests of their estates, creditors, customers, and employees to commence an auction process immediately, as the Debtors have limited funding and resources, to try to maximize the value of their assets. Indeed, the debtor-in-possession financing that the Debtors were able to negotiate is available only for a finite period of time. While the Debtors have made significant progress in reducing expenses, it is questionable whether they will be able to continue operating beyond the period of this proposed bidding process without additional funding, which may not be forthcoming. In

-19-

addition, the Asset Sale provides a realistic means for the Debtors to continue providing services to the Debtors' customers with minimal interruption and inconvenience. Absent a sale, the Debtors may be forced to cease operations and wind down their affairs. For these reasons, the Debtors have determined, based upon their business judgment, that the best option for maximizing the value of their estates for the benefit of their stakeholders is through an Asset Sale pursuant to the Bid Procedures.

B.   Purchaser is Entitled to Credit Bid

44.   The proposed recognition of the Purchaser's (as the designee of the Senior Noteholders) right to credit bid likewise is in accordance with the Bankruptcy Code and its objectives. Bankruptcy Code section 363(k) provides that where there is a sale of property that is subject to a lien, the holder of an allowed claim secured by such lien "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of the property." 11 U.S.C. § 363(k). Such holder is entitled to bid the "full face value of [its] secured claims," including "any unsecured deficiency portion thereof." *See In re Submicron Systems Corp.,* 432 F.3d 448, 459 (3d Cir. 2006). By recognizing the Purchaser's (as the designee of the Senior Noteholders) right to credit bid at this time, the Court's order will eliminate any uncertainty on the matter and help to ensure an orderly sale process.

C.   The Bidding Incentives Are Necessary to Preserve the Value of the Debtors' Estates

45.   Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that having the ability to offer the Bid Protections to the Purchaser will likely maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, their creditors, and the other parties in interest.

46.     The Bid Protections are a material inducement for, and condition of, the Purchaser's entry into the transaction. The Debtors believe that the Bid Protections are fair and reasonable in view of (i) the intensive analysis, due diligence investigation, and negotiation undertaken by the Purchaser in connection with the transaction and (ii) the fact that, if the Bid Protections are triggered, the Purchaser's efforts will have generated the opportunity for the Debtors to receive the highest and otherwise best offer for the Purchased Assets, to the benefit of the Debtors' creditors, customers, and employees.

47.     The Third Circuit Court of Appeals has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, *"O'Brien"*). Second, if the availability of break-up fees and expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.*

48.     In *O'Brien,* the Third Circuit reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

(A)     the presence of self-dealing or manipulation in negotiating the break-up fee;

(B)     whether the fee harms, rather than encourages, bidding;

(C)     the reasonableness of the break-up fee relative to the purchase price;

(D)     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(E)     the ability of the request for a break-up fee to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(F)     the correlation of the fee to a maximization of value of the debtor's estate;

(0)     the support of the principal secured creditors and creditors committees of the break-up fee;

(H)     the benefits of the safeguards to the debtor's estate; and

(I)     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*O'Brien*, 181 F.3d at 536.

49.     The Bid Protections allow the Debtors to set a floor for the Purchased Assets and, thus, insist that competing bids be materially higher or otherwise better than the Asset Purchase Agreement, a clear benefit to the Debtors' estates. Moreover, the Debtors do not believe the Purchaser would agree to act as a stalking horse bidder without the Bid Protections. Without the benefit of the Asset Purchase Agreement, the bids received at Auction for the Purchased Assets could be substantially lower than that offered by the Purchaser.

50.     Moreover, payment of the Bid Protections will not diminish the Debtors' estates. The Debtors do not intend to terminate the Asset Purchase Agreement if doing so would cause the Debtors to incur an obligation to pay the Bid Protections. By design, the Debtors would only accept a Successful Bid from a Qualified Bidder other than the Purchaser if doing so would increase the sale price by more than the amount of the Bid Protections.

51.     Thus, the Debtors should be permitted, in the exercise of their business judgment, to offer the Bid Protections in order to preserve the value of the Debtors' estates, promote more competitive bidding, and maximize the value of the Purchased Assets. Accordingly, the Debtors request that this Court authorize them to provide Bidding Incentives to the Potential Purchaser.

-22-

## NOTICE

52.     Notice of this Motion has been given to (i) the United States Trustee for this District, (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis, (iii) counsel to the agent for the Debtors' prepetition secured lenders, and (iv) counsel to the Debtors' proposed postpetition secured lenders. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

53.     The Debtors have not previously sought the relief requested herein from this or any other Court.

RLF1-3438863-1

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as <u>Exhibit D</u>, (i) approving Bid Procedures, (ii) approving the form and manner of notice of the Auction, (iii) scheduling a Sale Hearing to consider the sale of substantially all of the Debtors' assets, and (iv) granting such other and further relief as is just and proper.

Dated: Wilmington, Delaware
September 24, 2009

Respectfully submitted,

By: _~~Russell P. Silberglied~~_

**RICHARDS, LAYTON & FINGER, P.A.**
Russell Silberglied, Esq. (No. 3462)
Chun I. Jang, Esq. (No. 4790)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

-and-

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Thomas A. Pitta, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Proposed Counsel to Debtors
and Debtors In Possession*

RLF1-3438863-1