# EXHIBIT A

ASSET PURCHASE AGREEMENT

among

VELOCITY EXPRESS CORPORATION,

VELOCITY EXPRESS, INC.,

VELOCITY EXPRESS LEASING, INC.,

CD&L, INC.,

Certain other direct and indirect Subsidiaries of Velocity Express Corporation

and

COMVEST VELOCITY ACQUISITION I, LLC

Dated as of September 24, 2009

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ............................................................................................2
    Section 1.1    Definitions. ............................................................................2
    Section 1.2    Interpretation and Rules of Construction. ....................................12

ARTICLE II PURCHASE AND SALE .......................................................................13
    Section 2.1    Purchase and Sale of Assets. ....................................................13
    Section 2.2    Assumption and Exclusion of Liabilities. ..................................16
    Section 2.3    Purchase of Purchased Assets. ..................................................19
    Section 2.4    Purchase Price. ........................................................................19
    Section 2.5    Determined Cure Costs ............................................................20
    Section 2.6    Closing .....................................................................................20
    Section 2.7    Closing Deliveries by the Sellers. .............................................20
    Section 2.8    Closing Deliveries by the Purchaser ..........................................22
    Section 2.9    Relinquishment of Control. ......................................................23

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS ............23
    Section 3.1    Organization, Authority and Qualification of the Sellers ...........23
    Section 3.2    No Conflict. .............................................................................24
    Section 3.3    Governmental Consents and Approvals. .....................................24
    Section 3.4    Litigation. ................................................................................25
    Section 3.5    Compliance with Laws. ............................................................25
    Section 3.6    Environmental Matters. ............................................................25
    Section 3.7    Intellectual Property. ................................................................25
    Section 3.8    Real Property. ..........................................................................26
    Section 3.9    Employee Benefit Matters. .......................................................26
    Section 3.10    Taxes. ......................................................................................27
    Section 3.11    Material Contracts. ...................................................................28
    Section 3.12    Brokers. ...................................................................................29
    Section 3.13    Title to Purchased Assets; Good Condition ...............................29
    Section 3.14    Insurance .................................................................................30
    Section 3.15    Permits ....................................................................................30
    Section 3.16    Labor Matters. .........................................................................30
    Section 3.17    Transactions with Related Parties. .............................................31
    Section 3.18    Financial Statements. ...............................................................31

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ......32
    Section 4.1    Organization and Authority of the Purchaser ............................32
    Section 4.2    No Conflict. .............................................................................32
    Section 4.3    Governmental Consents and Approvals. .....................................33
    Section 4.4    Litigation. ................................................................................33
    Section 4.5    Financial Condition. .................................................................33
    Section 4.6    Brokers and Finders ..................................................................33

ARTICLE V ADDITIONAL AGREEMENTS .............................................................33
    Section 5.1    Assumption of Assigned Contracts. ..........................................33
    Section 5.2    Conduct of Business Prior to the Closing ..................................34
    Section 5.3    Access to Information ................................................................38
    Section 5.4    Damage or Destruction. ............................................................38

| | | |
|---|---|---|
| Section 5.5 | Regulatory and Other Authorizations; Notices and Consents. | 39 |
| Section 5.6 | Permits and Licenses. | 39 |
| Section 5.7 | Environmental Related Actions. | 39 |
| Section 5.8 | Intellectual Property. | 39 |
| Section 5.9 | Further Action. | 40 |
| Section 5.10 | Tax Cooperation and Exchange of Information. | 40 |
| Section 5.11 | Conveyance Taxes. | 41 |
| Section 5.12 | Nondisclosure. | 41 |
| Section 5.13 | Documents at Closing. | 42 |
| Section 5.14 | Parties' Access to Records After Closing. | 42 |
| Section 5.15 | Notification of Certain Matters. | 42 |
| Section 5.16 | Waiver and Release. | 42 |
| Section 5.17 | Compliance with Bidding Procedures Order. | 43 |
| Section 5.18 | Bankruptcy Court Approval. | 43 |
| Section 5.19 | Adequate Assurances Regarding Assigned Contracts and Assignments of Leased Properties. | 43 |

ARTICLE VI EMPLOYEE MATTERS ... 44

| | | |
|---|---|---|
| Section 6.1 | Transferred Employees | 44 |
| Section 6.2 | No Obligation. | 44 |

ARTICLE VII CONDITIONS TO CLOSING ... 45

| | | |
|---|---|---|
| Section 7.1 | Conditions to Obligations of the Sellers. | 45 |
| Section 7.2 | Conditions to Obligations of the Purchaser. | 46 |

ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER ... 48

| | | |
|---|---|---|
| Section 8.1 | Termination. | 48 |
| Section 8.2 | Effect of Termination. | 49 |
| Section 8.3 | Limitation on Damages. | 50 |

ARTICLE IX NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES ... 50

ARTICLE X GENERAL PROVISIONS ... 50

| | | |
|---|---|---|
| Section 10.1 | Expenses. | 50 |
| Section 10.2 | Notices. | 50 |
| Section 10.3 | Public Announcements. | 51 |
| Section 10.4 | Severability. | 51 |
| Section 10.5 | Entire Agreement. | 52 |
| Section 10.6 | Successors and Assigns. | 52 |
| Section 10.7 | Amendment. | 52 |
| Section 10.8 | Waiver. | 52 |
| Section 10.9 | No Third Party Beneficiaries. | 53 |
| Section 10.10 | Governing Law. | 53 |
| Section 10.11 | Waiver of Jury Trial. | 53 |
| Section 10.12 | Currency. | 53 |
| Section 10.13 | Construction. | 54 |
| Section 10.14 | Counterparts. | 54 |

<u>EXHIBITS</u>

| | | |
|---|---|---|
| Exhibit A | -- | Sellers' Disclosure Schedule |
| Exhibit B | -- | Purchaser's Disclosure Schedule |
| Exhibit C | -- | Form of Assignment of Leases |
| Exhibit D | -- | Form of Bill of Sale |
| Exhibit E | -- | Form of Bidding Procedures Order and exhibits thereto (including cure notice and sale notice) |
| Exhibit F | -- | Form of Sale Order |
| Exhibit G | -- | Form of DIP Order |

ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 24, 2009, among Velocity Express Corporation, a Delaware corporation ("Parent"), Velocity Express, Inc., a Delaware corporation ("VEI"), Velocity Express Leasing, Inc., a Delaware corporation ("VEL"), CD&L, Inc., a Delaware corporation ("CD&L"), VXP Mid-West, Inc., a Delaware corporation ("VXPM"), VXP Leasing Mid-West, Inc., a Delaware corporation ("VXPLM"), Clayton/National Courier Systems, Inc., a Missouri corporation ("CNCS"), Click Messenger Service, Inc., a New Jersey corporation ("Click"), Olympic Courier Systems, Inc., a New York corporation ("Olympic"), Securities Courier Corporation, a New York corporation ("SCS"), Silver Star Express, Inc., a Florida corporation ("Silver Star"), Velocity Systems Franchising Corporation, a Michigan corporation, and U-Ship International, Ltd., a Wisconsin corporation (together with VEI, VEL, CD&L, VXPM, VXPLM, CNCS, Click, Olympic, SCS and Silver Star, the "Subsidiaries"; the Subsidiaries together with Parent are referred to as the "Sellers"), and ComVest Velocity Acquisition I, LLC, a Delaware limited liability company (the "Purchaser").

## RECITALS

WHEREAS, the Sellers are engaged in the business of owning and operating an express delivery business (the "Business");

WHEREAS, the Sellers will commence voluntary cases under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, the Sellers wish to sell, assign and transfer to the Purchaser, and the Purchaser wishes to purchase and acquire from the Sellers, the Purchased Assets (as defined below) free and clear of all liens, claims, encumbrances and interests other than as expressly permitted hereunder and, in connection therewith, the Purchaser is willing to assume all of the Assumed Liabilities (as defined below), all upon the terms and subject to the conditions set forth herein; and

WHEREAS, the Sellers are currently indebted to the Purchaser and its affiliates by reason of their ownership of approximately 97.7374% of the Senior Secured Notes (as defined below); and

WHEREAS, simultaneously with the execution and delivery of this Agreement, Sellers and the DIP Lenders (as defined below) are entering into that certain Postpetition Agreement dated as of September 24, 2009, among Sellers, as debtors-in-possession, and the DIP Lender, as agent and as a lender (the "DIP Credit Agreement"), which amends the Burdale Credit Agreement and pursuant to which the DIP Lender has agreed to lend to Sellers, on the terms and conditions contained therein and in the Burdale Credit Agreement, as so amended, funds for use in the operation of Sellers' business pending the consummation of the transactions contemplated by this Agreement, subject to the provision by ComVest Investment Partners III, L.P. ("CIP III") of a guaranty (the "ComVest Guaranty") guaranteeing a portion of such loans; and

NOW, THEREFORE, in consideration of the promises and the representations, warranties, agreements and covenants hereinafter set forth, and intending to be legally bound, the Sellers and the Purchaser hereby agree as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    <u>Definitions</u>.

For purposes of this Agreement:

"<u>Action</u>" means any claim, as defined in section 101(5) of the Bankruptcy Code, action, complaint, suit, litigation, arbitration, appeal, petition, demand, inquiry, hearing, proceeding, investigation or other dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority or any third person.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly, controls, is controlled by, or is under common control with, such specified Person.

