(b)     All of the tangible personal property used or useful in or held for use in connection with the Business is, in all material respects, in good operating condition and repair, free of defects and in a state of good maintenance, ordinary wear and tear excepted, and is adequate and suitable for the purposes for which it is presently being used or intended.

Section 3.14   Insurance.

Set forth in Section 3.14 of the Sellers' Disclosure Schedule is an accurate and complete list of each insurance policy and insurance arrangement that covers businesses, properties, assets (including the Purchased Assets), Liabilities (including the Assumed Liabilities) or employees (including self insurance, but excluding insurance policies providing benefits under welfare plans and directors' and officers' insurance) of the Business (the "Insurance Policies"). The Insurance Policies are in full force and effect, all premiums thereon have been paid, and the Sellers are otherwise in compliance in all material respects with the terms and provisions of such policies. No Seller is in default under any of the Insurance Policies (or any policy required to be set forth in Section 3.14 of the Sellers' Disclosure Schedule) and there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default thereunder. No Seller has received any notice of cancellation or non-renewal of any such Insurance Policies nor has the termination of any such Insurance Policies been threatened, and there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such Insurance Policies.

Section 3.15   Permits.

The Sellers have made available to the Purchaser prior to the date hereof a true and complete copy of each of the Permits and Licenses, each of which is listed in Section 3.15 of the Sellers' Disclosure Schedule. The Sellers have obtained and possess all Permits and Licenses and have made all registrations or filings with or notices to any Governmental Authority necessary for the lawful conduct of the Business as presently conducted and operated, or necessary for the lawful ownership of their properties and assets or the operation of the Business as presently conducted and operated. Each such Permit and License is valid and in full force and effect and the Sellers are in material compliance with all such Permits and Licenses. Each such Permit and License is included in the Purchased Assets.

Section 3.16   Labor Matters.

Except as set forth in Section 3.16 of the Sellers' Disclosure Schedule, (i) none of the Sellers are a party to any collective bargaining, voluntary recognition, union or similar agreement with respect to any of the Business Employees, and to the Sellers' Knowledge, no union represents or claims to represent or is attempting to organize any of the Business Employees, and (ii) there is no unfair labor practice charge or complaint against the Sellers in respect of the Business pending or, to the Sellers' knowledge, threatened before the National Labor Relations Board, any federal or state labor relations board or any court or tribunal. Except as set forth in Section 3.16 of the Sellers' Disclosure Schedule, there are no pending, or to the Sellers' Knowledge, threatened actions, grievances, arbitrations, administrative proceedings, charges, complaints or investigations that involve the labor or employment relations of the Business, including but not limited to, issues relating to employment discrimination, wages and hours and occupational health and safety. Except as disclosed in Section 3.16 of the Sellers' Disclosure Schedule, (i) there are outstanding Orders

against any of the Sellers under any applicable Law relating to occupational safety and health, or any other matters relating to employment or employees, in connection with the Business.

Section 3.17    Transactions with Related Parties.

Except as set forth in Section 3.17 of the Sellers' Disclosure Schedule:

(a)    Except for employment or compensation agreements listed on Section 3.11 of the Sellers' Disclosure Schedule, no agreement or transaction between any of the Sellers and (i) any director, officer, stockholder or Affiliate of the Sellers, or (ii) any relative or spouse (or relative of such spouse) of any such director, office, stockholder or Affiliate (such persons in (i) and (ii) being referred to herein as a "Related Party" or collectively as the "Related Parties") has been entered into.

(b)    No Related Party is a director or officer of, or has any direct or indirect interest in (other than the ownership of not more than 5% of the publicly traded shares of), any Person or entity which is a supplier, vendor, or competitor of any of the Sellers.

(c)    No Related Party owns or has any interest in, directly or indirectly, in whole or in part, any tangible or intangible property used or useful in the conduct of the Business or any Purchased Asset.

(d)    No Seller has made any loans, payments or transfers of any Seller's assets to any Related Party.

Section 3.18    Financial Statements.

(a)    The Financial Statements, correct and complete copies of which have been delivered to the Purchaser, have been prepared from the books and records of the Sellers and fairly present in all material respects the financial position and results of operations, shareholders' equity and cash flows of the Sellers as at the dates and for the periods reflected thereon in accordance with GAAP applied on a consistent basis throughout the periods indicated, except as may be indicated in the notes thereto and except, in the case of the unaudited financial statements, for the failure of the unaudited financial statements to include the footnotes required by GAAP, and subject to normal year-end audit adjustments that are not anticipated individually or in the aggregate be material.

(b)    The Transferred Entities have no material Liabilities except (i) to the extent specifically reflected and accrued for or specifically reserved against in the Sellers' balance sheet as of July 25, 2009 and (ii) for Liabilities incurred subsequent to July 25, 2009 in the ordinary course of business consistent with past custom and practice. The Transferred Entities and their respective assets are subject to no Liens other than Permitted Liens.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES
OF THE PURCHASER**

Except as set forth in the corresponding sections or subsections of the Purchaser's Disclosure Schedule, the Purchaser hereby represents and warrants to the Sellers as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

Section 4.1    Organization and Authority of the Purchaser.

The Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of Delaware and has all necessary corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the Transactions. The Purchaser is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not adversely affect the ability of the Purchaser to carry out its obligations under this Agreement and the Ancillary Agreements to which it is a party, and to consummate the Transactions. The execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the Transactions have been duly authorized by all requisite company action on the part of the Purchaser. This Agreement has been, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall have been, duly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by each of the Sellers and other parties thereto), subject to the approval of the Bankruptcy Court, this Agreement constitutes, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

Section 4.2    No Conflict.

Subject to the approval of the Bankruptcy Court, and assuming that all consents, approvals, authorizations and other actions described in Section 4.2 have been obtained, all filings and notifications listed in Section 4.2 of the Purchaser's Disclosure Schedule have been made, and any applicable waiting period has expired or been terminated, and except as may result from any facts or circumstances relating solely to the Sellers, the execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements to which the Purchaser is a party do not and will not: (a) violate, conflict with or result in the breach of any provision of the certificate of incorporation or bylaws of the Purchaser; (b) conflict with or violate any Law or Order applicable to the Purchaser or its assets, properties or businesses; or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Purchaser is a party, except, in the case of clauses (b) and (c), as would not materially and

adversely affect the ability of the Purchaser to carry out its obligations under this Agreement and the Ancillary Agreements to which it is a party, and to consummate the Transactions.

Section 4.3    Governmental Consents and Approvals.

The execution, delivery and performance by the Purchaser of this Agreement and each Ancillary Agreement to which the Purchaser is a party do not or, upon the entry by the Bankruptcy Court of the Sale Order as required by Section 7.1(d) and 7.2(d), will not require any consent, approval, authorization or other Order of, action by, filing with, or notification to, any Governmental Authority, except as described in Section 4.3 of the Purchaser's Disclosure Schedule and (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by the Purchaser of the Transactions.

Section 4.4    Litigation.