"<u>Agreement</u>" has the meaning given to it in the Preamble.

"<u>Allocation</u>" has the meaning given to it in <u>Section 2.4(f)</u>.

"<u>Ancillary Agreements</u>" means the Bill of Sale and Assignment and Assumption Agreement, the Assignments of Leased Properties, and any other instrument or agreement contemplated by this Agreement or the foregoing.

"<u>Affected Assets</u>" has the meaning given to it in <u>Section 5.4</u>.

"<u>Assigned Contracts</u>" means Contracts (including leases relating to Leased Real Property and Permits and Licenses) that have been designated in writing for assumption and assignment by any Seller to Purchaser in accordance with <u>Section 5.1(a)</u> and not excluded by Purchaser pursuant to <u>Section 5.1(a)</u>.

"<u>Assignments of Leased Properties</u>" means the Assignments of Leased Properties in the form of Exhibit C to be executed and delivered by the Sellers and the Purchaser with respect to each lease of Leased Real Property that is an Assigned Contract.

"<u>Assumed Liabilities</u>" has the meaning given to it in <u>Section 2.2(a)</u>.

"<u>Avoidance Claims</u>" means all avoidance claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds thereof.

"<u>Bankruptcy Code</u>" has the meaning given to it in the recitals hereto.

"<u>Bankruptcy Court</u>" has the meaning given to it in the recitals hereto.

"<u>Bidding Procedures Order</u>" means the order of the Bankruptcy Court pursuant to 11 U.S.C. §§105(a), 363(b), 365, 503 and 507 and Fed. R. Bankruptcy P. 2002, 6004, 6006, 9014 and 9019, in substantially the form of <u>Exhibit C</u>, (a) approving (i) bidding procedures, (ii) the Break-Up Fee and (iii) the Expense Reimbursement, (b) scheduling a hearing to consider entry of the Sale Order, (c) establishing (i) the form and manner of notice of the sale of the Purchased Assets to the

Purchaser and (ii) the form and manner of notice of and procedures for the assumption and assignment of the Assigned Contracts (including the Real Property Leases and Permits and Licenses that are Assigned Contracts) and granting related relief and (d) containing such other terms as Purchaser or its counsel may reasonably require.

"Bill of Sale and Assignment and Assumption Agreement" means the Bill of Sale and Assignment and Assumption Agreement in the form of Exhibit D to be executed and delivered by the Sellers and the Purchaser at the Closing.

"Break-Up Fee" means $600,000.

"Burdale Credit Agreement" shall mean the Credit Agreement dated March 13, 2009 among Parent, the Subsidiaries, Burdale Capital Finance, Inc. and the lenders party thereto.

"Business" has the meaning given to it in the recitals hereto.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of New York.

"Business Employees" means all current employees, officers and directors of Sellers who perform as of the date hereof services primarily related to the Business. For purposes of Section 3.9 and the definition of Employee Plans, "Business Employees" means all current and former employees and other service providers, including officers and directors of Sellers and ERISA Affiliates.

"Cash Portion" has the meaning given to it in Section 2.4(e).

"Chapter 11 Cases" has the meaning given to it in the recitals hereto.

"Closing" has the meaning given to it in Section 2.6.

"Closing Date" has the meaning given to it in Section 2.6.

"COBRA" means the United States Consolidated Omnibus Budget Reconciliation Act of 1985.

"Consent" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"Contracts" means any contract, arrangement, note, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs, policies or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by Contract, or otherwise.

"Conveyance Taxes" means all sales, use, value added, transfer, stamp, stock transfer, real property transfer and similar Taxes.

"Corporate Name" has the meaning given to it in Section 5.8(a).

"Credit Bid" means a credit bid under Section 363 of the Bankruptcy Code of a principal portion of the Prepetition Note Obligations in an amount equal to $9,773,740.

"Determined Cure Costs" means, in the aggregate, all amounts payable to counterparties of Assigned Contracts on account of the assumption of the Assigned Contracts by the Sellers pursuant to Section 365 of the Bankruptcy Code as determined pursuant to a Final Order, which Order may be the Sale Order.

"DIP Credit Agreement" has the meaning given to it in the recitals hereto.

"DIP Lenders" means Burdale Capital Finance, Inc. and other financial institutions or entities from time to time that make loans under the DIP Credit Agreement.

"DIP Order" means, collectively, the Final Order of the Bankruptcy Court pursuant to 11 U.S.C. §§105, 361, 362, 363 and 364, in substantially the form of Exhibit G (i) approving the Sellers' emergency motion authorizing the Sellers to obtain post-petition financing, (ii) granting liens and superpriority claims, (iii) authorizing the use of cash collateral and providing adequate protection, (iv) granting other related relief and (v) scheduling an interim and final hearing."

"Employee Plans" means (i) all employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended), and all bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, active or retiree medical or life insurance, hospital, dental, vision care, drug, sick leave, disability (including short term disability and long term disability), salary continuation, maternity or paternity, legal benefits, unemployment benefits, pension, retirement, savings, severance, fringe or other benefit plans, programs or arrangements, and all employment, consulting, termination, severance or other contracts or agreements, to which any of the Sellers or ERISA Affiliates is a party, with respect to which any Seller or ERISA Affiliate has any obligation or which are maintained, contributed to or sponsored by a Seller or ERISA Affiliate for the benefit of any Business Employee; (ii) any plan in respect of which any of the Sellers or any ERISA Affiliates could incur liability under Section 4212(c) of ERISA; and (iv) any Contracts between any of the Sellers, any ERISA Affiliates or any of their Affiliates, and any Business Employee.

"Environmental Law" means all Federal, state, local and foreign laws, statutes, ordinances, rules, regulations, permits, licenses, registrations, orders, judgments, decrees, injunctions, or legally enforceable requirements of any Governmental Entity which are in existence on the date hereof, and all final court orders and decrees and arbitration awards imposing liability or establishing standards of conduct for protection of the environment and human health and safety including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq., as amended; the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended; the Clean Air Act, 42 U.S.C. 7401 et seq., as amended; the Clean Water Act, 33 U.S.C. 1251 et seq., as amended; the Occupational Safety and Health Act, 29 U.S.C. 655 et seq.

"Environmental Liability" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, natural

resource damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any governmental authority or any third party, and which relate to any environmental condition, violation or alleged violation of Environmental Laws or Releases of Hazardous Materials from (i) any of the Leased Real Property or any other assets, properties or businesses of any Seller or any of their respective predecessors in interest; (ii) from adjoining properties or businesses; or (iii) from or onto any facilities which received Hazardous Materials generated by any Seller or any predecessor in interest of any Seller.

"Environmental Permits" means any permit, registration, certificate, qualification, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law or otherwise required by any applicable Governmental Authority.

"Equity Award Agreement" means, as to any individual, a common equity award agreement in a form provided to such individual by the Purchaser that, except as may otherwise be agreed by the Purchaser and the Representative (as defined in the Participation Agreement), is consistent (including as concerns forfeiture provisions) with the Participation Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means a person required at any particular time to be aggregated with any of the Sellers under Sections 414(b), (c), (m) or (o) of the Tax Code or Section 4001 of ERISA.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, including the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning given to it in Section 2.1(b).

"Excluded Contract" has the meaning given to it in Section 5.1(a).

"Excluded Liabilities" has the meaning given to it in Section 2.2(b).

"Excluded Taxes" means (i) all Taxes relating to the Purchased Assets or the Business for any Pre-Closing Period and (ii) any income Taxes imposed on the Sellers. For purposes of this Agreement, in the case of any Straddle Period, (a) Property Taxes relating to the Purchased Assets allocable to the Pre-Closing Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that fall within the portion of the Straddle Period ending on (and including) the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (b) Taxes (other than Property Taxes) relating to the Purchased Assets for the Pre-Closing Period shall be computed as if such taxable period ended on the Closing Date.

"Existing Lenders" means the several banks and the other financial institutions or entities from time to time that made loans under the Burdale Credit Agreement.

"Expense Reimbursement" means the actual documented out-of-pocket expenses incurred in connection with the transactions contemplated hereby, not to exceed $250,000.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force

and effect, as to which no appeal is pending and which has not been, which is not subject to being, reversed, modified or amended and as to which the Bankruptcy Court has entered an order that waives the requirements of Bankruptcy Rules 6004(a), 6006(d), 7062 and 9014 and any other applicable local rule such that the order is effective and enforceable immediately upon its entry.

"Financial Statements" means the unaudited balance sheet of the Sellers as at July 25, 2009 and the related statements of income and cash flows of the Sellers for the period(s) then ended, in each case including the related notes and schedules thereto, as most recently delivered to the Purchaser prior to the date hereof.

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governmental Authority" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court (including the Bankruptcy Court), tribunal, judicial or arbitral body, or any self-regulatory organization.

"Hazardous Material" shall include, without regard to amount and/or concentration (a) any element, compound, or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substances, extremely hazardous substance or chemical, hazardous waste, medical waste, biohazardous or infectious waste, special waste, or solid waste under Environmental Laws; (b) petroleum, petroleum-based or petroleum-derived products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic including but not limited to corrosivity, ignitibility, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components, including but not limited to asbestos-containing materials and manufactured products containing Hazardous Materials.