As of the date hereof, no Action by or against the Purchaser is pending or, to the Purchaser's Knowledge, threatened, which would reasonably be expected to affect the legality, validity or enforceability of this Agreement, any Ancillary Agreement or the consummation of the Transactions.

Section 4.5    Financial Condition.

Purchaser has sufficient financial resources to provide adequate assurance of future performance of the Assigned Contracts and shall have on the Closing Date sufficient financial resources to consummate the Transactions.

Section 4.6    Brokers and Finders.

Except for Roth Capital Partners, LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Purchaser.

**ARTICLE V**

**ADDITIONAL AGREEMENTS**

Section 5.1    Assumption of Assigned Contracts.

(a)    The Sellers shall make available to the Purchaser a reasonably categorized list and true and complete copies of to the Contracts (including Permits and Licenses that are Contracts), or in the case of oral Contracts true and complete written descriptions thereof (in each case including all amendments thereto and assignments thereof) on or before the fifteenth (15th) day after the date hereof. Not later than ten (10) Business Days prior to the Closing, the Sellers shall provide the Purchaser with lists of all Contracts (including any lease pursuant to which the Leased Real Property is leased by a Seller), which shall be by specific Contract and not by category of Contract except as otherwise consented to by the Purchaser, which they deem should be Assigned Contracts hereunder and the "cure amounts" pursuant to Section 365 of the Bankruptcy Code relating to each (the "Sellers' Assigned Contracts Schedule"). All Contracts on Seller's Assigned Contracts Schedule shall be deemed to be Assigned Contracts unless, at any time and from time to time on or before (i) the 60th day after the Closing, with respect to any lease pursuant

to which the Leased Real Property is leased by a Seller or (ii) the Business Day prior to the Closing Date, with respect to all other Contracts, the Purchaser by written notice to the Sellers elects to exclude any one or more of the scheduled Contracts that would otherwise be Assigned Contracts. The Purchaser also may add Contracts not designated by the Sellers (the "Extra Contracts") (including any lease pursuant to which any Leased Real Property is leased by a Seller and Permits and Licenses) to be an Assigned Contract. Any Contract which is not designated on the Sellers' Assigned Contracts Schedule or in a notice pursuant to the preceding sentence as an Assigned Contract or which is designated in a notice pursuant to the second preceding sentence (each such designated Contract, an "Excluded Contract"), shall not be an Assigned Contract to be assigned to the Purchaser hereunder and shall be an Excluded Asset. Notwithstanding the foregoing, the Purchaser shall not be entitled to designate any Assumed Employment Agreement or Assumed Severance Agreement, or any other agreement listed on Schedule 2.2(a)(vi), as an Excluded Contract, and the Sellers shall be required to include each Assumed Employment Agreement and Assumed Severance Agreement on the Sellers' Assigned Contracts Schedule, unless the employee party thereto does not become a Transferred Employee. There shall be no adjustment to the Purchase Price as a result of the Purchaser's election to exclude any one or more of the Contracts from the Transactions pursuant to this Section 5.1(a), or to add any Extra Contracts; except that the Purchaser shall not be required to make any payments for Determined Cure Costs or any other amounts for any such Excluded Contracts. Each Seller hereby appoints the Purchaser its agent and attorney-in-fact for the sole purpose of allowing the Purchaser to continue to operate under each lease pursuant to which the Leased Real Property is leased by a Seller until such time as the Purchaser either designates such lease as an Assigned Contract or designates that it does not want to have such lease assigned to it, provided that during such period, the Purchaser shall be responsible for all obligations arising from or in connection with such lease during such period (and not based on a breach, default or other circumstance existing prior to such period).

(b)     At the time of Closing, except to the extent a later date is consented to by the Purchaser in its sole discretion with respect to any lease pursuant to which any Leased Real Property is leased by a Seller, Seller shall have obtained the approval of the Bankruptcy Court pursuant to the Sale Order or another Order of the Bankruptcy Court and/or the consent of the applicable counterparties to the extent necessary to effect the assignment of, and the Sellers shall assume (to the extent required) and then assign to the Purchaser, and the Purchaser shall assume from the Sellers, to the extent provided in Section 2.2(a), all the Assigned Contracts.

(c)     Subject to the terms of Section 5.1(a), the Purchaser shall make provision for the payment of the Determined Cure Costs. The Sellers shall use their reasonable best efforts, including the filing and prosecution of any and all appropriate proceedings in the Bankruptcy Court, to establish the Determined Cure Costs, if any, for each Assigned Contract no later than three Business Days prior to the deadline for the Purchaser to include such Contract in the Purchased Assets, in accordance with the Sellers' books and records as of the Petition Date.

(d)     Notwithstanding any provision in this Agreement to the contrary, the Sellers will not reject or take any action or cause any of their Affiliates to reject or take any action (or fail to take any action that would result in rejection by operation of law) to reject, repudiate or disclaim any Assigned Contract without the prior written consent of the Purchaser.

Section 5.2     Conduct of Business Prior to the Closing.

(a)     The Sellers covenant and agree that, except as described in Section 5.2(a) of the Sellers' Disclosure Schedule, between the date hereof and the Closing and except as a result of

the Chapter 11 Cases, and subject to Bankruptcy Court orders and the constraints of the DIP Credit Agreement, each Seller shall, and shall cause each of its Affiliates (as relates to the Business) in all material respects to:

(i)     conduct and maintain its business in the condition as of the date hereof, provided that nothing herein shall require the Sellers to continue operating any Leased Real Property subject to a lease that is an Excluded Asset;

(ii)    use its commercially reasonable efforts and take all necessary actions to maintain, preserve and keep the Purchased Assets in good condition and repair (normal wear and tear excepted), and to maintain in effect all material licenses, permits, and approvals of Governmental Authorities which are necessary for the conduct of the Business;

(iii)   use commercially reasonable efforts to maintain the Sellers' current insurance coverage under each insurance policy maintained by the Sellers with respect to the Business, provided that the Purchaser acknowledges that, after the Closing Date, the Sellers shall have no responsibility for obtaining or maintaining any insurance relating to the Business, whether relating to or arising out of occurrences prior to, at or subsequent to, the Closing, except to the extent required to enable the Sellers to comply with Section 2.1(a)(xiii);

(iv)    use commercially reasonable efforts to maintain in full force and effect the Owned Intellectual Property;

(v)     except as relates to any Excluded Assets, use commercially reasonable efforts to maintain in all material respects the goodwill and organization of the Business and Sellers' relationship with the Business Employees, suppliers, customers, lenders, lessors and others having business dealings with them in connection with the Business;

(vi)    subject to Section 5.1, use commercially reasonable efforts to obtain all necessary consents to the transfer of the Contracts that are to be transferred to the Purchaser pursuant to this Agreement, provided that, subject to Section 5.1, the obligation to use commercially reasonable efforts shall not require any payment of money or other consideration by the Sellers unless the Purchaser requests that the Sellers make such a payment and agrees to reimburse the Sellers for such payment;

(vii)   use commercially reasonable efforts to obtain authorization pursuant to the Sale Order to execute, deliver and/or file Uniform Commercial Code, lien releases, discharges, financing change statements and such other documents, notices or instruments as the Purchaser may reasonably deem necessary or desirable to release all Liens, except for Permitted Liens, against the Purchased Assets;

(viii)  pay and discharge their Liabilities relating to the Business as they come due in the ordinary course of business, to the extent consistent with the terms of the DIP Credit Agreement, except those subject to the automatic stay under the Bankruptcy Code;

(ix)    consult in good faith as requested by the Purchaser with the representatives of the Purchaser to report material operational developments and the general status of ongoing operations of the Business, including any Material Adverse Effect; and

(x)     pay, and cause any entity the equity of which is included in the Purchased Assets, and any subsidiary of any such entity, to pay, all Taxes due and payable by it before the Closing.