"Indebtedness" means any liabilities or obligations, whether contingent or otherwise (including penalties, interest and premiums), including any of the following: (i) in respect of borrowed money or with respect to advances of any kind (including under any applicable credit line); (ii) evidenced by bonds, notes, debentures or similar instruments, (iii) for the payment of money relating to any capitalized lease obligation; (iv) for the deferred purchase price of goods or services or for trade or barter arrangements; (v) evidenced by a letter of credit or reimbursement obligation with respect to any letter of credit; (vi) under interest rate, currency or commodity hedging, swap or similar derivative transactions; (vii) all guarantees, assumptions, endorsements or other agreements and arrangements having the economic effect of a guarantee of any Person by the Sellers; and (viii) all liabilities and other obligations of others of the kind described in clauses (i) – (vii) that are secured by a Lien on any properties or assets of the Sellers.

"Insurance Policies" has the meaning given to it in Section 3.14.

"Intellectual Property" means all (i) foreign and domestic trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby, including without limitation all extensions, modifications and renewals of same (collectively, "Trademarks"); (ii) foreign and domestic inventions, discoveries and ideas, whether

patentable or not, and all patents, registrations, and applications therefor, including without limitation divisions, continuations, continuations-in-part and renewal applications, and including without limitation renewals, extensions and reissues; (iii) confidential and proprietary information, trade secrets and know-how, including without limitation processes, schematics, databases, formulae, drawings, prototypes, models, designs and customer lists; (iv) foreign and domestic published and unpublished works of authorship, whether copyrightable or not (including, but not limited to, computer software), copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof; (v) electronic data processing, information, recordkeeping, communications, telecommunications, networking, account management, inventory management and other such applications, software, and hardware, equipment and services (including, but not limited to, all applications and software installed on all hardware and equipment, and all databases, firmware, and related documentation), and Internet websites and related content (collectively, "IT Systems"); and (vi) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including without limitation rights to recover for past, present and future violations thereof.

"Inventory" means all inventory and all finished goods, merchandise, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to the Business and maintained, held or stored by or for any of the Sellers as of the Closing Date and any prepaid deposits for any of the same.

"IRS" means the Internal Revenue Service of the United States.

"Law" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Authority.

"Leased Real Property" means the leasehold interests of the Sellers or their Affiliates and the security deposits appurtenant thereto described in Section 3.8 of the Sellers' Disclosure Schedule, together with (a) any prepaid rent, security deposits and options to renew or purchase relating to the foregoing and (b) Sellers' interest in all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems and items of personal property of such Seller or its Affiliate used or useful in the Business attached or appurtenant thereto and all easements, rights of way, options, renewal rights, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities, obligations to perform services and other obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, known or unknown or determined or determinable, including those arising under any Law, Action or Order and those arising under any Contract.

"Licensed Intellectual Property" means all Intellectual Property used or useful in connection with the Business that any Seller is licensed or otherwise permitted by other Persons to use.

"Liens" means any mortgage, deed of trust, pledge, assignment, security interest, encumbrance, lien, landlord's lien, mechanics lien, charge, hypothecation, deemed trust, Action, easement, charge or otherwise, or claim of any kind or nature whatsoever in respect of any property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Law in any other jurisdiction.

"Loss" has the meaning given to it in Section 5.4.

"Material Adverse Effect" means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects, (a) has had or would reasonably be expected to have or result in a material adverse effect or change in the results of operations, properties, assets, liabilities or condition (financial or otherwise) of the Business or the Purchased Assets or (b) has prevented, delayed or materially impaired, or would reasonably be expected to prevent, materially delay or materially impair, the ability of any Seller to consummate the Transactions, except, in each case, for any such effects resulting from or attributable to (i) general changes or developments in economic or political conditions; (ii) any condition arising solely by reason of the commencement of the Chapter 11 Cases; (iii) changes caused by acts of war, armed hostilities or terrorism occurring after the date hereof; or (iv) changes arising from the announcement of the execution of this Agreement. Notwithstanding the foregoing, the determination of "Material Adverse Effect" shall include any event, circumstance, development, change or effect described in clause (i) or (iii) that has a disproportionately adverse effect on the Business, the Purchased Assets, the Assumed Liabilities or the Sellers as compared to the effect on other affected Persons.

"Material Contracts" has the meaning given to it in Section 3.11.

"Mechanics Liens" means mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of any of the Sellers, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation).

"Office Depot Litigation" means the lawsuit filed on May 4, 2007 in Superior Court of Kent County, Delaware identified as Velocity Express Corporation vs. Office Depot, Inc. Docket No. 07c-05-012.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final, including, without limitation, any Order entered by the Bankruptcy Court in the Chapter 11 Cases (including, without limitation, the Sale Order).

"Owned Intellectual Property" means all Intellectual Property used or useful in connection with the Business that is owned by any Seller, directly or indirectly, jointly or individually.

"Parent" means Velocity Express Corporation., a Delaware corporation.

"Participation Agreement" means the Management Equity and Participation Agreement dated as of August 14, 2009 among ComVest Velocity Holdings, LLC, Vincent A. Wasik, Mark T. Carlesimo and Garrett Stonehouse.

"Permits and Licenses" has the meaning given to it in Section 2.1(a)(xi).

"Permitted Liens" means (a) Liens for current Taxes not yet due or delinquent; (b) zoning, landmarking, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the occupancy or current use of the Purchased Assets; (c) all covenants, conditions, restrictions, easements, rights of way, licenses and other similar interests in land (excluding, for greater certainty, as of the Closing, any mortgages, assignments of rents or any other financial charges except those in the preceding clause (a)) which were recorded and reflected in the official records in the jurisdiction in which the applicable real property is located as of the Petition Date and which do not materially interfere with the occupancy, value or current use of any such real property or any interests therein; (d) Liens in favor of the trustee under the Senior Secured Note Indenture and (e) matters which would be disclosed by an accurate survey or inspection of the real property which do not or could not materially impair the occupancy, value or current use of such real property which they encumber.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Petition Date" means the date on which the Chapter 11 Cases are commenced by the filing of voluntary petitions under the Bankruptcy Code.

"Pre-Closing Period" means any taxable period (or portion thereof) ending on or prior to the Closing Date.

"Prepetition Note Obligations" means all indebtedness, obligations and liabilities of Sellers incurred prior to the Petition Date arising from or related to the Senior Secured Notes held by Purchaser or its affiliates, together with all fees, expenses, indemnities and reimbursement obligations due to Purchaser or its affiliates thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Property Taxes" means real and personal ad valorem property Taxes and any other Taxes imposed on a periodic basis and measured by the value of any item of property.

"Purchased Assets" has the meaning given to it in Section 2.1(a).

"Purchase Price" has the meaning given to it in Section 2.4.

"Purchaser" has the meaning given to it in the Preamble.

"Purchaser's Disclosure Schedule" means the Disclosure Schedule attached hereto as Exhibit B, dated as of the date hereof, delivered by the Purchaser to Sellers in connection with this Agreement.

"Purchaser's Knowledge" means the actual knowledge of the appropriate officers and employees of the Purchaser and the knowledge that would be obtained by such officers and employees through reasonable inquiry.

"Receivables" means any and all accounts receivable, notes and other amounts receivable from third parties, including customers, arising from the conduct of the Business before the Closing, whether or not in the ordinary course of business, together with any unpaid financing charges accrued thereon.

"Registered" means, solely with respect to Intellectual Property, issued by, registered or filed with, renewed by or the subject of a pending application or registration before any Governmental Authority or Internet domain name registrar.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Tax Code or other federal tax statutes.

"Related Party" has the meaning given to it in Section 3.17(a).

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other closed receptacles containing Hazardous Materials) into the environment.

"Remedial Action" means all actions taken to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (ii) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities or (iv) any other actions authorized or required by any Environmental Law or Governmental Authority.

"Representatives" means, with respect to a particular Person, any director or officer or other designated representative of such Person, including such Person's attorneys and financial advisors.

"Sale Hearing" means the hearing in the Bankruptcy Court to consider and approve the Sale Order, as such hearing may be adjourned or continued from time to time.

"Sale Motion" means the motion, in form and substance satisfactory to Purchaser in its sole discretion, filed by Sellers pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to secure entry of the Sale Order by the Bankruptcy Court.

"Sale Order" means a Final Order of the Bankruptcy Court substantially in the form of Exhibit F hereto (with such changes thereto as the Purchaser and the Sellers shall mutually approve) that, among other things, (i) approves, authorizes and directs the Sellers to enter into this Agreement (or any amended version of such agreement approved by Purchaser and Sellers) and consummate the Transactions, including the assumption by Sellers and assignment to Purchaser of the Assigned Contracts, under Sections 105(a), 363, and 365 of the Bankruptcy Code; (ii) determines that this Agreement was entered into by the Purchaser in good faith and represents the highest and

best offer for the Purchased Assets and should be approved; (iii) determines that the Purchaser is a good faith purchaser under Section 363(m) of the Bankruptcy Code and that the provisions of Sections 363(n) of the Bankruptcy Code have not been violated; (iv) authorizes and directs the Sellers to sell the Purchased Assets to the Purchaser pursuant to this Agreement (or any amended version of such agreement approved by Purchaser and Sellers) and all applicable provisions of the Bankruptcy Code, free and clear of any and all Liens (including any and all "interests" in the Purchased Assets within the meaning of Section 363(f) of the Bankruptcy Code), other than the Assumed Liabilities and the Permitted Liens, such that the Purchaser shall not incur any liability as a successor to the Sellers, the Purchased Assets or the Business; (v) determines that the Purchaser is not a successor to the Sellers or otherwise liable for any Actions against the Sellers in the Bankruptcy Case (other than the Assumed Liabilities) and permanently enjoins each and every holder of any such Actions from commencing, continuing or otherwise pursuing or enforcing any remedy, Action, cause of action or encumbrance against Purchaser or the Purchased Assets; (vi) authorizes and directs the Sellers to execute, deliver, perform under, consummate and implement this Agreement (or any amended version of such agreement approved by Purchaser and Sellers, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (vii) finds and determines that, from and after the Closing, Purchasers shall have good, valid and marketable title to the Purchased Assets, free and clear of Liens (other than Permitted Liens and Assumed Liabilities); and (viii) waives any stay that would otherwise be applicable pursuant to Bankruptcy Rules 6004(h) or 6006(d).