(b)     The Sellers covenant and agree that, except as described in Section 5.2(b) of the Sellers' Disclosure Schedule, between the date hereof and the Closing, and except as required by applicable Law or as a result of the Chapter 11 Cases, each Seller shall not, and shall cause each of their Affiliates and the Sellers' and Affiliates' respective officers, directors, shareholders, members, employees, managers, partners, representatives and agents not to, in any material respect, without the prior written consent of the Purchaser, or with respect to clause (ix) and below, without providing the Purchase with reasonable notice and a reasonable opportunity to consult with the Sellers:

(i)     sell, lease, dispose or otherwise transfer or distribute any of the Purchased Assets, or any interest therein, other than transfers and dispositions, including the sale and purchase of Inventory from suppliers, made in the ordinary course of business;

(ii)     grant or announce any increase in the salaries, bonuses, severance or other payments or benefits payable to any of the Business Employees or independent contractors or grant any equity or equity-based compensation to any Business Employees or independent contractors;

(iii)     hire any new employees or transfer employees from any other operations of the Sellers, or enter into any employment Contract or other arrangement with any Business Employees, except for any non-managerial employee earning no more than $75,000 per annum;

(iv)     effect any involuntary termination of any Business Employees, except for involuntary terminations in the ordinary course of business or for cause (including for violation of a Seller's employment policies);

(v)     adopt any employee benefit plan that would be an Employee Plan if in existence as of the date of this Agreement for any Business Employees, or amend or modify any existing Employee Plans for such employees, other than as required by a change in Law after the date hereof;

(vi)     change any method of accounting or accounting practice or policy used by the Sellers (or by the Parent in a consolidated return with Sellers), other than such changes required by GAAP;

(vii)     fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire, except with respect to any lease that is an Excluded Asset;

(viii)     enter or agree to enter into any Material Contract which may be included in the Purchased Assets, other than in the ordinary course of business, or make or agree to make a material change or modification to any existing Material Contract included in the Purchased Assets, other than in the ordinary course of business;

(ix)     take or omit to take any action that would require disclosure under Article III, or that would otherwise result in a breach of any of the representations, warranties or covenants made by the Sellers in this Agreement or in any of the Ancillary Agreements;

(x)     take any action or omit to take any action which act or omission would reasonably be anticipated to have a Material Adverse Effect on the Business or the Purchased Assets;

(xi)     enter into any Contract regarding the license, sublicense, agreement or permission to use Intellectual Property;

(xii)    enter into any Contract for the sublease of any of the Leased Real Property;

(xiii)   amend its certificate or articles of incorporation, bylaws, certificate of formation, limited liability company agreement or other organizational documents or take any other action if any such amendment or action would have an adverse effect on the ability of any Seller to consummate the Transactions or otherwise adversely affect the Business or the value, utility or transferability of the Purchased Assets;

(xiv)    purchase, redeem or agree to purchase or redeem any of its equity interests, options, warrants or rights to purchase equity interests or securities of any kind convertible or exchangeable for equity interests;

(xv)     acquire any entity or all or substantially all of the assets of any entity or make any other investment outside the ordinary course of business;

(xvi)    make any capital expenditures, including capital expenditures for new scanners for the Sellers' drivers (whether capitalized or expensed), except as explicitly provided for in the budget annexed to the DIP Credit Agreement, as such budget may be amended with the prior written consent of the Purchaser (the "Budget");

(xvii)   other than Trade Payables, create or incur any Indebtedness or other Liabilities (absolute or contingent) except as explicitly provided for in the Budget;

(xviii)  make any loan, advance, guaranty or other extension of credit to any Person or enter into any commitment to make any loan, advance, guaranty or other extension or credit, except as explicitly provided for in the Budget;

(xix)    create or incur any Lien or fail to take action to discharge any involuntary Lien, against or in respect of any Purchased Assets, except for Permitted Liens;

(xx)     institute, settle, or agree to settle any claims, actions, or proceedings before any court or other Governmental Authority;

(xxi)    compromise or otherwise settle any claims relating to, or adjust any assertion or claim of a deficiency in, Taxes (or interest thereon or penalties in connection therewith), or file any appeal from an asserted deficiency, except in a form previously approved by the Purchaser or file or amend any Tax Return;

(xxii)   amend any Tax Return or make any Tax election;

(xxiii)  declare, issue, make or pay any dividend or other distribution of assets, whether consisting of money, other personal property, real property or other thing of value, to holders of its equity interests (other than another Seller);

(xxiv)   fail to comply, in all material respects, with all applicable Laws and Orders;

(xxv)    enter into any transaction with any Affiliate, director, officer, manager or employee of any Seller (including Parent);

(xxvi) subject to <u>Section 5.3</u>, make any other payment or take any other action is that is materially inconsistent with the Budget; or

(xxvii) agree to take any of the actions specified in this <u>Section 5.2(b)</u>, except as expressly contemplated by this Agreement and the Ancillary Agreements.

Section 5.3    <u>Access to Information</u>.

(a)    From the date hereof until the Closing, upon reasonable notice, the Sellers shall, and shall cause their respective officers, directors, managers, employees, agents, representatives, accountants and counsel to: (a) afford the Purchaser, its Affiliates, potential financing sources and their respective authorized representatives reasonable access to the offices, properties and books and records of the Sellers (to the extent relating to the Business, the Purchased Assets or the Assumed Liabilities) including access to conduct environmental site assessments; (b) review with the Purchaser on a daily basis all disbursements, receipts and sales, with all such disbursements (other than disbursements to the Sellers' counsel) being subject to the Purchaser's approval which, except in the case of disbursements to professionals, shall not be unreasonably withheld if they are in accordance with the Budget; and (c) furnish to the respective officers, employees, and authorized agents and representatives of the Purchaser and its Affiliates and potential financing sources such additional financial and operating data and other information regarding the Business, the Purchased Assets and the Assumed Liabilities (or copies thereof) as the Purchaser may from time to time reasonably request; provided, however, that any such access or furnishing of information shall be conducted during normal business hours, under the supervision of the applicable Seller's personnel and in such a manner as not to interfere with the normal operations of the Business; provided, further, that such review by and any information furnished to the Purchaser shall not affect the representations and warranties made by the Sellers in this Agreement or the remedies of the Purchaser for breaches of those representations and warranties. From time to time prior to the Closing, the Sellers shall promptly supplement or amend information previously delivered to the Purchaser with respect to any matter hereafter arising which, if existing or occurring prior to or at the date of this Agreement, would have been required to be set forth or disclosed herein; provided, however, that such supplemental information shall not be deemed to be an amendment to the Sellers' Disclosure Schedule or the representations and warranties made by the Sellers in this Agreement.