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" shall mean the Securities Act of 1933, as amended, including the rules and regulations promulgated thereunder.

"Sellers" has the meaning given to it in the Preamble.

"Sellers' Assigned Contracts Schedule" has the meaning given to it in Section 5.1(a).

"Sellers' Disclosure Schedule" means the Disclosure Schedule attached hereto as Exhibit A, dated as of the date hereof, delivered by the Sellers to the Purchaser in connection with this Agreement.

"Sellers' Knowledge" means the actual knowledge of the appropriate officers and employees of the Sellers (including Parent) and the knowledge that would be obtained by such officers and employees through reasonable inquiry.

"Senior Secured Note Indenture" means that certain Indenture dated as of July 3, 2006, as amended, between Parent and Wilmington Trust Company (as successor trustee to Wells Fargo Bank, N.A.), as trustees.

"Senior Secured Notes" means those certain Senior Secured Notes of Parent, issued pursuant to the Senior Secured Note Indenture.

"Straddle Period" means any taxable period beginning on or prior to and ending after the Closing Date.

"Subsidiary" has the meaning given to it in the Preamble.

"Suits" has the meaning given to it in Section 3.7(b).

"Tax" or "Taxes" means any and all taxes, assessments, charges, duties, fees, levies or other governmental charges, including, without limitation, all federal, state, provincial, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding, escheat and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

"Tax Code" means the U.S. Internal Revenue Code of 1986, as amended through the date hereof.

"Tax Documents" has the meaning given to it in Section 5.10(a).

"Tax Returns" means any and all returns, reports, documents, declarations, claims for refund or other information or filings required to be supplied to any Governmental Authority or jurisdiction (foreign or domestic) with respect to Taxes together with all schedules or attachments thereto, including, without limitation, information returns where required, any documents with respect to or accompanying payments of estimated Taxes, or any documents with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration or other information, and including any amendments of any of the foregoing.

"Trade Payables" means any valid trade payables of the Sellers to third parties (other than to any Seller or any Affiliate of any Seller) arising from the conduct of the Business and relating to the Purchased Assets, incurred by the Sellers after the Petition Date and prior to the Closing and that are not yet due and payable to such third parties on or prior to the Closing Date in accordance with the terms of the transactions giving rise to such trade payables, solely to the extent such trade payables are incurred in the ordinary course of business consistent with past practice.

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"Transferred Employees" has the meaning given to it in Section 6.1(a).

"Transferred Entities" has the meaning given to it in Section 2.1(a)(iv).

"Transferred Intellectual Property" means all Owned Intellectual Property and all Licensed Intellectual Property.

Section 1.2    Interpretation and Rules of Construction.

In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section or Schedule, such reference is to an Article or Section of or Schedule to, this Agreement unless otherwise indicated;

(b)     the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)     whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)     the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)     all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)     the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)     references to a Person are also to the Person's heirs, executors, administrators, personal representatives, successors and permitted assigns, as applicable;

(h)     references to agreements are also to the same agreements as amended, restated or otherwise modified from time to time;

(i)     references to the Sellers are also to each Seller individually; and

(j)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1     Purchase and Sale of Assets.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, each Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to the Purchaser, and the Purchaser shall purchase and acquire from such Seller, all of such Seller's right, title and interest, as of the Closing Date, in and to any and all assets, properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of any of the Sellers, whether now existing or hereinafter acquired, excluding only the Excluded Assets (such assets, properties, rights and claims to be acquired hereunder, collectively, the "Purchased Assets"), free and clear of all Liens (except for Permitted Liens) in accordance with, and with all of the protections afforded by, Sections 363 and 365 of the Bankruptcy Code. The Purchased Assets shall include, but not be limited to, the following:

(i)     the Leased Real Property save and except any Leased Real Property that is leased under a lease that is an Excluded Contract;

(ii)     all tangible personal property related to, or used or useful in or held for use in the conduct of, the Business, including equipment, machinery, tools, supplies, spare parts, trucks,

cars, other vehicles and rolling stock, furniture, fixtures, trade fixtures, leasehold improvements, office materials and supplies, and other tangible personal property located on, or off, the premises of the Leased Real Property;

(iii)     the Inventory;

(iv)     all of the stock of USDS Canada, Inc., a Canadian corporation and Velocity Express Canada LTD, a Canadian corporation (collectively, the "Transferred Entities").

(v)     all cash and cash equivalents, securities (other than any equity interests in the Sellers) and negotiable instruments of the Sellers on hand, in lock boxes, in financial institutions or elsewhere;

(vi)     the Receivables;

(vii)     all files, operating data, books of account, general, financial and Tax (other than income tax) records, personnel records of the Transferred Employees, invoices, shipping records, supplier lists, price lists, vendor lists, mailing lists, catalogs, sales promotion literature, advertising materials, brochures, standard forms of documents, manuals of operations or business procedures, research materials, contracts, instruments, filings, administrative and pricing manuals, correspondence, memoranda, plats, architectural plans, surveys, title insurance policies, drawings, plans and specifications, environmental reports, maintenance or service records, soil tests, engineering reports, expired purchase orders, operating records, operating safety manuals, and other material and documents, records and files (whether or not in the possession of any of the Sellers or their respective Representatives, stored in hardcopy form or on magnetic, optical or other media) and any rights thereto owned, associated with or employed by any of the Sellers in the conduct of the Business or otherwise related to the Purchased Assets or the Assumed Liabilities;

(viii)     all goodwill associated with the Business or the Purchased Assets, including rights under any confidentiality agreements executed by any third party for the benefit of any of the Sellers to the extent relating to the Business;

(ix)     the Transferred Intellectual Property;

(x)     all of the rights and benefits accruing under any Assigned Contracts, including any outstanding deposits thereunder;

(xi)     all of the rights and benefits accruing under any franchises, permits, consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, licenses, agreements, waivers and authorizations, including Environmental Permits, of or with any Governmental Authority held, used or made by any of the Sellers in connection with the Business (collectively, the "Permits and Licenses") and all deposits and prepaid expenses held by third parties and/or governmental agencies, save and except any such Permit and License that is an Excluded Contract;

(xii)     the sales and promotional literature, customer lists and other sales related materials related to the Business;

(xiii)     the amount of, and all rights to any, insurance proceeds received by any of the Sellers after the date hereof in respect of the Loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or relating to any Assumed Liabilities;

(xiv)   all unexpired warranties, indemnities, or guaranties from any third party with respect to any Purchased Asset, including any item of real property, personal property or equipment;

(xv)   to the extent related to the Purchased Assets, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by any of the Sellers on the purchase or other acquisition of the Purchased Assets;

(xvi)   the Office Depot Litigation and any other litigation rights, causes of action, choses in action and rights of action of recovery and counterclaims and setoff and recoupment rights, whether known or unknown and including the proceeds thereof, including without limitation any and all demands, defenses, Actions, causes of action, credits, allowances, rebates, refunds, prepayments, security deposits and other security, deposits or rights of setoff or recoupment (other than against the Sellers or any of their Affiliates), including all Avoidance Claims;

(xvii)   any rights to Tax refunds, credits or similar benefits, other than refunds, credits or similar benefits due to Sellers with respect to income taxes (but including refunds, credits or similar benefits to any entity the equity of which is included in the Purchased Assets with respect to income taxes or any subsidiaries of such entities);

(xviii)   all deposits received by any of the Sellers from any subtenants with respect to any subleases of Leased Real Property which are Assigned Contracts;

(xix)   all prepaid and deferred items that relate to the Business or the Purchased Assets, including all prepaid rentals and unbilled charges, fees and deposits;

(xx)   all confidentiality, non-compete and similar agreements entered into by any employees of or independent contractors retained by the Sellers;

(xxi)   to the extent that they are Assigned Contracts, all Contracts with the Sellers' drivers and other independent contractors;

(xxii)   subject to the terms of the respective Employee Plans with respect to such assets and subject to applicable Law, including ERISA, any assets relating to the Employee Plans listed in Section 6.1(b) of the Sellers' Disclosure Schedule that are assumed pursuant to Section 2.2(a)(vii) or Section 6.1(b); and

(xxiii)   all current and prior insurance policies of any of the Sellers and all rights and benefits of any nature with respect thereto, including all prepaid premiums, deposit and insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries.