Section 5.4    <u>Damage or Destruction</u>.

Until the Closing, the Purchased Assets shall remain at the risk of the Sellers. In the event of any material damage to or destruction of any material Purchased Asset (other than normal wear and tear) after the date hereof and prior to the Closing (in any such case, a "<u>Loss</u>"), the Sellers shall give notice thereof to the Purchaser, and if any such Losses would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, Purchaser shall be entitled to terminate this Agreement upon providing Sellers written notice of such termination. If any such Loss is covered by policies of insurance, all right and claim of the Sellers (or Parent) to any proceeds of insurance for such Loss shall be assigned and (if previously received by the Sellers and not used prior to the Closing Date to repair any damage or destruction) paid to the Purchaser at Closing. If any such Loss is not funded by policies of insurance, the Purchaser shall have the right to reduce the Purchase Price by an amount equal to (i) the estimated cost to repair or restore the Purchased Assets affected by such Loss (the "<u>Affected Assets</u>") to substantially repair or restore their condition immediately prior to the occurrence of such Loss or (ii) if such Affected Assets are destroyed or damaged beyond repair, the replacement cost of the Affected Assets, and all compensation payable on account of such Loss shall be retained by the Sellers. If the Purchaser elects to reduce the

Purchase Price pursuant to this Section 5.4, the Sellers and the Purchaser shall negotiate in good faith in an effort to agree upon the amount of such reduction. If the parties are unable to reach agreement within five (5) Business Days after notice of the Loss is given by the Sellers, then the amount of the reduction shall be determined by an independent, qualified insurance adjuster selected by the parties (or, if they are unable to agree on such selection, one appointed by the Bankruptcy Court upon application of either party).

Section 5.5    Regulatory and Other Authorizations; Notices and Consents.

The Purchaser and the Sellers shall each use their commercially reasonable efforts to promptly obtain all waivers, authorizations, notices to proceed, consents, orders and approvals of all Governmental Authorities, officials and other Persons, make all required filings, applications and petitions with, and give all required notices to, the applicable Governmental Authorities and other Persons that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and the Ancillary Agreements and will cooperate fully with the other parties in promptly seeking to obtain all such waivers, authorizations, consents, orders, notices to proceed and approvals.

Section 5.6    Permits and Licenses.

Commencing on the date of this Agreement, the parties, cooperating in good faith, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with Governmental Authorities, as may be necessary (i) to effect the transfer of the Permits and Licenses to the Purchaser on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) to enable the Purchaser to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Business from and after the Closing Date.

Section 5.7    Environmental Related Actions.

Sellers shall, at their own cost and expense to the extent permitted under the DIP Credit Agreement, be responsible for complying with the notice and transfer requirements of any Environmental Laws regarding the Leased Real Property in compliance with, and within the time required under, Environmental Laws. All of the Environmental Permits will be modified or transferred, as the case may be, by the Sellers in compliance with, and within the time required under, Environmental Laws.

Section 5.8    Intellectual Property.

(a)    No later than ten (10) Business Days following the Closing, each Seller shall, and shall cause each of its Affiliates to, except as otherwise consented in writing by the Purchaser, file amendments with the appropriate Governmental Authorities changing its corporate name, "doing business as" name, trade name, and any other similar corporate identifier (each, a "Corporate Name") to a Corporate Name that does not contain any of the Trademarks comprising the Transferred Intellectual Property.

(b)    The Sellers shall assign to the Purchaser the Contracts concerning Licensed Intellectual Property, or otherwise shall obtain for the Purchaser and its Affiliates the right to use

Licensed Intellectual Property, such that, beginning on the Closing Date, the Purchaser and its Affiliates will have valid and enforceable rights to use all Licensed Intellectual Property as it was used by or for the benefit of the Business (including all configurations and customizations thereof) prior to the Closing. Prior to the Closing Date, the Sellers shall obtain (but Purchaser shall pay for) all third party consents necessary to assign such agreements or to obtain such rights.

(c)     On or before the Closing Date, the Sellers shall deliver to the Purchaser all records and information in the Sellers' possession or under the Sellers' control concerning the Owned Intellectual Property, and all copies thereof, including, but not limited to, any license and settlement agreements, the documentation, source code and object code for all computer software, documentation concerning registrations and applications, prosecution histories, correspondence with Governmental Authorities, litigation files relating to infringements, disputes or demands, including opposition and cancellation proceedings, cease and desist and protest letters, and all documents concerning security interests, mortgages, liens and other encumbrances.

Section 5.9    Further Action.

Each party hereto shall use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the Transactions, including using its commercially reasonable efforts to defend any lawsuits or other legal proceedings, whether judicial or administrative, whether brought derivatively or on behalf of third parties (including any Governmental Authority), challenging this Agreement. Without limiting the generality of the foregoing, each of the Sellers shall use (or cause its Affiliates to use) its commercially reasonable efforts to cause its accountants, attorneys, advisors, employees and other representatives to cooperate with the Purchaser in order to consummate and make effective the Transactions. In case at any time after the Closing Date any further action is reasonably necessary or desirable to carry out the purposes of this Agreement, the Sellers and the Purchaser shall take all such necessary action. To the extent that any insurance policies owned or controlled by any Seller covers any loss, Liability, claim, damage or expense resulting from, arising out of, based on or relating to occurrences prior to the Closing with respect to the Business and permits claims to be made thereunder with respect to such losses, Liabilities, claims, damages or expenses after the Closing, the Sellers shall use commercially reasonable efforts to obtain an insurance certificate naming the Purchaser as an additional insured thereunder. The Sellers grant to the Purchaser access to the Sellers' administrative contact for the Sellers' domain names and agrees to make such person available to the Purchaser and its representatives and agents to effectuate the transfer to the Purchaser of such domain names. From and after the Closing, (i) Sellers shall promptly forward to Purchaser any and all payments received by Sellers from customers or any other Persons, which constitute part of the Assets and (ii) Purchaser shall promptly forward to Sellers any and all payments received by Purchaser from customers or any other Persons, which constitute part of the Excluded Assets.

Section 5.10    Tax Cooperation and Exchange of Information.