(b)   Notwithstanding anything in Section 2.1(a) to the contrary, the Sellers shall not sell, convey, assign, transfer or deliver, nor cause to be sold, conveyed, assigned, transferred or delivered, to the Purchaser, and the Purchaser shall not purchase or acquire, and the Purchased Assets shall not include, the Sellers' right, title and interest in and to the following assets of the Sellers (collectively, the "Excluded Assets"):

(i)   the company seal, minute books, charter documents, stock or equity record books and such other similar books and records pertaining solely to the organization, existence or capitalization of the Sellers, as well as any other records or materials relating solely to the Sellers

generally and not involving or related to the Purchased Assets, Assumed Liabilities or the operations of the Business;

(ii)     all rights of the Sellers under this Agreement and the Ancillary Agreements;

(iii)     Tax Returns of the Sellers, other than those relating solely to the Purchased Assets, the Assumed Liabilities or the Business, except that income tax returns and documents and records related solely to such income tax returns, other than income Tax Returns of Transferred Entities or any subsidiaries of such entities (whether or not relating solely to the Purchased Assets, the Assumed Liabilities or the Business), shall be Excluded Assets except to the extent they are filed by any Transferred Entity or any subsidiary of a Transferred Entity;

(iv)     any Excluded Contract and rights thereunder;

(v)     any of the capital stock or equity interests in any of the Subsidiaries; and

(vi)     any right, property or asset that is listed or described in Schedule 2.1(b)(vi). The Purchaser at its sole discretion shall be allowed to amend or supplement Schedule 2.1(b)(vi) at any time on or prior to the Business Day prior to the Closing Date (or such later time as Sellers and the Purchaser may agree) to add to the properties or assets to be excluded under this Section 2.1(b)(vi) without any adjustment to the Purchase Price, provided that the Purchaser may exercise such right with respect to any Contract until the end of the period provided for designating such Contract as an Assigned Contract pursuant to Section 5.1, subject to the express limitations of this Agreement.

Section 2.2     Assumption and Exclusion of Liabilities.

(a)     The Purchaser shall assume no liability or obligation of the Sellers except the liabilities and obligations expressly set forth in this Section 2.2(a) (collectively, the "Assumed Liabilities"), which the Purchaser or its assignee (as contemplated by Section 10.6) as the case may be, shall assume and pay, perform and discharge in accordance with their respective terms, subject to any defenses or claimed offsets that may be asserted in good faith against the obligee to whom such liabilities or obligations are owed:

(i)     all Liabilities of the Sellers under the Assigned Contracts for the lease of real property and the other Assigned Contracts, in each case (A) for which Bankruptcy Court approval (and all other consents, if any, that are necessary notwithstanding such Bankruptcy Court approval) has been obtained and (B) arising and relating solely to the period from and after the Closing and not to the extent arising out of any breach or default thereof or other activities prior to the Closing, and, with respect to the foregoing Assigned Contracts, all Determined Cure Costs, it being understood and agreed that all such Determined Cure Costs shall be paid as a portion of the Purchase Price in accordance with Section 2.4(e);

(ii)     all Liabilities in respect of Permits and Licenses, if any, that are assigned to and assumed by the Purchaser (by virtue of being an Assigned Contract or otherwise), in each case arising and relating solely to the period from and after the Closing and not to the extent arising out of any breach or default thereof or other activities prior to the Closing and, with respect to the foregoing Permits and Licenses that are Assigned Contracts, all Determined Cure Costs, it being understood and agreed that all such Determined Cure Costs shall be paid as a portion of the Purchase Price in accordance with Section 2.4(e);

(iii)     all Property Taxes and assessments on the Purchased Assets that relate to the period after the Closing Date;

(iv)     all Trade Payables set forth on the Schedule delivered pursuant to Section 2.7(k) except to the extent that, at any time and from time to time on or before the Business Day prior to the Closing Date, the Purchaser, by written notice to the Sellers, elects to exclude any one or more of the Trade Payables that would otherwise be Assumed Liabilities;

(v)     any obligations to make available health coverage under COBRA to current and former employees of the Sellers solely to the extent that the Purchaser is required to make available such coverage pursuant to §§54,4980B-9 of the Regulations;

(vi)     any obligations of the Sellers (A) to make severance or stay bonus payments to the individuals set forth on Schedule 2.2(a)(vi), pursuant to the agreements listed on Schedule 2.2(a)(vi) (subject to acknowledgment of the individuals party thereto, prior to and as a condition to any payment being required to be made by the Purchaser thereunder, that the maximum payment thereunder shall be one years' compensation) (the "Assumed Severance Agreements"), to the extent any such stay bonuses become due and payable based on actions taken by the Purchaser after the Closing, provided that the Purchaser shall not assume the obligation to make any such payment to any individual (I) based on an assertion by such individual that such payment has become due as a result of the Closing and (II) if the Purchaser and such individual have entered into a mutually acceptable severance agreement (which may be incorporated as part of an employment agreement) superseding the severance obligation listed on Schedule 2.2(a)(vi) with respect to such individual and (B) under the other agreements listed on Schedule 2.2(a)(vi);

(vii)     all obligations assumed by the Purchaser pursuant to Section 6.1(b); and

(viii)     the employment agreements (the "Assumed Employment Agreements") between Parent and each of Mark Carlesimo ("Carlesimo") and Edward Stone ("Stone"), provided that the noncompetition and nonsolicitation covenants in the Equity Award Agreements need not conform to those in the Assumed Employment Agreements and provided further that (A) Carlesimo shall acknowledge that he is entitled to equity compensation only pursuant to his Equity Award Agreement and not pursuant to his employment agreement, that he is not entitled to a severance payment upon a termination for cause, that he is entitled to severance benefits only pursuant to his severance agreement and not pursuant to his employment agreement and, solely to the extent the same would not result in the imposition of any excise tax under Section 409A of the Internal Revenue Code, that the consummation of the transactions contemplated hereby do result in the acceleration of payment of the "Special Monthly Compensation" provided for therein and (B) Stone shall acknowledge that he is entitled to equity compensation only pursuant to his Equity Award Agreement and not pursuant to his employment agreement.

(b)     Notwithstanding anything to the contrary in this Agreement, the parties expressly acknowledge and agree that the Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of any of the Sellers, or of any predecessor or Affiliate of any of the Sellers of any kind or nature whatsoever, including Liabilities existing on the Closing Date and Liabilities arising thereafter as a result of an act, omission or circumstance taking place prior to the Closing, other than the Assumed Liabilities.   The Liabilities not specifically assumed by Purchaser pursuant to Section 2.2(a) shall be referred to herein collectively as the "Excluded Liabilities." Without limiting the foregoing, the Purchaser shall not be obligated to assume, and does

not assume, and hereby disclaims all of the Excluded Liabilities, including, without limitation, all of the following Liabilities, of any of the Sellers, or of any predecessor or Affiliate of any of the Sellers:

      (i)     all Excluded Taxes;

      (ii)    any Liabilities relating to or arising out of the Excluded Assets;

      (iii)   except as provided in Section 2.2(a)(iv), all accounts payable;

      (iv)   any Environmental Liabilities in respect of the Leased Real Property or any area used pursuant to the Permits and Licenses relating to the Business or otherwise in respect of Hazardous Material used or environmental conditions that exist on or prior to the Closing Date;

      (v)    the Sellers' obligations under this Agreement and the Ancillary Agreements and any fees or expenses incurred by any of the Sellers in connection with the negotiation, preparation, approval or execution of this Agreement and the Ancillary Agreements and/or the sale of the Purchased Assets pursuant hereto, including, without limitation, the fees and expenses of counsel, independent auditors, brokers, bankers, investment bankers and other advisors or consultants and any success (or similar fees) arising in connection therewith;

      (vi)   any Liabilities arising as a result of any Action initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date (except to the extent that any such Liability is an Assumed Liability explicitly set forth in clauses (i) through (vii) of Section 2.2(a)), including, without limitation, all Liabilities arising in connection with any Actions set forth or required to be set forth on Section 3.4 of the Sellers' Disclosure Schedule;

      (vii)  any Liabilities arising from or related to (A) the Employee Plans, except for Employee Plans assumed pursuant to Section 2.2(a)(vii) and Section 6.1(b), or (B) the termination of any of the Employee Plans;

      (viii) any Liability (other than Liabilities to provide benefits under COBRA, but including any liability of the Sellers arising from a failure to provide any required notices under COBRA to former employees) relating to the employment or termination of employment of any Person or the engagement or termination of engagement of any independent contractor arising from the operation of the Business (including but not limited to, any severance or stay or incentive bonuses) other than obligations (A) arising on or after the Closing with respect to Transferred Employees or independent contractors engaged by the Purchaser or (B) expressly assumed by Purchaser under Section 2.2(a)(vi) or (vii) or Article VI;

      (ix)   all Liabilities arising under the Burdale Credit Agreement or the DIP Credit Agreement;

      (x)    subject to Section 2.2(a)(iv), any Liabilities arising from the ownership and operation of the Business prior to the Closing, including, without limitation, all Liabilities in respect of Indebtedness (including intercompany Indebtedness);

      (xi)   any Liabilities arising from the operation of any successor liability Laws, including, without limitation, "bulk sales" statutes;

      (xii)  any Liabilities of any of the Sellers not related to the operation of the Business; and

(xiii)   any violation of an applicable Law or Order prior to the Closing by any of the Sellers, including, without limitation, any Environmental Law.

(c)   Nothing contained in this Agreement shall require the Purchaser to pay or discharge any Assumed Liabilities so long as the Purchaser shall in good faith contest the amount or validity thereof.