(a)     The parties hereto will provide the other parties with such cooperation and information as may be reasonably requested in filing any Tax Return, amended Tax Return or claim for refund, determining any liability for Taxes or a right to a refund of Taxes or participating in or conducting any audit or other proceeding in respect of Taxes relating to the Purchased Assets or the Business. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules and related work papers and documents

relating to rulings or other determinations by taxing authorities. Each of the parties will make themselves (and their respective employees) available, on a mutually convenient basis, to provide explanations of any documents or information provided under this Section 5.10(a). Each of the parties will retain all Tax Returns, schedules and work papers and all material records or other documents in its possession (or in the possession of its Affiliates) relating to Tax matters relevant to the Purchased Assets or the Business for the taxable period first ending after the Closing and for all prior taxable periods (the "Tax Documents") until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions, or (ii) six (6) years following the due date (without extension) for such Tax Returns. After such time, before any of the parties shall dispose of any such documents in its possession (or in the possession of its Affiliates), the other party shall be given the opportunity, after 90 days' prior written notice, to remove and retain all or any part of such documents as such other party may select (at such other party's expense). In the event that a Seller is liquidated or otherwise ceases to be a going concern prior to the expiration of the period described in the second preceding sentence, such Seller shall offer the Purchaser the opportunity described in the preceding sentence (with 90 days' prior written notice or such shorter period of notice as may be practicable) to remove and retain Tax Documents and such Seller may then dispose of any such documents not removed by the Purchaser.

(b) The Sellers shall not take any actions (including, but not limited to, filing any Tax Return or amended Tax Return, responding to any audit or inquiry by a taxing authority, or settling or compromising any controversy with a taxing authority) that could affect the Tax Liability of the Purchaser or any of its Affiliates without the prior written consent of the Purchaser, which consent shall not be unreasonably withheld or delayed.

Section 5.11   Conveyance Taxes.

In the event that any Conveyance Taxes (as may be reduced or eliminated pursuant to Section 1146(b) of the Bankruptcy Code and/or the Sale Order entered by the Bankruptcy Court) are assessed on the transfer of the Purchased Assets to the Purchaser, the Purchaser shall pay or cause to be paid such Conveyance Taxes. The Sellers shall timely and duly complete and file all returns and other documents associated therewith at the direction of the Purchaser.

Section 5.12   Nondisclosure.

Neither the Purchaser nor any Seller shall disclose to the public or to any third party any material non-public information concerning or relating to the other parties hereto, other than with the express prior written consent of such other parties, except as may be required by applicable Law (including the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court) or to enforce the rights of such disclosing party under this Agreement or to interested bidders in compliance with the Bidding Procedures Order, in which event the contents of any proposed disclosure shall be discussed with such other parties before release; provided, however, that notwithstanding anything to the contrary contained in this Agreement, any party hereto may disclose such information to (a) any of its directors, officers, employees, stockholders, members, Affiliates, agents and representatives who need to know such information for the sole purpose of evaluating the Transactions, or (b) the SEC or any other Governmental Authority where such disclosure is required under any applicable Law. For the avoidance of doubt, as of the Closing, the Business, the Purchased Assets and the Assumed Liabilities (and any material non-public information with respect thereto) shall be deemed the confidential information of the Purchaser, and the Sellers shall maintain the confidentiality thereof in accordance with the terms of this Section 5.12

but the confidentiality obligations of the Purchaser with respect thereto shall terminate as of the Closing.

Section 5.13    Documents at Closing.

Subject to the terms hereof, each party hereto agrees to execute and deliver on the Closing Date those documents identified in Sections 2.7 and 2.8 to which it is a party.

Section 5.14    Parties' Access to Records After Closing.

Each Seller acknowledges that all customer lists, records and other information pertaining to any Seller, the Business or its customers that are included in the Purchased Assets are proprietary, confidential information and that on and after the Closing, all such lists, records and information shall be the property of the Purchaser. Each of the parties hereto agrees to preserve until December 31, 2012, or the expiration of the applicable statute of limitations for documents necessary to prepare Tax returns, all records in its possession relating to any of the Purchased Assets, Assumed Liabilities or the Business for all time periods hereof ended on or prior to the Closing Date or relating to the transactions contemplated herein. In the event that any party hereto (or their successors) needs and requests access to such records in the possession of any other party hereto relating to any of the Purchased Assets, the Assumed Liabilities or the Business or relating to the Transactions for the purpose of preparing income tax returns or for complying with any audit request, subpoena or other investigative demand by any Governmental Authority or for any civil litigation or any other legitimate purpose not injurious to such other party (including administration of the Sellers' Chapter 11 Cases), such other party will allow such requesting party and its authorized representatives and agents reasonable access to such records during normal business hours at such other party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such requesting party to make extracts and copies thereof as may be necessary or convenient and, if required for such purpose, to have access to and copies of original documents (at such requesting party's expense). Sellers and their successors, including any Bankruptcy Trustee, shall have access to all such information at all times provided for herein.

Section 5.15    Notification of Certain Matters.

Except with respect to the actions required by this Agreement, Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to Sellers, of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would cause any of its representations or warranties in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date and (ii) any material failure of any Seller, on the one hand, or the Purchaser, on the other hand, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement; provided, however, the delivery of any notice pursuant to this Section 5.15 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

Section 5.16    Waiver and Release.

Subject to the entry of the Sale Order, no Seller shall assert, and, at Purchaser's election with respect to any such Avoidance Claim, within 10 days of the Closing each Seller shall waive and release, any and all Avoidance Claims against any vendor, supplier, customer or other Person related to the Purchased Assets or arising out of or in connection with transactions with or for

the benefit of any of the Sellers. In no event shall any Seller waive or release an Avoidance Claim that is included in the Purchased Assets unless the Purchaser shall have consented thereto.

Section 5.17  Compliance with Bidding Procedures Order.

Sellers will comply with all of the terms and conditions of the Bidding Procedures Order.

Section 5.18  Bankruptcy Court Approval.

(a)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval. On the Petition Date, Sellers shall file a motion with the Bankruptcy Court seeking entry of the Bidding Procedures Order and Seller shall use their best efforts to cause a hearing on such motion to be held within 14 days of the Petition Date.

(b)     As soon as reasonably possible after the Parties execute this Agreement, but in any event no later than five Business Days after the Parties execute this Agreement, Sellers shall file the Sale Motion with the Bankruptcy Court, together with required supporting papers and required notices. Sellers shall give prompt notice to Purchaser of (i) any written notice or other written communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated hereby is not likely to be obtained prior to Closing and (ii) any written objection or proceeding that challenges such transactions or the entry of the Sale Order.

(c)     In the event an appeal is taken or a stay pending appeal is requested, with respect to the Bidding Procedures Order or the Sale Order, Sellers shall promptly notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay. Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders. Sellers and Purchaser shall use their best reasonable efforts to defend any such appeal or stay.

From and after the date hereof, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

Section 5.19  Adequate     Assurances     Regarding     Assigned     Contracts     and Assignments of Leased Properties.

With respect to each Assigned Contract and Assignments of Leased Properties, Purchaser will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by Purchaser of each such Assigned Contract and Assignments of Leased Properties. Purchaser and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts and Assignments of Leased Properties, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's and Sellers' employees and representatives available to testify before the Bankruptcy Court.