Section 2.3   Purchase of Purchased Assets.

On the terms and subject to the conditions of this Agreement, on the Closing Date (a) the Purchaser shall purchase the Purchased Assets from the Sellers, and (b) the Purchase Price shall be paid as set forth in Section 2.4.

Section 2.4   Purchase Price.

The purchase price (the "Purchase Price") payable in consideration for the sale, transfer, assignment, conveyance and delivery by the Sellers to the Purchaser of the Purchased Assets shall consist of the following:

(a)   $9,773,740 evidenced by the Credit Bid, which shall become effective on the Closing Date; plus

(b)   an amount equal to the sum of the Obligations (as defined in the DIP Credit Agreement) outstanding under the DIP Credit Agreement (including all letters of credit to the extent not replaced) and the Obligations outstanding under the Burdale Credit Agreement (including all letters of credit to the extent not replaced), in each case as of the Closing Date, which shall be used by the Sellers solely for the purpose of satisfying such Obligations; plus

(c)   the assumption at the Closing by the Purchaser of the Assumed Liabilities from the Sellers; plus

(d)   an amount equal to the Determined Cure Costs for Assigned Contracts payable by the Purchaser under Section 5.1, which shall be paid to the applicable counterparties of the applicable Assigned Contracts on the Closing Date or, if later, the date such Contracts are determined to be Assigned Contracts in accordance with Section 5.1; plus

(e)   cash in an amount equal to $50,000 (the "Cash Portion");

The Purchase Price shall be paid by (i) a credit bid equal to the Credit Bid, (ii) execution of the Assignment and Assumption Agreement, (iii) payment in immediate available funds of (A) an amount equal to the Obligations outstanding under the Burdale Credit Agreement directly to the Existing Lenders, (B) an amount equal to the Obligations outstanding under the DIP Credit Agreement directly to the DIP Lenders and (C) the Cash Portion to an account or accounts specified by Sellers and (iv) payment in immediate available funds of the Determined Cure Costs in accordance with Sections 2.5 and 5.1(c).

The Sellers acknowledge a validly perfected, allowed secured claim of the Purchaser in an amount equal to the Prepetition Note Obligations and that the Credit Bid is a valid credit bid under Section 363(k) of the Bankruptcy Code.

(f)     Allocation of the Purchase Price.

The Purchase Price (to the extent required by the Tax Code) shall be allocated among the Purchased Assets as of the Closing Date in accordance with the relative fair market value of the Purchased Assets at that time, to the extent relevant, and in a manner consistent with Section 1060 of the Tax Code and the Regulations which allocation will be set out in a schedule to be agreed upon by Sellers and the Purchaser prior to the Closing Date (the "Allocation"). If Sellers and the Purchaser are unable to agree upon the Allocation by the Closing Date, they shall work in good faith to finalize the Allocation within 45 days following the Closing Date. If they are unable to agree upon the Allocation by such date, the disputed items shall be resolved by an independent accounting firm selected by Sellers and the Purchaser. Subject to the foregoing provisions of this Section 2.4, for all Tax purposes, the Purchaser and the Sellers agree that the Transactions shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and that none of them will take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation, or otherwise unless otherwise directed by a Governmental Authority following a determination within the meaning of Section 1313(a) of the Tax Code and similar state or local law. The Sellers and the Purchaser agree to cooperate with each other in preparing IRS Form 8594, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date. If such allocation is disputed by any taxation or other Governmental Authority, the Purchaser or any Seller receiving notice of such dispute will promptly notify the other party and the parties will use their reasonable best efforts to sustain the final Allocation. The parties will share information and cooperate to the extent reasonably necessary to permit the Transactions to be properly, timely and consistently reported.

Section 2.5     Determined Cure Costs.

The Purchaser agrees to satisfy all Determined Cure Costs when due in respect of Assigned Contracts (other than Excluded Contracts) for which Bankruptcy Court approval (and all other consents, if any, that are necessary notwithstanding such Bankruptcy Court approval) to transfer have been obtained.

Section 2.6     Closing.

Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Akerman Senterfitt LLP, 335 Madison Avenue, Suite 2600, New York, New York 10017 at 10:00 a.m. Eastern time on the third Business Day following the satisfaction or waiver of the conditions to the obligations of the parties hereto set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions), or at such other place or at such other time or on such other date as Sellers and the Purchaser may mutually agree upon. The date of the Closing is herein referred to as the "Closing Date."

Section 2.7     Closing Deliveries by the Sellers.

At the Closing, the Sellers shall deliver or cause to be delivered to the Purchaser:

(a)     a copy of the Sale Order, as entered by the Bankruptcy Court;

(b)     the Bill of Sale and Assignment and Assumption Agreement, the Assignments of Leased Properties in recordation form, and such other instruments, in form and substance and in registrable or recordation form where applicable, reasonably satisfactory to the Purchaser, as may be reasonably requested by the Purchaser to effect the transfer of the Purchased Assets to the Purchaser, or to register or record or evidence such transfer on the public records, in each case duly executed by each applicable Seller and the other parties thereto (other than the Purchaser);

(c)     the Ancillary Agreements, duly executed by each applicable Seller and the other parties thereto (other than the Purchaser) other than the Ancillary Agreements delivered pursuant to Section 2.7(b) and Section 2.7(i);

(d)     copies of resolutions of the board of directors or managers (or equivalent governing body) of each Seller authorizing and approving the execution and delivery of this Agreement and the Ancillary Agreements and the performance by such Seller of its obligations hereunder and thereunder, certified by the Secretary of such Seller;

(e)     an incumbency certificate dated as of the Closing Date for each Seller executed by the Secretary of such Seller which shall identify the names and titles and bear the signatures of the officers of such Seller individually authorized to execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party;

(f)     termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as the Purchaser may reasonably deem necessary or desirable to release or evidence the release of Liens (other than Permitted Liens) on the Purchased Assets, each in form and substance reasonably satisfactory to the Purchaser duly authorized (to the extent necessary, taking into account the terms of the Sale Order) by any holders of such Liens;

(g)     to the extent not addressed in the Sale Order, written consents in form and substance reasonably satisfactory to the Purchaser duly executed by the applicable Sellers and counterparties evidencing any consents necessary to effect the assignment to the Purchaser of the Contracts set forth in Section 7.2(i) of the Sellers' Disclosure Schedule and the assignment to the Purchaser of Intellectual Property pursuant to Sections 5.8(b) and 5.8(c);

(h)     a certificate of a duly authorized officer of each of the Sellers certifying that all conditions set forth in Section 7.2 have been satisfied (or to the extent any such condition has been waived in accordance with the terms hereof, attaching thereto the applicable written waiver);

(i)     the Equity Award Agreements and any additional employment agreements, non-competition, non-solicitation and/or confidentiality agreements that are required by and satisfactory by the Purchaser in accordance with the Participation Agreement (which may include non-competition and non-solicitation covenants of up to two years) (collectively, the "New Employment Documents"), in each case signed by the individuals who are parties to the Severance Agreements listed in Schedule 2.2(a)(vi) and who become Transferred Employees on the Closing Date;

(j)     a certificate of non-foreign status from each Seller meeting the requirements of Regulations Section 1.1445-2(b)(2);

(k)     a schedule of the Trade Payables outstanding as of 11:59 p.m. on a date no earlier than three (3) Business Days prior to the Closing Date;

(l)     certificates of title and title transfer documents to substantially all titled motor vehicles and an undertaking of the Sellers to provide any missing or improperly prepared title and/or title transfer documents as promptly as practicable following the Closing; and

(m)     such other customary documents and instruments of transfer, assumptions and filings as may be reasonably required to be delivered by any Seller to consummate the Transactions or otherwise give effect to this Agreement.

Section 2.8     Closing Deliveries by the Purchaser.

At the Closing, the Purchaser shall deliver, or cause to be delivered to Sellers:

(a)     the Bill of Sale and Assignment and Assumption Agreement, the Assignments of Leased Properties and the Assignments of Intellectual Property, in each case in form and substance reasonably satisfactory to Sellers, to effect the assumption by the Purchaser of the Assumed Liabilities, duly executed by the Purchaser;

(b)     the Equity Award Agreements and any other New Employment Documents with the individuals who are parties to the Severance Agreements listed in Schedule 2.2(a)(vi) and who become Transferred Employees on the Closing Date, signed by the Purchaser;

(c)     the Ancillary Agreements to which the Purchaser is a party, duly executed by the Purchaser other than the Ancillary Agreements delivered pursuant to Section 2.7(b) and Section 2.7(i);

(d)     a certificate of a duly authorized officer of the Purchaser certifying as to the matters set forth in Section 7.1;

(e)     a copy of resolutions of the board of managers of the Purchaser authorizing and approving the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and the performance by the Purchaser of its obligations hereunder and thereunder, certified by the Secretary of the Purchaser;

(f)     an incumbency certificate dated the Closing Date for the Purchaser executed by the Secretary of the Purchaser which shall identify the names and titles and bear the signatures of the officers of the Purchaser individually authorized to execute and deliver this Agreement and the Ancillary Agreements to which the Purchaser is a party;

(g)     such other customary documents and instruments of transfer, assumptions and filings as may be reasonably required to be delivered by the Purchaser to consummate the Transactions or otherwise give effect to this Agreement, including the board and shareholder consents required to transfer the Transferred Entities to the Purchaser; and

(h)     the Purchase Price in accordance with Section 2.4.