## ARTICLE VI

## EMPLOYEE MATTERS

Section 6.1     Transferred Employees

(a)     Upon notice to the Sellers' and at mutually agreeable times, the Sellers will permit the Purchaser's representatives to meet with Business Employees prior to the Closing Date. The Purchaser may, at its option, extend offers of employment to all or any of the Business Employees effective as of the Closing Date (or, with respect to employees on approved leave, effective upon return to active duty) (those employees who are offered and accept employment by the Closing Date shall be known as "Transferred Employees"), it being understood that the Purchaser shall have no obligation to employ any of the employees of the Sellers. Purchaser may, at its option, also accept assignment of contracts with all independent contractor drivers that are scheduled in accordance with Section 5.1(a). From and after the execution of this Agreement, the Sellers shall use their best efforts to assist the Purchaser in retaining those employees and independent contractors that are employed or engaged in connection with the Business which the Purchaser wishes to hire or engage and the Sellers will not take any action to preclude or discourage any of the Sellers' employees or independent contractors from accepting any offer of employment or engagement extended by the Purchaser.

(b)     Effective as of the Closing Date, the Purchaser shall, with respect to each Employee Plan of Sellers listed in Section 6.1(b) of the Sellers' Disclosure Schedule, either assume such Employee Plan or adopt a mirror plan or other arrangement providing substantially equivalent benefits to the Transferred Employees (and, with respect to the Sellers' 401(k) plan, allow the Transferred Employees to roll over their current account balances).

(c)     The Sellers shall retain responsibility for and continue to pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Transferred Employee with respect to claims incurred by such Transferred Employees or their covered dependents on or prior to the Closing Date. Expenses and benefits with respect to claims incurred by Transferred Employees or their covered dependents after the Closing Date under Employee Plans assumed by the Purchaser pursuant to Section 6.1(b) shall be the responsibility of the Purchaser. For purposes of this paragraph, a claim is deemed incurred when the services that are the subject of the claim are performed; in the case of life insurance, when the death occurs; in the case of long-term disability benefits, when the disability occurs; and, in the case of a hospital stay, when the employee first enters the hospital.

(d)     Purchaser and Sellers hereby acknowledge that for purposes of IRS Revenue Procedure 2004-53, Purchaser qualifies as a successor employer with respect to any Transferred Employees. In connection with the foregoing, (i) the parties agree to follow the "Alternative Procedures" set forth in Section 5 of IRS Revenue Procedure 2004-53, and (ii) Purchaser shall assume each Seller's obligation to furnish an IRS Form W-2, Wage and Tax Statement, to each Transferred Employee with respect to the calendar year in which the Closing Date occurs.

Section 6.2     No Obligation.

Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the compensation or employee benefits provided to

any individual Transferred Employee (except as may otherwise be provided in any employment agreement). No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of any Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1    Conditions to Obligations of the Sellers.

The obligations of the Sellers to consummate the Transactions shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived by the Sellers (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a)    Representations, Warranties and Covenants. (i) All of the representations and warranties made by the Purchaser in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); (ii) the Purchaser shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by the Purchaser on or prior to the Closing Date; and (iii) with respect to clauses (i) and (ii), at the Closing there shall be delivered to the Sellers a certificate signed by a duly authorized representative of the Purchaser to the foregoing effect.

(b)    Governmental Approvals. All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Authority which are necessary to consummate the Transactions contemplated hereby shall have been filed, been obtained or occurred and such authorizations, consents, orders or approvals shall not have expired or been withdrawn.

(c)    No Order. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise restraining, prohibiting or materially restricting the consummation of such Transactions.

(d)    Sale Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

(e)    Equity Award Agreements; Amendment and Restatement of Operating Agreement. The individuals that are parties to the Severance Agreements listed on Schedule 2.2(a)(vi) (other than any such individual that is not offered or does not accept employment or, in the case of Ted Itzkowitz, engagement as an independent contractor with the Purchaser on the Closing Date) shall have received Equity Award Agreements reflecting common equity allocations determined in accordance with the Participation Agreement, and the awards subject thereto shall in the aggregate represent 20% of the common equity of the Purchaser (reduced by such amount, if any, as is allocated to individuals listed on Schedule 2.2(a)(vi) who are not offered or do not accept

employment or, in the case of Ted Itzkowitz, engagement as an independent contractor with the Purchaser on the Closing Date, which equity shall be reallocated in accordance with the Participation Agreement). The operating agreement of the Purchaser shall have been amended and restated in a manner consistent with the Participation Agreement and the Equity Award Agreements and the Purchaser shall have executed the same.

(f)     Closing Deliveries. Sellers shall have received all of the deliverables of the Purchaser as set forth in Section 2.7.

Section 7.2    Conditions to Obligations of the Purchaser.

The obligations of the Purchaser to consummate the Transactions shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived by the Purchaser (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a)     Representations, Warranties and Covenants. (i) All of the representations and warranties made by the Sellers in this Agreement and in the Ancillary Agreements shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); (ii) each Seller shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by such Seller on or prior to the Closing Date; and (iii) with respect to clauses (i) and (ii), at the Closing there shall be delivered to the Purchaser a certificate signed by a duly authorized representative of each Seller to the foregoing effect.

(b)     Governmental Approvals. All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Authority which are necessary to consummate the transactions contemplated hereby shall have been filed, been obtained or occurred and such authorizations, consents, orders or approvals shall not have expired or been withdrawn. With respect to each Permit and License held by the Sellers as of the date hereof and reasonably necessary to conduct the Business, either (i) such Permit and License shall have been transferred to the Purchaser effective as of the Closing in accordance with applicable Law or (ii) the Purchaser shall have obtained a corresponding Permit and License in its own name.

(c)     No Order. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise restraining, prohibiting or materially restricting the consummation of such Transactions.

(d)     Orders of the Bankruptcy Court. The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order and such Orders shall each have become Final Orders.

(e)     Further Bankruptcy Condition. None of the Chapter 11 Cases shall have been dismissed or converted to a proceeding under chapter 7 of the Bankruptcy Code and no trustee or examiner shall have been appointed.

(f)     No Material Adverse Effect. Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(g)     Equity Award Agreements; Amendment and Restatement of Operating Agreement. The operating agreement of the Purchaser shall have been amended and restated in a manner consistent with the Participation Agreement and the Equity Award Agreements and each recipient of an Equity Award Agreement shall have executed the same.

(h)     Closing Deliveries. The Purchaser shall have received all of the deliverables of the Sellers as set forth in Section 2.8.

(i)     Contracts and Intellectual Property. The Sellers shall have obtained, to the extent necessary to effect the assignment of the Contracts set forth in Section 7.2(i) of the Sellers' Disclosure Schedule and the assignment of the Intellectual Property pursuant to Sections 5.8(b) and 5.8(c), the approval of the Bankruptcy Court pursuant to the Sale Order and/or the consent to the assignment from the applicable counterparties, and the Sellers shall have duly assigned such Contracts and Intellectual Property to the Purchaser and such Contracts and Intellectual Property shall be in full force and effect. The sum of (i) the aggregate Determined Cure Costs for Assigned Contracts and (ii) the Purchaser's good faith estimate of cure costs with respect to leases in respect of Leased Real Property that are anticipated to become, but have not yet become, Assigned Contracts shall not exceed $250,000.