Section 2.9    Relinquishment of Control.

At the Closing, the Sellers shall turn over actual possession and control of all of the Purchased Assets to the Purchaser by taking such action that may be required or reasonably requested by the Purchaser to effect such transfer of possession and control.

Section 2.10    Representative. Each Seller irrevocably designates Parent to represent each Seller and act as the attorney-in-fact and agent for and on behalf of such Seller with respect to any and all matters relating to, arising out of, or in connection with this Agreement and the Ancillary Agreements. The Purchaser will be entitled to rely on Parent's authority as the agent, representative and attorney-in-fact of the Sellers for all purposes under this Agreement and the Ancillary Agreements, including for purposes of effecting any waiver or amendment. Any payment or delivery to be made pursuant to this Agreement or the Ancillary Agreements to the Sellers, or any of them, may be made by the Purchaser to Parent and thereupon will be deemed to have been made to such Sellers.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the corresponding sections or subsections of the Sellers' Disclosure Schedule, the Sellers jointly and severally hereby represent and warrant to the Purchaser as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows. Within five Business Days from the date hereof, the Sellers' shall provide any additional documentation or information required by the Purchaser regarding the items marked with an asterisk on the Sellers' Disclosure Schedule and, except to the extent the Purchaser consents to the retention of such items on the Sellers' Disclosure Schedule, the exclusion of such items shall be reflected on an updated Sellers' Disclosure Schedule or other appropriate adjustments consented to by the Purchaser shall be made.

Section 3.1    Organization, Authority and Qualification of the Sellers.

Except as set forth in Section 3.1 of the Sellers' Disclosure Schedule, each of the Sellers (x) is a corporation or limited liability company, as the case may be, duly organized, validly existing and, except as a result of the commencement of the Chapter 11 Cases, in good standing under the laws of the jurisdiction of its incorporation, formation or organization, and, subject to obtaining the approval of the Bankruptcy Court, has all necessary power and authority to enter into this Agreement and the Ancillary Agreements, to carry out its obligations hereunder and thereunder, and to consummate the Transactions.; (y) has all necessary power and authority to own, lease, operate and conduct its respective businesses, properties and assets as now being conducted; and (z) is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its respective business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (a) has resulted from the commencement or continuance of the Chapter 11 Cases; or (b) would not: (i) adversely affect the ability of such Seller to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions; or (ii) otherwise reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Subject to obtaining the Sale Order from the Bankruptcy Court, the execution and delivery of this Agreement

and the Ancillary Agreements by each Seller, the performance by each Seller of its obligations hereunder and thereunder, and the consummation by each Seller of the Transactions have been duly authorized by all requisite action on the part of such Seller and their stockholders or members, as the case may be, and no other corporate or limited liability company action or proceeding on the part of any of the Sellers is necessary to authorize the execution and delivery of this Agreement and the Ancillary Agreements by each of the Sellers, or the consummation of the Transactions. This Agreement has been, and upon their execution, the Ancillary Agreements shall have been, duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by the Purchaser), subject to the approval of the Bankruptcy Court, this Agreement constitutes, and, upon their execution, the Ancillary Agreements shall constitute, legal, valid and binding obligations of such Seller, as applicable, enforceable against such Seller in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity. None of the Sellers have any Subsidiaries, except for other Sellers, except as specified in <u>Section 2.1(a)(iv)</u>.

Section 3.2    <u>No Conflict</u>.

Subject to the approval of the Bankruptcy Court and the entry of the Sale Order, and assuming that all consents, approvals, authorizations and other actions described in <u>Section 3.3</u> have been obtained, all filings and notifications listed in <u>Section 3.3</u> of the Sellers' Disclosure Schedule have been made, and any applicable waiting period has expired or been terminated, and except as may result from any facts or circumstances relating solely to the Purchaser, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Sellers and the consummation of the Transactions hereby and thereby do not and will not, except as set forth in <u>Section 3.2</u> of the Sellers' Disclosure Schedule: (a) violate, conflict with or result in the breach of the certificate of incorporation, articles of incorporation, bylaws, certificate of formation, operating agreement, limited liability company agreement or similar formation or organizational documents of any of the Sellers; (b) conflict with or violate any Law or Order applicable to any of the Sellers or any of the Purchased Assets or Assumed Liabilities; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which any of the Sellers is a party, or result in the creation of any Lien on any of the Purchased Assets, except to the extent that any such rights of termination, amendment, acceleration, suspension, revocation or cancellation and such Liens are cured, remedied or otherwise accounted for in the Sale Order and except, in the case of clauses (b) and (c), for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or reasonably be expected to result in the imposition of any Lien against any of the Purchased Assets.

Section 3.3    <u>Governmental Consents and Approvals</u>.

The execution, delivery and performance of this Agreement and each Ancillary Agreement by the Sellers do not and, upon the entry by the Bankruptcy Court of the Sale Order as required by <u>Section 7.1(d)</u> and <u>Section 7.2(d)</u>, will not require any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law or Order applicable to any Seller or by which any of the Purchased Assets may be bound, any Contract to which any Seller is a party

or by which any Seller may be bound, except (i) as described in <u>Section 3.3</u> of the Sellers' Disclosure Schedule, and (ii) filings or consents, the failure to obtain which would not constitute a Material Adverse Effect.

Section 3.4    <u>Litigation.</u>

Except (a) for the Chapter 11 Cases, (b) as set forth in <u>Section 3.4</u> of the Sellers' Disclosure Schedule or (c) for Actions involving, in the aggregate, less than $200,000 and which would not, if decided adversely, have any impact on the post-closing operations of the Business, there is no pending Action by or against any of the Sellers or relating to the Business or any of the Purchased Assets or Assumed Liabilities, or, to the Sellers' Knowledge, threatened against or affecting any of the Sellers or relating to the Business or any of the Purchased Assets or Assumed Liabilities.

Section 3.5    <u>Compliance with Laws.</u>

Except as set forth in <u>Section 3.5</u> of the Sellers' Disclosure Schedule, the Sellers (a) have conducted and continue to conduct the Business in all material respects in accordance with all applicable Laws and Orders applicable to the Business, (b) have complied with and continue to comply with in all material respects all Laws and Orders applicable to the Purchased Assets and the Assumed Liabilities, (c) are not in violation in any material respect of any such Law or Order, and (d) have not received any notice that any violation of any such Law or Order is being or may be alleged.

Section 3.6    <u>Environmental Matters.</u>

Except as set forth in <u>Section 3.6</u> of the Sellers' Disclosure Schedule to Sellers' knowledge:

(a)    The Business, the Leased Real Property, and any properties or facilities owned, leased or operated by the Business are in compliance with Environmental Laws; and

(b)    The Business possesses and is in compliance with all Environmental Permits necessary for the conduct of its business as presently conducted.

Section 3.7    <u>Intellectual Property.</u>

(a)    <u>Section 3.7</u> of the Sellers' Disclosure Schedule sets forth a true and complete list of all material (i) material Owned Intellectual Property, including an indication of whether or not it is registered with any Governmental Authority; and (ii) Licensed Intellectual Property. The Transferred Intellectual Property constitutes all Intellectual Property used by the Sellers in the conduct of the Business.

(b)    The continued operation of the Business as presently conducted or reasonably expected to be conducted does not interfere with, infringe upon, misappropriate, or otherwise come into conflict with, any Intellectual Property rights of third parties. To Sellers' Knowledge, there are not, and have not been during the preceding two (2) year, any Actions, reissues, reexaminations, public protests, interferences, arbitrations, mediations, oppositions, cancellations, Internet domain name dispute resolutions or other proceedings (collectively, "<u>Suits</u>") pending, decided, threatened or asserted concerning the Owned Intellectual Property, and no valid basis for any such Suit exists. To the Seller's Knowledge, there are no Suits pending, decided, threatened or asserted concerning the

Licensed Intellectual Property or the right of any Seller to use the Licensed Intellectual Property, and, to the Seller's Knowledge, no valid basis for any such Suits or Actions exists.

(c)     No Person other than a Seller has any ownership interest in, or a right to receive a royalty or similar payment with respect to, any of the Owned Intellectual Property. Except as set forth on Section 3.7 of the Sellers' Disclosure Schedule, no Person is entitled to a royalty or similar payment with respect to Intellectual Property not owned by a Seller. None of the Sellers have granted any options, licenses, assignments or agreements of any kind relating to (i) ownership of rights in Owned Intellectual Property; or (ii) the marketing or distribution of Owned Intellectual Property.

(d)     To the Knowledge of Seller, no Intellectual Property that is Owned Intellectual Property or subject to any Intellectual Property License is being infringed by third parties.

Section 3.8     Real Property.

(a)     Section 3.8 of the Sellers' Disclosure Schedule lists the street address and legal description where appropriate of each parcel of real property leased or subleased by any Seller as tenant or subtenant, as the case may be, which is used or useful in or held for use in the conduct of the Business, and the identity of the lessee of each such parcel of Leased Real Property. The Sellers have delivered to the Purchaser true and complete copies of the leases and subleases in effect at the date hereof (including all amendments thereto and assignments in respect thereof) relating to the Leased Real Property, and there has not been any sublease or assignment entered into by any of the Sellers in respect of the leases and subleases relating to the Leased Real Property. Each lease and sublease in respect of the Leased Real Property is a valid lease or sublease and Sellers have received no written notice of default except as disclosed in Section 3.8 of the Sellers' Disclosure Schedule. No Seller has received notice of any pending condemnation proceeding or any threatened condemnation that would preclude or impair the use of any Leased Real Property by the Business for the purposes for which it is currently used.  No Seller has received notice of the applicable Governmental Authority altering its zoning Laws so as to affect or potentially affect the Leased Real Property.