(j)     Permits and Licenses. All Permits and Licenses included in the Purchased Assets shall have been transferred to the Purchaser as legal and beneficial holder thereof, if transferable.

(k)     Release of Liens. To the extent that the Sale Order authorizes the Sellers to file, execute, deliver and/or file Uniform Commercial Code termination statements, lien releases, discharges, financing change statements and such other documents, notices or instruments absent the consent of the holder of a Lien, the Sellers shall have executed, delivered and/or filed such termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as the Purchaser may reasonably deem necessary or desirable to release Liens (other than Permitted Liens) on the Purchased Assets, to the extent they are authorized to do so absent the consent of the holder of the Lien. To the extent the consent of the Existing Lenders or the DIP Lenders is required for the release of its Liens, such consent shall have been obtained.

(l)     Chapter 5 Causes of Action. The Sale Order shall approve the transfer by the Sellers to the Purchaser of all rights, claims, causes of action and Avoidance Claims arising under chapter 5 of the Bankruptcy Code, including, without limitation, under Sections 510 and 544 through 550 of the Bankruptcy Code or under similar state law as part of the Purchased Assets set forth in Section 2.1(a)(xi).

(m)     Absence of Investigations and Proceedings. There shall be no Order or Action before or by any Governmental Authority and no formal investigation by any Governmental Authority pending or promulgated, or to the Sellers' Knowledge, threatened, to which the Purchaser or any Seller is or may be a party that could reasonably be expected to adversely affect, in any material respect, the Business or the Purchased Assets or with the object of challenging or preventing the consummation of the Transactions.

**ARTICLE VIII**

**TERMINATION, AMENDMENT AND WAIVER**

Section 8.1    Termination.

This Agreement may be terminated at any time prior to the Closing:

(a)      by the Sellers, if the Closing shall not have occurred by December 9, 2009, or by the Purchaser, if the Closing shall not have occurred by November 23, 2009; provided, however, that the right to terminate this Agreement under this Section 8.1(a) shall not be available to any party whose failure (or in the case of the Sellers as the determining party, any Seller's failure) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date;

(b)      by either the Purchaser or the Sellers in the event that any Order restraining, enjoining or otherwise prohibiting the Transactions shall have become a Final Order;

(c)      by the Purchaser by written notice to the Sellers (i) if any event occurs or condition exists which would render impossible the satisfaction of one or more conditions to the obligations of the Purchaser to consummate the transactions contemplated by this Agreement as set forth in Section 7.2, or (ii) in accordance with Section 5.4;

(d)      by the Sellers by written notice to the Purchaser if any event occurs or condition exists which would render impossible the satisfaction of one or more conditions to the obligations of the Sellers to consummate the transactions contemplated by this Agreement as set forth in Section 7.1;

(e)      by the Purchaser if there has occurred a material misrepresentation or other material breach by any Seller of its representations, warranties or covenants set forth herein; provided, however, that if such breach is susceptible to cure, the breaching party or parties shall have ten (10) calendar days after receipt of written notice (which notice includes a summary description of such breach) from the Purchaser of its intention to terminate this Agreement if such breach continues in which to cure such breach;

(f)      by the Sellers if there has occurred a material misrepresentation or other material breach by the Purchaser of its representations, warranties or covenants set forth herein or in any Ancillary Agreement to which the Purchaser is a party; provided, however, that if such breach is susceptible to cure, the Purchaser shall have ten (10) calendar days after receipt of written notice (which notice includes a summary description of such breach) from the Sellers of its intention to terminate this Agreement if such breach continues in which to cure such breach;

(g)      by the Purchaser if (i) any Seller proposes or announces any plan of reorganization or liquidation other than a plan that contemplates a sale of all or substantially all of the assets of the Business to the Purchaser, or if any Seller shall withdraw or seek to withdraw or fail to file its motion seeking approval of the transactions contemplated hereby, or (ii) the Bankruptcy Court approves the sale, transfer or other disposition to a purchaser of all or substantially all of the Sellers' assets relating to the Business other than in a sale to the Purchaser pursuant to the transactions contemplated by this Agreement;

(h)     by either the Sellers or the Purchaser, upon confirmation of any plan of reorganization or liquidation other than a plan that contemplates a sale of all or substantially all of the assets of the Business to the Purchaser;

(i)     by the Purchaser, if prior to the Closing any Case 11 Case is converted from a case under Chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code without the prior written consent of the Purchaser;

(j)     by the Purchaser, (i) if the Bidding Procedures Order shall not have been entered by the Bankruptcy Court on or prior to the seventeenth (17th) day after the date hereof or if the Sale Order shall not have been entered by the Bankruptcy Court on or prior to the forty-fifth (45th) day after the date hereof or (ii) if any such Order shall fail to be in full force and effect after entry or shall have been stayed, reversed, modified or amended in any material respect without the prior written consent of the Purchaser; or

(k)     by the written consent of each of the Sellers and the Purchaser.

Section 8.2     Effect of Termination.

(a)     In the event that this Agreement shall be terminated pursuant to Section 8.1, all further obligations of the parties under this Agreement shall terminate; provided that the obligations of the parties contained in Sections 5.12, Sections 10.1 through 10.14 and this Section 8.2 shall survive any such termination. In no event shall the Purchaser be entitled to surcharge any collateral subject to the Lien of the Burdale Credit Agreement or the DIP Credit Agreement pursuant to Section 506(b) or 552 of the Bankruptcy Code in respect of the Break-Up Fee or the Expense Reimbursement.

(b)     If this Agreement is terminated pursuant to Section 8.1(e) (even if another paragraph of Section 8.1 is also the basis for termination by the Purchaser), Section 8.1(i) or Section 8.1(j), then, within five (5) Business Days after such termination, Seller shall pay to Purchaser the Expense Reimbursement;

(c)     If this Agreement is terminated pursuant to Section 8.1(g) or Section 8.1(h) then upon the earlier of (i) ten (10) days after such termination and (ii) the consummation of any such sale, transfer, disposition, plan or liquidation (or within ten (10) days after any such withdrawal or seeking to withdraw its motion seeking approval of the transactions contemplated hereby), Seller shall pay to Purchaser the Break-Up Fee and the Expense Reimbursement;

(d)     The parties agree that the Purchaser would be substantially damaged in any event requiring the payment of the Break-Up Fee, that the precise amount of such damage would be impossible or difficult to determine, and that the amount of the Break-Up Fee represents a reasonable estimate of such damages. Any payment of the Break-Up Fee would constitute liquidated damages and not a penalty. The provisions herein as to the payment of the Break-Up Fee and the Expense Reimbursement were material inducements to the Purchaser entering into this Agreement. Any payments of the Breakup Fee or Expense Reimbursement under this Section 8.2 shall be made by Seller by wire transfer of immediately available funds to an account designated in writing by Purchaser.