(b)     Except as set forth in Section 3.8 of the Sellers' Disclosure Schedule, Sellers have valid and binding leasehold interests in all of their respective material assets, free and clear of any Liens, except, in each case, for Permitted Liens.  No options or rights of first offer or rights of first refusal or similar rights or options have been granted by any Seller to any Person (other than the Purchaser) that are enforceable despite the continuation of the Chapter 11 Cases to purchase, lease or otherwise acquire any interest in any of the leases or subleases relating to the Leased Real Property.

(c)     Subject to the entry of the Sale Order, except as set forth on Section 3.8 of the Sellers' Disclosure Schedule, all real property leases listed in Section 3.8 of the Sellers' Disclosure Schedule are assumable by the Sellers and assignable by the Sellers to Purchaser pursuant to Section 365 of the Bankruptcy Code.

Section 3.9     Employee Benefit Matters.

(a)     Section 3.9 of the Sellers' Disclosure Schedule lists all Employee Plans. Each Employee Plan is in writing, and the Sellers have made available to the Purchaser a true and complete copy of each Employee Plan and all amendments made to such plans together with, as

applicable, any applicable collective bargaining agreements and ancillary agreements, all current funding agreements, the most recent determination letter, if applicable, all current summary descriptions, and, if applicable, the Form 5500 and attached schedules, actuarial report and financial statements relating to those Employee Plans for the most recent two years. No facts, conditions or circumstances have occurred between the date of the foregoing documents that were delivered or made available to the Purchaser and the date of this Agreement that would materially affect the information contained in those documents and, in particular, and without limiting the generality of the foregoing, no oral or written promises or commitments have been made to amend any Employee Plan or to provide increased benefits under any Employee Plan to any of the Business Employees, except as required by applicable Laws.

(b)     To Sellers' knowledge, each Employee Plan has been operated in all material respects in accordance with its terms and the requirements of all applicable Laws (including, without limitation, all Tax rules with which compliance is required for any intended favorable Tax treatment). Each of the Sellers has performed all material obligations required to be performed by it in respect of the Business Employees prior to Closing under, is not in any material respect in default under or in material violation of, any Employee Plan. No Employee Plan is or at any time was a "defined benefit plan" as defined in Section 3(35) of ERISA or a pension plan subject to the funding standards of Section 302 of ERISA or Section 412 of the Tax Code nor a "multiple employer plan" within the meaning of Section 210(a) of ERISA or Section 413(c) of the Tax Code. The Sellers or any ERISA Affiliates have never participated in nor has been required to contribute to any "multi employer plan," as defined in Sections 3(37)(A) and 4001(a)(3) of ERISA and Section 414(f) of the Tax Code or any plan that is subject to Title IV of ERISA. There is no material default or violation of an Employee Plan by any party thereto and no action is pending or, to the Sellers' Knowledge, threatened with respect to any Employee Plan and, to the Sellers' Knowledge, no fact or event exists that could give rise to any such Action. The Sellers and ERISA Affiliates have complied with the notice and continuation of coverage requirements of Section 4980B of the Tax Code, and the regulations thereunder, and Part 6 of Title I of ERISA and has complied with the Health Insurance Portability and Accountability Act of 1996 with respect to any group health plan within the meaning of Tax Code Section 5000(b)(1).

Section 3.10   Taxes.

Except as set forth in Section 3.10 of the Sellers' Disclosure Schedule,

(a)     Sellers have timely filed or caused to be timely filed or will timely file or cause to be timely filed with the appropriate Governmental Authorities (taking into account extensions to file Tax Returns) all Tax Returns that are required to be filed with respect to the income or operations of the Business or the ownership of the Purchased Assets on or prior to the Closing Date. All such Tax Returns are true, correct, and complete. Each Transferred Entity, and each subsidiary of a Transferred Entity, has timely filed (or has had filed on its behalf) all Tax Returns required to be filed by or with respect to it. All such Tax Returns are true, correct, and complete;

(b)     All Taxes shown to be payable on such Tax Returns have been paid or will be timely paid and all Taxes due by or with respect to the income or operations of the Business or the ownership of the Purchased Assets for the Pre-Closing Period have been timely paid or will be timely paid in full on or prior to the Closing Date. Each Transferred Entity, and each subsidiary of a Transferred Entity, has paid all Taxes required to be paid by it (or has had such Taxes paid on its behalf) in accordance with applicable Law;

(c)     (i) None of the Sellers are the subject of an audit or other examination of Taxes by any Governmental Authorities with respect to the income or operations of the Business or the ownership of the Purchased Assets and no Transferred Entity, nor any subsidiary of a Transferred Entity, is the subject of an audit or other examination of Taxes by any Governmental Authority; (ii) to the Sellers' Knowledge, no such audit or examination is threatened or pending; and (iii) the Sellers have not received any written notices from any Governmental Authority relating to any issue that could result in any liability for Taxes with respect to the income or operations of the Business or the ownership of the Purchased Assets, or with respect to any Transferred Entity or any subsidiary of a Transferred Entity;

(d)     There are no filed Liens for Taxes or security interests on any of the Purchased Assets or on any assets of any Transferred Entity or any assets of any subsidiary of a Transferred Entity arising in connection with any failure (or alleged failure) to pay any Taxes (other than Permitted Liens).

(e)     No deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of Taxes has been asserted or assessed by any Governmental Authority against any Seller (with respect to the Purchased Assets or the Business) or against any Transferred Entity or any subsidiary of a Transferred Entity.

(f)     No Seller, nor any Transferred Entity, nor any subsidiary of a Transferred Entity, has consented to extend the time in which any Taxes may be assessed or collected by any Governmental Authority.

(g)     Each Seller, each Transferred Entity and each subsidiary of each Transferred Entity has withheld and remitted to the appropriate Governmental Authorities in compliance with all applicable laws and regulations all Taxes required to be withheld and remitted by it in connection with payments made to other persons.

(h)     No Transferred Entity, nor any subsidiary of a Transferred Entity, is a party to or bound by any tax allocation or tax sharing agreement or has any current or potential obligation to indemnify any other Person with respect to Taxes.

Section 3.11   Material Contracts.

(a)     Section 3.11(a) of the Sellers' Disclosure Schedule sets forth all Contracts concerning the Purchased Assets, the Transferred Intellectual Property or that are related to, or used or useful in or held for use in, the Business that are in any of the following categories:

(i)     Contracts for the sale of assets, products or services with any of Sellers' 20 largest customers;

(ii)     Contracts with any of the Sellers 20 largest vendors and all other vendors other than vendors reasonably determined by the Sellers not to be material to the Business as a whole;

(iii)     Contracts containing a covenant that restricts a Seller or any Affiliate of a Seller from engaging in any line of business or competing with any Person;

(iv)    Contracts providing for indemnification by a Seller, other than in connection with respect to standard terms and conditions of a Contract for the purchase or sale of assets, products or services in the ordinary course of business;

(v)    (A) Employment contracts with the individuals listed on Schedule 2.2(a)(vi) or Schedule 2.7(i) and any other non-ordinary course employment agreements, (B) any severance, stay bonus or similar agreements not listed on Schedule 2.2(a)(vi), (C) Employee Plans and (D) all bonus, commission or other incentive compensation plans;

(vi)    Contracts relating to a joint venture of the Business;

(vii)    Currency exchange, interest rate, commodity exchange or similar Contracts;

(viii)    Contracts for capital expenditures except to the extent such Contracts involve the payment in the aggregate of less than $50,000 during the terms thereof;

(ix)    Contracts or licenses of any patents, trademarks, trade names, service marks, copyrights or other Intellectual Property received from or granted to third parties;

(x)    Contracts related to or arising in connection with the Transferred Entities which contains any material restrictions on any Seller; and

(xi)    Contracts not made in the ordinary course of business involving payments of more than $100,000.

(such Contracts collectively, "Material Contracts", and each a "Material Contract").

(b)    The Sellers have made available to the Purchaser true and complete copies of the Material Contracts (including all amendments thereto and assignments thereof).

(c)    Each Material Contract (i) is valid and binding on the applicable Seller and, to the Sellers' Knowledge, the counterparties thereto, and is in full force and effect; and (ii) upon entry of the Sale Order and consummation of the Transactions, shall continue in full force and effect without penalty or other adverse consequence. The applicable Seller and, to the Sellers' Knowledge, the counterparties thereto, are not in breach of, or default under, any Material Contract to which any of them is a party.

Section 3.12   Brokers.

Except for Roth Capital Partners, LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of any Seller. The Sellers are solely responsible for the fees and expenses of any financial advisor to the Sellers.

Section 3.13   Title to Purchased Assets; Good Condition.

(a)    The Sellers have good and valid title to, or in the case of leased assets, a valid leasehold interest in, all of the Purchased Assets. The Purchased Assets include all of the tangible and intangible assets used in or reasonably necessary to conduct the Business as currently conducted or proposed to be conducted.