(e)     The Sellers acknowledge and agree that the Break-Up Fee and the Expense Reimbursement are actual necessary costs and expenses of preserving the Business within the

meaning of Section 503 of the Bankruptcy Code and shall constitute administrative expenses pursuant to Section 503(b) of the Bankruptcy Code.

Section 8.3    Limitation on Damages. In no event shall the Purchaser be liable in respect of any breach or alleged breach of this Agreement for (a) damages or other monetary remedies in excess of the difference between (i) $5 million and (ii) the sum of (A) the amount of the outstanding Obligations (as defined in the DIP Credit Agreement) that are guaranteed by the ComVest Guaranty and (B) any amounts previously paid by CIP III or its affiliates in respect of the ComVest Guaranty (including the amount of any cash collateral or letter of credit for so long as the same shall be maintained), (b) any punitive, exemplary or special damages  or (c) any non-monetary remedies.

## ARTICLE IX

### NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES

The representations and warranties contain in this Agreement and the other agreements and documents executed in connection herewith shall not survive the Closing.

## ARTICLE X

### GENERAL PROVISIONS

Section 10.1    Expenses.

Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred. As between the Purchaser and the Sellers, the Sellers shall bear all of the costs of administration of the Chapter 11 Cases. Upon entry of a Final Order determining the amount of the carveout for professional fees and the payment of all such fees, U.S. Trustee fees and any other wind-down costs approved by a Final Order, the remainder of the Cash Portion, if any, shall be remitted to the Purchaser.

Section 10.2    Notices.

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for any party as shall be specified by such party in a notice given in accordance with this Section 10.2):

(i)    if to the Sellers:

Velocity Express Corporation
One Morningside Drive North
Building B, Suite 300
Westport, CT 06880
Facsimile: (203) 349-4199
Attention: Vincent Wasik, CEO

with a copy to:

Lowenstein Sandler LLP
65 Livingston Avenue
Roseland, New Jersey 07068-1791
Facsimile:     (973) 597-2549
Attention:     Kenneth Rosen, Esq.

(ii)     if to the Purchaser:

ComVest Velocity Acquisition I, LLC
525 Okeechobee Blvd., Suite 1050
West Palm Beach, FL 33401
Facsimile: (561) 727-2100
Attention: Jose Gordo

with a copy to:

Akerman Senterfitt LLP
335 Madison Avenue
Suite 2600
New York, New York 10017
Facsimile: (212) 880-8965
Attention: Kenneth G. Alberstadt, Esq.

Section 10.3   Public Announcements.

Neither the Purchaser, on the one hand, nor any of the Sellers, on the other hand, shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the Transactions, or otherwise communicate with any news media without the prior written consent of the Sellers or the Purchaser, respectively, except as otherwise required by Law, applicable stock exchange regulation or in filings in the Bankruptcy Court or office of the United States trustee, and the parties to this Agreement shall cooperate as to the timing and contents of any such press release, public announcement or communication.

Section 10.4   Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the

parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 10.5 <u>Entire Agreement</u>.

This Agreement (including the Exhibits hereto) and the Ancillary Agreements constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, among the Sellers and the Purchaser with respect to the subject matter hereof and thereof.

Section 10.6 <u>Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in respect of the Sellers in the Chapter 11 Cases) and permitted assigns, but shall not be assignable or delegable by the Sellers (other than as part of a bona fide security agreement or collateral assignment entered into in connection with the Burdale Credit Agreement or the DIP Credit Agreement or pursuant to the exercise of remedies by the Existing Lenders or the DIP Lenders thereunder) without the prior written consent of the Purchaser and by Order of the Bankruptcy Court. The Purchaser may assign this Agreement or any of its rights or obligations hereunder to an affiliate of the Purchaser without the consent of the Sellers and the Purchaser shall have no further liability in respect of the rights or obligations so assigned; provided that such assignee shall assume all such rights or obligations of the Purchaser hereunder. Sellers agree to enter into such amendments to, or restatements of, this Agreement and the exhibits hereto as may be reasonably required to give effect to this <u>Section 10.6</u>, so long as such amendments or restatements do not adversely affect the rights of Sellers hereunder or thereunder.

Section 10.7 <u>Amendment</u>.

This Agreement may not be amended or modified except (a) (i) by an instrument in writing signed by, or on behalf of, the Sellers and the Purchaser or (ii) by a waiver in accordance with <u>Section 10.8</u>; and, (b) to the extent such amendment or modification is material, by an Order of the Bankruptcy Court.

Section 10.8 <u>Waiver</u>.

Any Seller, on the one hand, or the Purchaser, on the other hand, may: (a) extend the time for the performance of any of the obligations or other acts of the other; (b) waive any inaccuracies in the representations and warranties of the other contained herein or in any document delivered by the other pursuant hereto; or (c) waive compliance with any of the agreements or obligations of the other contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

Section 10.9  No Third Party Beneficiaries.

This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

Section 10.10  Governing Law.

This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York and, to the extent applicable, the Bankruptcy Code. The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the Transactions and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (a) agrees that all such actions or proceedings shall be heard and determined in a federal court sitting in New York; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by Section 10.2 to such party at its address as provided in Section 10.2 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law).

Section 10.11  Waiver of Jury Trial.

EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

Section 10.12  Currency.

Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

Section 10.13 <u>Construction</u>.

The parties hereto and their respective legal counsel participated in the preparation of this Agreement, and therefore, this Agreement shall be construed neither against nor in favor of any of the parties hereto, but rather in accordance with the fair meaning thereof.

Section 10.14 <u>Counterparts</u>.

This Agreement may be executed and delivered (including by facsimile transmission or in pdf format) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. A signature page delivered by facsimile or pdf format shall be deemed the same, and equally enforceable, as an original.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**VELOCITY EXPRESS CORPORATION**

By: _____
Name: _____
Title: _____

**VELOCITY EXPRESS, INC.**

By: _____
Name: _____
Title: _____

**VELOCITY EXPRESS LEASING, INC.**

By: _____
Name: _____
Title: _____

**CD&L, INC.**

By: _____
Name: _____
Title: _____

**VXP MID-WEST, INC.**

By: _____
Name: _____
Title: _____

**VXP LEASING MID-WEST, INC.**

By: _____
Name: _____
Title: _____

**CLAYTON/NATIONAL COURIER SYSTEMS, INC.**

By: _____
Name: _____
Title: _____

**CLICK MESSENGER SERVICE, INC.**

By: _____
Name: _____
Title: _____

**OLYMPIC COURIER SYSTEMS, INC.**

By: _____
Name: _____
Title: _____

**SECURITIES COURIER CORPORATION**

By: _____
Name: _____
Title: _____

**U-SHIP INTERNATIONAL, LTD.**

By: _____
Name: _____
Title: _____

**SILVER STAR EXPRESS, INC.**

By: _____
Name: _____
Title: _____

**VELOCITY SYSTEMS
FRANCHISING CORPORATION**

By: _____
Name: _____
Title: _____

**COMVEST VELOCITY ACQUISITION I, LLC**

By: _____

Name: <u>Jose Gordo</u>

Title: <u>President</u>